UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OPENLANDS, MIDEWIN HERITAGE | ) | |
| ASSOCIATION, AND SIERRA CLUB, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 13 C 4950 |
| v. | ) | |
| | ) | Judge Guzman |
| UNITED STATES DEPARTMENT OF | ) | |
| TRANSPORTATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER

Defendant United States, by its attorney, Gary S. Shapiro, United States Attorney for the

Northern District of Illinois, answers the complaint as follows:

### First Defense

Plaintiffs lack standing to bring some or all of the claims raised in their Complaint.

### Second Defense

Plaintiffs have failed to state a claim under NEPA, Section 4(f) of the Department of

Transportation Act, and the Administrative Procedures Act.

### Third Defense

Answering the specific allegations of the complaint, the defendant admits, denies, or

otherwise avers as follows:

1.       This action challenges the Defendants' violations of the National Environmental
Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, Section 4(f) of the Department of Transpiration
Act ("Section 4(f)), 42 U.S.C. § 3030 and 23 U.S.C. § 138; and the Administrative Procedure
Act ("APA"), 5 U.S.C. §§ 553-559 and §§ 701-706, in connection with Defendant FHWA's
approval of a Tier 1 FEIS and ROD for the proposed Illiana Expressway in northeastern Illinois
and northwestern Indiana. Plaintiffs are citizens' groups whose members live in the area of the
tollroad corridor, enjoy recreational activities in the vicinity of the tollroad corridor that may be

affected adversely by the proposed tollroad, and support environmentally and fiscally responsible transportation solutions in the vicinity of the tollroad corridor.

**Answer:** The allegations in the first sentence constitute Plaintiffs' characterization of this action, to which no response is required. Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in the second sentence and therefore deny the allegations on that basis.

2. The Illiana Expressway is a proposed new 46.8 mile tolled expressway in the exurban edge of the Chicago metropolitan area. This tollroad would run east-west from Interstate 55, near Wilmington, Illinois into southwestern Will County, Illinois, to Interstate 65, near Lowell, Indiana in Lake County.

**Answer:** Defendants deny the allegations insofar as the proposed project is to be tolled and named the "Illiana Expressway." Rather, the project study is named "Illiana Corridor." Defendants deny that the proposed alignment is final and aver that the corridor was selected based on a working alignment within the corridor.

3. Defendants currently estimate that the Illiana Expressway would cost at least $1.25 billion. The new tollroad would cut through a corridor that currently is almost entirely farmland and open land, causing the loss of over 1,500 acres of prime farmland, 65 acres of forests, and 34 acres of wetlands.

**Answer:** Defendants deny the allegations insofar as the proposed project is to be named the "Illiana Expressway." Defendants admit the current cost estimate for the proposed project is $1.25 billion. Defendants deny the allegations in the second sentence.

4. The proposed new tollroad would cut across rivers and other waterways more than 30 times, degrading the quality of these waterways, and require the construction of new bridges over the Kankakee River and other rivers and waterways.

**Answer:** Defendants deny the allegations.

5. The proposed new tollroad would be built along the southern border of the Midlewin National Tallgrass Prairie ("Midewin"), which was established in 1996 by the United States Congress as the first national tallgrass prairie in the country. Midewin covers 18,225 acres, and it is the largest open space in the Chicago metropolitan area and northeastern Illinois. The Midlewin National Tallgrass Prairie was created to conserve and enhance native populations

and habitats of fish, wildfire and plants and provide a variety of recreational and research opportunities. Midelwin's role in providing habitat for prairie wildlife is ecologically vital because less than 0.01 percent of Illinois' original 22 million acres of prairie remain. Car and truck traffic on and around the proposed new tollroad, was well as population growth and development induced by the new tollroad, would harm the Midewin National Tallgrass Prairies natural resources and other important natural and cultural resources.

**Answer:** Defendants deny that they have decided whether the corridor would be tolled. The allegations purporting to characterize Midewin require no response. Defendants deny the allegations in the last sentence.

6. On January 17, 2013, Defendant FHWA approved a Tier I FEIS and ROD for the Illiana Expressway. *See* 78 Fed. Reg. 9771 (February 11, 2013). These final federal actions are part of the tiered environment review process under NEPA and its implementing regulations and determined certain issues relating to the proposed new tollroad, including the purported "purpose and need" for the new tollroad and a preferred corridor for the Project, identified as "Alternative B3".

**Answer:** Defendants deny the allegations insofar as the proposed project is to be tolled and named the "Illiana Expressway." Defendants otherwise admit the allegations of the first sentence. Defendants deny the allegations in the second sentence.

7. Defendants violated NEPA and Section 4(f), in part, because they acted arbitrarily and capriciously, abused their discretion and acted contrary to law by relying on inflated population and employment forecasts for the Illiana Expressway study area. These inflated forecasts, in turn, became the basis for inflated traffic projects used to establish the proposed new tollroad' s purpose and need, and for evaluating alternatives to fulfill that need. As a result, Defendants were unable to conduct a rigorous exploration and objective evaluation of the alternatives as required by NEPA and other federal laws. 42 U.S.C. § 4322(2)(C); 5 U.S.C. § 702; *see Sierra Club v. U.S. Dep't of Transp.*, 926 F. Suppl. 1037, 1043(N.D. Ill.1997).

**Answer:** Defendants deny the allegations contained in Paragraph 7.

8. During the environment study process, a number of stakeholders expressed concern regarding Defendants' reliance on these inflated population and employment forecasts, among them the Chicago Metropolitan Agency for Planning ("CMAP"). CMAP is the designated metropolitan planning organization for northeastern Illinois. Among other federally and state-mandated responsibilities, CMAP makes official population and employment forecasts for the Northeastern Illinois region that are used for transportation and other regional planning purposes. CMAP's official forecasts showed much less robust growth in the study area than the forecasts relied upon by Defendants. CMAP's comments during the environmental study process are attached as Exhibit A.

**Answer:** Defendants deny the allegations contained in the first two sentences of

Paragraph 8. Defendants admit the last sentence of Paragraph 8.

9. Defendants also failed to adequately analyze Alternative B3's environmental impacts by ignoring or deferring study of significant area wide impacts. As a result of these errors, Defendants were unable to conduct a rigorous exploration and objective evaluation of the alternatives to and for the Illiana Expressway as required by NEPA and other federal laws. 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 702.

**Answer:** Defendants deny the allegations contained in Paragraph 9.

10. Defendants' approvals and other actions should be reversed and remanded to avoid causing irreparable harm to natural resources and environmental quality, to the Plaintiff organizations and their members; use and enjoyment of the Midewin National Tallgrass Prairie and other resources, to the NEPA process, and to the public in the manner described herein. Plaintiffs respectfully request that the Court enter an Order: (1) Declaring that the Defendants violated NEPA, Section 4(f) and the APA in approving the Tier 1 FEIS and ROD for the proposed Illiana Expressway; (2) Declaring that the Defendants' approval of the Tier 1 FIER and ROD was arbitrary and capricious, an abuse of discretion, and contrary to law; (3) Vacating, setting aside, reversing and remanding the TIER 1 FEIS and ROD; (4) Enjoining Defendants from using the Tier 1 decisions in subsequent proceedings, including decisions whether to grant licenses, permits, and approvals for the proposed Illiana Expressway unless and until the Defendants fully comply with the requirements of NEPA, Section 4(f) and the APA; (5) Directing that the Plaintiffs be allowed to recover their costs, including reasonable attorneys' fees, incurred in connection with this action, as provided for under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable laws; and (6) Providing such other and further relief as the Court may deem just and proper and in the public interest.

**Answer:** Defendants deny the allegations contained in Paragraph 10.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331(federal question), 2201 (declaratory relief), and Section 2202 (injunctive relief), as this action presents cases and controversies under the National Environment Policy Act, Department of Transportation Act, and Administrative Procedure Act.

**Answer:** Defendants admit the allegations in Paragraph 11 but deny any legal

conclusions contained therein.

12. Venue is proper in this Court pursuant to 28 U.S.C. § Section 1391(b) and (e), because the proposed Illiana Expressway lies mostly within the Northern District of Illinois, and because all of the Plaintiffs, as well as Defendants, are present in and do business in the Northern

District. Furthermore, a substantial portion of the events or omissions giving rise to the claims stated herein occurred in the Northern District. FHWA, in consultation with the Illinois and Indiana Department of Transportation ("IDOT" and "INDOT"), respectively) prepared the unlawful Tier 1 FEIS and ROD and violated the laws at issue in this Complaint.

**Answer:**    Defendants admit the allegations contained in Paragraph 12.

13.    Plaintiffs have no adequate remedy at law. The relief of Plaintiffs seek will redress the injuries to their members, and unless this Court grants the requested relief, the Defendants' actions will cause irreparable harm to the environment and natural resources, to Plaintiff's and their members; interests, including their members; use and enjoyment of the affected land and natural resources, and to the public in violation of federal laws and contrary to the public interest. No monetary damages or other legal remedy could adequately compensate Plaintiffs, their members, or the public for these harms. Considering the balance of hardships between the Plaintiffs and Defendants, a remedy in equity is warranted.

**Answer:**    Defendants deny the allegations contained in Paragraph 13.

14.    Plaintiffs and their members are persons adversely affected or aggrieved by federal agency action within the meaning of Section 702 of the Administrative Procedure Act. 5 U.S.C. § 702.

**Answer:**    Defendants lack sufficient knowledge or information to form a belief as to

the truth of the allegations in therefore denies the allegations on that basis.

15.    On February 11, 2013, pursuant to 23 U.S.C. § 139(1)(1), Defendant FHWA published a notice in the Federal Register stating that any claim seeking judicial review of federal agency actions related to the Tier 1 FEIS and ROD would be barred unless the claim is filed on or before July 11, 2013. This Complaint was filed on July 10, 2013, and therefore is not time-barred under 23 U.S.C. § 139(1)(1).

**Answer:**    Defendants deny the allegations in Paragraph 15.

16.    Plaintiff Openlands is a not-for-profit corporation organized and existing under the laws of the State of Illinois. Openlands and its members use and enjoy and work to protect and conserve natural and open spaces in northeastern Illinois and the surrounding region to ensure cleaner air and water, to protect natural habitats and wildlife and to help balance and enrich Illinoisans' lives. Openlands and its members have been instrumental in forming, restoring and improving access to the Midewin National Tallgrass Prairie's landscapes for the use and enjoyment of its members and the public at large. Openlands has approximately 3000 members. Openlands has members living in the area of the proposed Illiana Expressway, and they use and enjoy the land and natural areas that would be affected and degraded by the proposed new tollroad construction and operation, related car and truck traffic and induced development. Specifically, Openlands' members enjoy activities such as hiking, paddling, and volunteering, monitoring, stewarding and restoring natural areas at Midewin. The Defendants;

actions in issuing the Tier 1 FEIS and ROD and their other related actions and omissions, as set forth in this Complaint, will irreparably harm Openlands and its members, and the construction and operation of the Illiana Expressway would significantly impair members, use and enjoyment of the affected land and natural resources. Openlands participated in and commented extensively in administrative proceedings concerning the proposed Illiana Expressway and the violations of federal laws raised here.

   **Answer:**      Defendants lack sufficient knowledge or information to form a belief as to

the truth of the allegations contained in Paragraph 16 and therefore deny the allegations on that

basis.

   17.      Plaintiff Midewin Heritage Association ("MHA") is a not for profit corporation organized and existing under the laws of the State of Illinois. MHA"s purpose is to promote an understanding of the cultural and natural history of the land which, today, is the Midewin National Tallgrass Prairie, along with those surrounding areas having a historical connection to this land. MHA's objectives include increasing the public's awareness of Midewin' s history and promoting the preservation of historically significant sites, structures and artifacts. MHA promotes the use and enjoyment of Midewin as a recreational resource. MHA has approximately 40 individual members and organizational members, which, in tum, have many additional individual members. MHA's members use and enjoy the land and natural areas that would be affected and degraded by the proposed Illiana Expressway. Specifically, MHA members enjoy activities such as leading, and participating in, heritage tours at Midewin. The Defendants' actions in issuing the Tier 1 FEIS and ROD and their other related actions and omissions, as set forth in this Complaint, will irreparably harm MHA and its members, and the construction and operation of the Illiana Expressway would significantly impair members' use and enjoyment of the affected land and natural resources. MHA participated in and commented extensively in administrative proceedings concerning the proposed Illiana Expressway and the violations of federal laws raised here.

   **Answer:**      Defendants lack sufficient knowledge or information to form a belief as to

the truth of the allegations contained in Paragraph 17 and therefore deny the allegations on that

basis.

   18.      Plaintiff Sierra Club is a not-for-profit corporation organized and existing under the laws of the State of California. The Sierra Club is a national environmental organization with more than 596,000 members, with offices and programs authorized and doing business in the States of Illinois and Indiana. More than 22,000 of these members live in the State of Illinois and more than 7,600 in the State of Indiana. The Sierra Club's purpose is to protect the natural environment and promote the responsible use of the Earth's ecosystems and resources. The Sierra Club has members living in the area of the proposed Illiana Expressway, and they use and enjoy the land and natural areas which would be affected and degraded. Specifically, the Sierra Club's

members enjoy such activities as birdwatching, hiking, bicycling and volunteering at the Midewin National Tallgrass Prairie, and bicycling on the adjacent Wauponsee Glacial Trail. The Defendants' actions in issuing the Tier 1 FEIS and ROD and their other related actions and omissions, as set forth in this Complaint, will irreparably harm the Sierra Club and its members, and the construction and operation of the Illiana Expressway would significantly impair members' use and enjoyment of the affected land and natural resources. The Sierra Club participated in and commented extensively in administrative proceedings concerning the proposed Illiana Expressway and violations of federal laws raised here.

**Answer:** Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 18 and therefore deny the allegations on that basis.

19. Defendant United States Department of Transportation ("U.S. DOT") is an executive department of the United States Government. Its duties include ensuring the coordinated and effective administration of the transportation programs of the United States Government and encouraging cooperation of Federal, State and local governments to achieve transportation objectives. 49 U.S.C. § 10l(b).

**Answer:** Defendants admit the allegations contained in Paragraph 19.

20. Defendant Anthony Foxx is the Secretary of the U.S. DOT. Secretary Foxx oversees the activities of the U.S. DOT and its agencies, including the Federal Highway Administration. Secretary Foxx is sued in his official capacity.

**Answer:** Defendants admit the allegations contained in Paragraph 20.

21. Defendant Federal Highway Administration ("FHWA") is an agency within the U.S. DOT. Among other things, FHWA is required to ensure compliance with NEPA before approving the proposed Illiana Expressway and other such transportation projects. FHWA is responsible for overseeing the preparation of Environmental Impact Statements, reviewing Environmental Impact Statements to determine their compliance with NEPA and other federal laws and, when lawful and appropriate, approving or denying Environmental Impact Statements in the form of written Records of Decision. FHW A, through its office in Springfield, Illinois, issued the Tier I FEIS and ROD challenged in this action.

**Answer:** Defendants admit the allegations contained in the first, second, and fourth sentences of Paragraph 21. Defendants deny all remaining allegations and legal conclusions contained therein.

22.     Defendant Victor M. Mendez, the Administrator of the FHWA, is the director of FHWA. He oversees the activities of FHWA and its various divisions. Administrator Mendez is sued in his official capacity.

**Answer:**     Defendants deny that Victor M. Mendez is the "director" of FHWA.

Defendants aver he is the Administrator of the agency. Defendants admit the remaining

allegations.

23.     Defendant Catherine Batey, Division Administrator of FHWA, is the director of FHWA's Illinois Division. Administrator Batey oversees the activities of the Illinois Division, including the preparation and approval of Environmental Impact Statements and the issuance of Records of Decision. Administrator Batey is sued in her official capacity.

**Answer:**     Defendants deny that Catherine Batey is the "director" of FHWA's Illinois

Division. She is the Administrator of the FHWA Illinois Division. Defendants admit the

remaining allegations.

## APPLICABLE LAW

### The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

24.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.l(a). NEPA seeks to protect the environment by ensuring that public officials "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.l(c).

**Answer:**     Defendants admit the allegations contained in Paragraph 24, but deny any

legal conclusions contained therein.

25.     NEPA requires all federal agencies to prepare a detailed Environmental Impact Statement ("EIS") on every proposal for a major federal action which will or may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). NEPA defines the required elements of an EIS, which must include a detailed discussion of:

(i)     the environmental impact of the proposed action;
(ii)    any adverse environmental effects which cannot be avoided should the proposal be implemented;
(iii)   alternatives to the proposed action;
(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

          (v)       any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

**Answer:**      Defendants admit the allegations contained in Paragraph 25, but deny any legal conclusions contained therein.

26.    NEPA requires federal agencies to study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. § 4332(2)(E); *Sierra Club v. U.S. Dep 't of Transp.,* 962 F. Supp. 1037, 1042 (N.D. Ill. 1997).

**Answer:**      Defendants admit the allegations contained in Paragraph 26, but deny any legal conclusions contained therein.

27.    NEPA regulations further require that an agency must identify the purpose and need of the proposed action in its EIS, 40 C.F.R. § 1502.13; must "rigorously explore and objectively evaluate all reasonable alternatives" for achieving the general goals of the proposed action, 40 C.F.R. § 1502.14(a); and must thoroughly analyze the environmental impacts of the proposed action and alternatives, 40 C.F.R. § 1502.16.

**Answer:**      Defendants admit the allegations contained in Paragraph 27, but deny any legal conclusions contained therein.

28.    The environmental impacts that an EIS must consider include "indirect" impacts, including "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems," 40 C.F.R. § 1508.8(b), and "cumulative" impacts which result from incremental impact of the proposed action when combined with other past, present, and reasonably foreseeable future actions. 40 C.P.R. § 1508.7. *See North Carolina Wildlife Federation* v. *North Carolina Dep 't of Transp.,* 677 P.3d 596, 602 (4th Cir. 2012).

**Answer:**      Defendants admit the allegations contained in Paragraph 28, but deny any legal conclusions contained therein.

29.    An EIS also must evaluate "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local ... land use plans, policies and controls for the area concerned." 40 C.P.R. § 1502.16(c). "Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.P.R. § 1506.2(d).

**Answer:** Defendants admit the allegations contained in Paragraph 29, but deny any legal conclusions contained therein.

30. PHWA's NEPA regulations provide that a NEPA study may, when appropriate, proceed in "tiers." At the first tier of study, PHWA is to consider "broad issues such as general location, mode choice, and areawide air quality and land use implications of the major alternatives." 23 C.F .R. § 771.111 (g). FHWA is then to address "site-specific details" at the second tier. *Id.*

**Answer:** Defendants admit the allegations contained in Paragraph 30, but deny any legal conclusions contained therein.

### Section 4(f) of the Transportation Act, 49 U.S.C. § 303 and 23 U.S.C. § 138

31. Section 4(f) of the Transportation Act establishes as a national policy that "special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a); 23 U.S.C. § 138(a). In order to achieve this national policy, Section 4(f) prohibits the U.S. Secretary of Transportation from approving any "transportation program or project ... requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site)" unless "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c); *see also* 23 U.S.C. § 138.

**Answer:** Defendants admit the allegations contained in Paragraph 31, but deny any legal conclusions contained therein.

32. FHWA regulations implementing Section 4(t) define "use" to include both actual use and "constructive" use. 23 C.F.R. § 774.17. Actual use occurs when "land is permanently incorporated into a transportation facility." *!d.* "Constructive" use occurs when "the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(t) are substantially impaired." 23 C.F.R. § 774.15.

**Answer:** Defendants admit the allegations contained in Paragraph 32, but deny any legal conclusions contained therein.

### The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553-559, 701-706

33. The APA provides for judicial review of final agency actions, such as those at issue here. A reviewing court shall hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

**Answer:** Defendants admit the allegations contained in Paragraph 33, but deny any

legal conclusions contained therein.

## FACTUAL BACKGROUND

### The Proposed New Illiana Expressway and Its Impacts

34. The proposed new Illiana Expressway would be built through a corridor at the exurban edge of the Chicago metropolitan area that is now almost entirely agricultural lands, low-density residential homes, and open and natural spaces. Construction of the proposed new tollroad would destroy thousands of acres of farmland and change population growth and traffic patterns in a manner that would also threaten the long-term viability of the Midewin National Tallgrass Prairie.

**Answer:** The allegations contained in Paragraph 34 purport to characterize the

Project description, which speaks for itself and is the best evidence of its contents. Defendants

deny all legal conclusions contained therein.

35. Attached as Exhibit B is a map showing the three final expressway corridor alternatives surrounding the Midewin National Tallgrass Prairie, as they were described in the Tier I FEIS, including the selected Alternative B3 corridor. The large green area on the western end of the study area is the Midewin National Tallgrass Prairie.

**Answer:** The allegations purport to characterize Exhibit B to the Complaint, which

speaks for itself and is the best evidence of its contents.

36. The proposed Alternative B3 corridor is located less than a mile south of the Midewin National Tallgrass Prairie.

**Answer:** Defendants admit the allegations but deny any legal conclusions contained

therein.

37. The proposed Alternative B3 corridor is about 10 to 15 miles south of existing developed residential and commercial communities in northern Will County.

**Answer:** The allegations lack sufficient definition as to what constitutes "about 10 to 15 miles," "existing developed residential and commercial communities," and "northern Will County," making it impossible to provide an accurate response admitting or denying the allegations. To the extent a response is required, Defendants deny the allegations.

38. The proposed new Illiana Expressway would likely induce significant new nearby commercial, industrial, and residential development, changing the character of an area dominated by farming and natural spaces and attracting new "sprawl" development to the exurban, outlying edge of the Chicago metropolitan area.

**Answer:** Defendants deny the allegations.

39. The proposed new Illiana Expressway would likely induce new traffic onto the north-south Illinois Route 53, which runs through the Midewin National Tallgrass Prairie in an area used as habitat by grasslands birds and passes by the entrance to the Abraham Lincoln National Cemetery, a federal military cemetery. Illinois Route 53, itself, is also a historic resource listed as Alternate Route 66 in the National Register of Historic Places, and designated by Defendant FHWA as a Federal Scenic Byway.

**Answer:** Defendants deny the allegations contained in the first sentence. As to the second sentence, Defendants deny that Illinois Route 53 was designated by FHWA as a Federal Scenic Byway; the U.S. Secretary of Transportation has the authority to make said designation. Defendants admit the remaining allegations but deny any legal conclusions contained therein.

**Development of the Illiana Expressway Project's Purpose and Need**

40. On June 8, 2011, Defendant FHWA published a Notice of Intent ("NOI") in the *Federal Register* (76 Fed. Reg. 33,401), announcing the initiation of the NEPA review process for "the Illiana Corridor Project." The environmental study process was divided into two tiers. Tier 1 was to include a "broad analysis" of project alternatives and conclude with the selection of a preferred corridor. Tier 2 would include more detailed environmental analyses of the preferred corridor.

**Answer:** Defendants admit the allegations.

41. On or about December 1, 2011, IDOT and INDOT released a Draft Transportation System Performance Report and a Draft Purpose and Need Statement for the proposed Illiana Expressway. The documents identified a project "study area" south of Interstate 80 (an existing east-west connector), including approximately 950 square miles of portions of

southern Will County and northern Kankakee County in Illinois and southern Lake County in Indiana.

**Answer:** The allegations purport to characterize a Draft Transportation System Performance Report and Draft Purpose and Need Statement, which speak for themselves and are the best evidence of their contents.

42. The Draft Purpose and Need Statement set out three broad project needs: (1) Improving regional mobility; (2) Addressing local system deficiencies; and (3) Providing for efficient movement of truck freight.

**Answer:** The allegations purport to characterize the Draft Purpose and Need Statement, which speaks for itself and is the best evidence of its contents. Federal defendants aver that said "Draft" was developed based on stakeholder input and circulated for public and participating agency comment in accordance with 23 U.S.C. § 139.

43. Both the Draft Transportation System Performance Report and the Draft Purpose and Need Statement were premised on high expected future population and employment growth in the project study area focused on Will County, Illinois. IDOT and INDOT relied on regional population forecasts for the year 2040 produced by a consultant retained by IDOT, which was proposing to build the new Illiana Expressway. The consultant forecasted a baseline population growth of over 170%, and employment growth of over 220%, in the project study area between 2010 and 2040. By contrast, the consultant forecasted population and employment growth of 29% and 35%, respectively, during the same period, for the overall eighteen-county northeastern Illinois and northwestern Indiana region.

**Answer:** Defendants deny the allegations contained in Paragraph 43.

44. The consultant's forecasts of rapid population growth for the project study area are not consistent with United States Census Bureau's official data showing that Will County, the primary driver for growth in the consultant's forecasts, has not been growing since the beginning of last decade's economic downturn. For example, Will County's 2010 population of 677,560 was actually lower than the Census Bureau's estimated 2008 population of 679,069.

**Answer:** Defendants deny the allegations contained in Paragraph 44.

45. The consultant's forecasts purported to be an analysis of population growth absent construction of the Illiana Expressway. However, the consultant cited to the potential construction of the Illiana Expressway as one of the justifications for robust growth in Will County, Illinois and Lake County, Indiana. The consultant therefore considered the potential

existence of the proposed new Illiana Expressway in developing population forecasts that later were used to justify the need for the new tollroad.

**Answer:** Defendants deny the allegations contained in Paragraph 45.

46. IDOT's consultant also explicitly rejected 2040 population and employment forecasts that already had been produced by the region's metropolitan planning organizations ("MPOs").

**Answer:** Defendants deny the allegations contained in Paragraph 43.

47. MPOs are created under federal law to serve as regional transportation planning authorities. Among other functions, MPOs develop long-range transportation plans to meet forecasted needs. *See* 23 U.S.C. § 134(g); 23 C.F.R. § 450.322.

**Answer:** The allegations contained in Paragraph 47 purport to characterize the cited statutes, which speak for themselves and are the best evidence of their contents. Defendants deny any legal conclusions.

48. Illinois state law has established CMAP as the MPO for the Chicago metropolitan area, including Will County.

**Answer:** The allegations purport to characterize Illinois state law, which speaks for itself and is the best evidence of its contents. Defendants deny any legal conclusions.

49. Indiana state law has established the Northwestern Indiana Regional Planning Commission ("NIRPC") as the MPO for northwestern Indiana, including Lake County.

**Answer:** The allegations purport to characterize Indiana state law, which speaks for itself and is the best evidence of its contents. Defendants deny any legal conclusions.

50. CMAP and NIRPC are responsible for making official population forecasts for the northeastern Illinois region and the northwestern Indiana region, respectively, that are used for regional planning purposes and to prioritize transportation projects in their areas. The MPOs' long-range plans are designed to encourage population growth in existing communities and to discourage "sprawl" growth into less developed and undeveloped areas. CMAP and NIRPC's population and employment forecasts reflected this policy.

**Answer:** The allegations constitute Plaintiffs' characterization of the purpose of the MPOs, to which no response is required. To the extent an answer is required, Defendants deny all allegations therein.

51. By contrast, IDOT's consultant based its population forecasts on the premise that "sprawl" growth would continue as in certain past decades. Compared to the IDOT consultant's forecasts, the MPOs' forecasts showed much less robust growth in currently undeveloped areas, such as the southern half of the project study area in Will County, Illinois.

**Answer:** Defendants deny the allegations contained in Paragraph 51 and state that the population and employment forecasts used in the project are contained in Appendix E of the Final Environmental Impact Statement (FEIS), which speaks for itself and is the best evidence of its contents.

52. On December 21, 2011, as part of the EIS process, CMAP submitted official written comments on the Draft Purpose and Need Statement for the Tier 1 environmental study process. CMAP expressed concerns that IDOT had not considered CMAP's 2040 population forecasts in determining the purported need for the proposed new Illiana Expressway. CMAP requested that IDOT prepare traffic demand forecasts for the project using CMAP's forecasts in order "to support current regional planning analyses and to remain consistent with requirements of the National Environmental Policy Act." (See Exhibit A.)

**Answer:** Defendants admit CMAP submitted comments as part of the EIS process on December 21, 2011. As to the remaining allegations in Paragraph 52, Defendants deny the characterization of the comments and deny any remaining allegations and the legal conclusions contained therein.

### IDOT's and INDOT's "Preliminary Recommendation"

53. On or about February 22, 2012, prior to the completion of the Tier 1 environmental study process, IDOT and INDOT announced a "preliminary recommendation" of Alternative B3 for the proposed new Illiana Expressway project corridor.

**Answer:** Defendants admit the allegations contained in Paragraph 53, but deny any legal conclusions contained therein.

54.     On March 9, 2012, Plaintiffs Openlands, Midewin Heritage Association, and Sierra Club, among others, submitted detailed comments on the preliminary recommendation. Among other things, they noted that IDOT's and INDOT's pre-selection of Alternative B3, to then be studied in conjunction only with a "no-action" alternative, would preclude a rigorous exploration and objective evaluation of all Illiana Expressway alternatives. In the same comments, the Plaintiffs and others also: (1) Requested that IDOT and INDOT thoroughly evaluate more northern corridors that would better serve existing communities; and (2) Stated that Alternative B3 would cause direct, indirect and cumulative impacts on the Midewin National Tallgrass Prairie and other natural resources, including by inducing truck traffic on Illinois Route 53 that would threaten Midewin's grassland bird habitat.

**Answer:**     Defendants deny the allegations contained in Paragraph 54.

55.     On March 8, 2012, the Midewin National Tallgrass Prairie, part of the United States Forest Service, a federal agency, submitted official written comments on the preliminary recommendation (attached hereto as Exhibit C). Among other things, the comments: (1) Described Alternative B3 as "not a viable alternative" because of its direct, indirect, and cumulative impacts on wildlife habitat at Midewin and throughout Will County; and (2) Urged INDOT and INDOT to consider both more northern and more southern corridors to avoid building an expressway in such close proximity to the Midewin National Tallgrass Prairie.

**Answer:**     Defendants admit the Midewin National Tallgrass Prairie submitted written comments on March 8, 2012. Defendants deny any remaining allegations in the first sentence. As to the remaining allegations in Paragraph 55, Defendants deny the characterization of the comments and deny any remaining allegations and legal conclusions contained therein.

### The Tier 1 Draft EIS for the Proposed Illiana Expressway Project

56.     On or about July 13, 2012, IDOT and INDOT released the Tier 1 Draft EIS for the proposed Illiana Expressway project.

**Answer:**     In response to the allegations in Paragraph 56, Defendants admit the Tier 1 Draft EIS for the Project was made available on July 13, 2012, and clarify that the Notice of Availability was published in the Federal Register by the USEPA on that date.

57.     The Tier 1 Draft EIS modified the asserted needs for the proposed new Illiana Expressway from those listed in the Draft Purpose and Need Statement, now identifying project needs as: (1) Improving regional mobility; (2) Alleviating local system congestion and improving local system mobility; and (3) Providing for efficient movement of freight.

**Answer:** Defendants deny the allegations contained in Paragraph 57, and state that

the Project's Purpose and Need was developed in a manner consistent with Federal regulations.

Defendants deny all legal conclusions contained in Paragraph 57.

58. The Tier 1 Draft EIS continued to rely on the population and employment forecasts produced by IDOT's consultant and it did not fully and fairly consider the need for the proposed new Illinois Expressway based on the MPOs' lower forecasts.

**Answer:** Defendants deny the allegations and any legal conclusions contained in

Paragraph 58.

59. In response to comments from Plaintiffs and other stakeholders, the Tier 1 Draft EIS did compare Alternative B3 to two newly proposed corridors, a more northern Alternative A3S2, and Alternative B4, a variation of Alternative B3.

**Answer:** The allegations contained in Paragraph 59 purport to characterize the

alternatives analysis contained in the Draft EIS, which speaks for itself and is the best evidence

of its contents. Defendants deny all legal conclusions.

60. Again, however, the Tier 1 Draft EIS indicated that Alternative B3 remained the preferred alternative. Using traffic projections based on the consultant's population and employment forecasts, the Tier 1 Draft EIS concluded that Alternative B3 addressed the project's purpose and need criteria.

**Answer:** Defendants deny the allegations contained in the first sentence of

Paragraph 60. As to the second sentence, Defendants admit that the B3 alternative meets the

Project's Purpose and Need. Defendants deny any remaining allegations and legal conclusions

contained in Paragraph 60.

61. The Tier 1 Draft EIS did not acknowledge, explain, or discuss any inconsistencies with the CMAP and NIRPC's long-range transportation plans and their associated population forecasts notwithstanding the fact that MPOs are created under federal law to serve as the regional authorities for transportation planning activities.

**Answer:** Defendants deny the allegations contained in Paragraph 61.

## Comments on the Tier 1 Draft EIS

62.     The Plaintiffs, CMAP, NIRPC, the Midewin National Tallgrass Prairie, the United States Department of Interior, and other stakeholders filed comments raising legal and factual concerns with the Tier 1 Draft EIS. Plaintiffs' and other stakeholders' comments expressed concern that: (1) The Tier 1 Draft EIS did not consider the need for the proposed Illiana Expressway based on the MPOs' population forecasts, and that Alternative B3 was sited too far south to meet expected transportation needs; and (2) The Tier 1 Draft EIS did not adequately consider environmental impacts on the Midewin National Tallgrass Prairie and other natural resources.

        **Answer:**     Defendants admit generally that the parties identified in sentence one submitted comments on the Tier 1 Draft EIS. Defendants deny all remaining allegations and legal conclusions contained in Paragraph 62.

63.     On and around August 29, 2012, Plaintiffs and other groups filed written comments demonstrating that the Tier 1 Draft EIS had either ignored or deferred consideration of a number of Alternative B3's significant environmental impacts, including noise, light, and air pollution caused by car and truck traffic on the proposed Illiana Expressway, as well as by induced traffic on Illinois Route 53. Plaintiffs stated that the Defendants' incomplete consideration of these impacts at the Tier 1 stage would preclude a meaningful evaluation of project alternatives.

        **Answer:**     Defendants deny all allegations and legal conclusions contained in Paragraph 63.

64.     Plaintiffs and other groups also stated in their written comments: (1) Support for CMAP and NIRPC's concerns that the MPOs' population forecasts had been ignored; and (2) Concerns that Alternative B3 was sited too far south to serve existing populations and to fulfill the proposed Illiana Expressway's still-unclear purpose and need.

        **Answer:**     Defendants admit Plaintiffs and others submitted comments on the Draft EIS.  As to the remaining allegations in Paragraph 64, Defendants deny the characterization of the comments and deny any remaining allegations and legal conclusions contained therein.

65.     On August 29, 2012, CMAP submitted written comments (attached hereto in Exhibit A) on the Tier 1 Draft EIS. CMAP: (1) Again requested that IDOT and INDOT evaluate project alternatives using CMAP's forecasts and cautioned that "[t]he comparative results for the three alternatives could be significantly different" if CMAP's forecasts were used; (2) Expressed "serious concerns" that Alternative B3 would promote new sprawled development throughout the southern portion of Will County in direct conflict with CMAP's policies to foster growth in existing communities; and (3) Requested that IDOT and INDOT consider the costs to "provide and maintain the necessary infrastructure to serve" this new low-density, sprawled development.

**Answer:** Defendants admit the allegations contained in sentence one. As to the remaining allegations in Paragraph 65, Defendants deny the characterization of the comments and deny any remaining allegations and legal conclusions contained therein.

66. On August 24, 2012, NIRPC submitted written staff comments (attached hereto as Exhibit D) on the Tier 1 Draft EIS, also stating concerns about the study. NIRPC: (1) Stated that it disagreed with the consultant's forecasts and that, if, instead, NIRPC's forecasts were used, "there would be a basis to predict significantly less travel and traffic congestion in the study area, and the need for the project would be greatly diminished"; and (2) noted that the Tier 1 Draft EIS did not account for costs associated with increased population and traffic in the project study area.

**Answer:** Defendants admit NIRPC submitted comments on or about August 24, 2012. As to the remaining allegations in Paragraph 66, Defendants deny the characterization of the comments and deny any remaining allegations and the legal conclusions contained therein.

67. On August 29, 2012, the Midewin National Tallgrass Prairie, United States Forest Service, submitted written comments (attached hereto in Exhibit C) on the Tier 1 Draft EIS raising significant environmental objections to Alternative B3. Among other things, the Midewin National Tallgrass Prairie: (1) Stated that "all remaining alternatives, due to their close proximity to Midewin's borders, will cause irreparable damage to the habitat" and advised IDOT and INDOT that "now is the time in Tier 1 to find a better alternative than the ones you have elected to evaluate"; and (2) Stated that the Tier 1 Draft EIS had failed to identify Midewin, in its entirety, as being protected by Section 4(f) as a resource that provided wildlife habitat and recreational opportunities.

**Answer:** Defendants admit the Midewin National Tallgrass Prairie submitted written comments on or about August 29, 2012. As to the remaining allegations in Paragraph 67, Defendants deny the characterization of the comments and deny any remaining allegations and legal conclusions contained therein.

68. On August 29, 2012, the United States Department of Interior ("DOI") submitted written comments (attached hereto as Exhibit E) stating concerns with the Tier 1 Draft EIS and its consideration of alternatives. Among other things, DOI: (1) Stated that the Tier 1 Draft EIS had failed to fully identify the Midewin National Tallgrass Prairie as a Section 4(f) resource, and failed to fully acknowledge impacts on Illinois Route 53 as a Section 4(f) resource; and (2) Stated that the Tier 1 Draft EIS's assessment of indirect and cumulative environmental impacts was insufficiently narrow, citing the example of impacts of traffic noise from Illinois Route 53 on the Midewin Tallgrass Prairie.

**Answer:** Defendants admit USDOI submitted written comments on or about August 29, 2012. As to the remaining allegations in Paragraph 68, Defendants deny the characterization of the comments and deny any remaining allegations and legal conclusions contained therein.

## The Tier 1 Final EIS and ROD for the Illiana Expressway

69. On or about October 12, 2012, notwithstanding these criticisms, IDOT and INDOT officially announced that they had selected Alternative B3 as the preferred project corridor for the proposed Illiana Expressway.

**Answer:** Defendants admit the announcement identifying Corridor B3 as the preferred corridor was made available on the public website on October 12, 2012. Defendants deny all remaining allegations and legal conclusions contained in Paragraph 69.

70. On November 12, 2012, Plaintiffs and other groups submitted written comments regarding the announcement. In the comments, Plaintiffs and other groups noted the same deficiencies in the environmental study as they had identified in their earlier comments.

**Answer:** Defendants admit Plaintiffs submitted written comments on November 12, 2012. Paragraph 70 purports to characterize the comments, which speak for themselves and are the best evidence of their contents. Defendants deny all remaining allegations and legal conclusions contained in Paragraph 70.

71. On December 12, 2012, CMAP submitted written comments (attached hereto in Exhibit A) regarding the announcement of this preferred Illiana Expressway corridor. CMAP stated disappointment that IDOT and INDOT had decided to advance only Alternative B3 for further study and reiterated its concerns that: (1) Alternative B3 would cause low-density "sprawl" development in Will County, Illinois; and (2) IDOT and INDOT had refused to conduct an analysis of need based on CMAP's population and employment forecasts that accounted for policies intended to limit sprawl and low density development.

**Answer:** Defendants admit CMAP submitted written comments on December 12, 2012. Paragraph 71 purports to characterize the comments, which speak for themselves and are the best evidence of their contents. Defendants deny all remaining allegations and legal conclusions contained in Paragraph 71.

72.     On January 17, 2013, FHWA signed the Tier 1 FEIS and ROD approving Alternative B3 as the selected alternative for the proposed Illiana Expressway project and advancing it for further study in Tier 2.

**Answer:**     Defendants admit the allegations contained in Paragraph 72.

73.     The Tier 1 FEIS perpetuated many of the same errors that Plaintiffs and others had identified in the Tier 1 Draft EIS, including reliance on inflated population and employment forecasts and failure to adequately analyze Alternative B3's environmental impacts.

**Answer:**     Defendants deny the allegations contained in Paragraph 73.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT AND THE ADMINISTRATIVE PROCEDURE ACT

74.     Plaintiffs reassert and reallege Paragraphs 1 through 73 above.

**Answer:**     Defendants hereby incorporate by reference the responses to all preceding paragraphs.

75.     The Defendants violated NEPA and its implementing regulations and the Administrative Procedure Act in approving the Tier 1 EIS and ROD for the proposed Illiana Expressway by: (1) Conducting a flawed analysis of the need for the proposed new tollroad and the performance of alternatives in meeting that need, based on inflated population and employment forecasts; (2) Failing to reasonably explain or justify the proposed Illiana Expressway's inconsistency with the long-range plans promulgated by CMAP and NIRPC; and (3) Failing to take a "hard look" at areawide environmental impacts of building the Illiana Expressway on the Alternative B3 corridor, including but not limited to the harmful impacts of noise, light, and air pollution from new car and truck traffic on the tollroad and on Illinois Route 53, and the harmful impacts of low density sprawled population growth in currently less-developed and undeveloped areas.

**Answer:**     Defendants deny the allegations contained in Paragraph 75.

76.     The Defendants' failure to comply with NEPA and its implementing regulations and its approval of the Tier 1 FEIS and ROD was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and thus violates the Administrative Procedure Act, 5 U.S.C. § 706.

**Answer:**     Defendants deny the allegations contained in Paragraph 76.

## COUNT II

## VIOLATIONS OF SECTION 4(t) OF THE DEPARTMENT OF TRANSPORTATION ACT AND THE ADMINISTRATIVE PROCEDURE ACT

77.     Plaintiffs reassert and reallege Paragraphs 1 through 73 above.

**Answer:**     Defendants hereby incorporate by reference the responses to all preceding

paragraphs.

78.     The Defendants violated Section 4(f) and its implementing regulations and the Administrative Procedure Act in approving the Tier 1 FEIS and ROD for the proposed Illiana Expressway by failing to (1) reasonably and adequately address the preferred Alternative B3's constructive use of lands protected by Section 4(f), including the Midewin National Tallgrass Prairie and Alternative Route 66, and (2) adequately consider reasonable, prudent and feasible alternatives to avoid harmful impacts to these protected lands.

**Answer:**     Defendants deny the allegations contained in Paragraph 78.

79.     Accordingly, the Defendants' failure to comply with Section 4(f) and its implementing regulations and its approval of the Tier 1 FEIS and ROD was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and thus violates the Administrative Procedure Act, 5 U.S.C. § 706.

**Answer:**     Defendants deny the allegations contained in Paragraph 79.

WHEREFORE, the United States requests that the case be dismissed with costs and that

the court award such further relief as may be appropriate

Respectfully submitted,

GARY S. SHAPRIRO
United States Attorney

By: s/ Harpreet K. Chahal
    HARPEET K. CHAHAL
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 353-1996
    harpreet.chahal@usdoj.gov
