**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS EASTERN
DIVISION**

| | |
|---|---|
| OPENLANDS, MIDEWIN HERITAGE ASSOCIATION, and SIERRA CLUB,<br><br>                 Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, ANTHONY FOX, Secretary, United States Department of Transportation, FEDERAL HIGHWAY ADMINISTRATION, VICTOR M. MENDEZ, Administrator, Federal Highway Administration, and CATHERINE BATEY, Division Administrator, Illinois Division, Federal Highway Administration,<br><br>                 Defendants.<br><br>ILLINOIS DEPARTMENT OF TRANSPORTATION,<br><br>                 Defendant-Intervenor | No. 13-CV-04950<br><br>Hon. Ronald A. Guzman |

## ANSWER OF ILLINOIS DEPARTMENT OF TRANSPORTATION

Defendant-Intervenor Illinois Department of Transportation ("IDOT") hereby answers and responds, upon its best information and belief, to the Plaintiffs' Complaint for Permanent Declaratory and Injunctive Relief ("Complaint"), as set forth in the Answer below. IDOT denies all allegations contained in the Complaint except to the extent that such allegations are specifically admitted in this Answer. The paragraph numbers in this Answer correspond to the paragraph numbers in the Complaint.

## INTRODUCTION AND NATURE OF ACTION

1.     This action challenges the Defendants' violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.; Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303 and 23 U.S.C. § 138; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553-559 and §§ 701-706, in connection with Defendant FHWA's approval of a Tier 1 FEIS and ROD for the proposed Illiana Expressway in northeastern Illinois and northwestern Indiana. Plaintiffs are citizens' groups whose members live in the area of the tollroad corridor, enjoy recreational activities in the vicinity of the tollroad corridor that may be affected adversely by the proposed tollroad, and support environmentally and fiscally responsible transportation solutions in the vicinity of the tollroad corridor.

**ANSWER:**  The allegations in Paragraph 1 constitute Plaintiffs' characterization of their Complaint to which no response is required.  To the extent that the allegations are considered allegations of fact, IDOT admits that portion of sentence 1 of Paragraph 1 that asserts that the Federal Highway Administration ("FHWA") approved a Tier 1 Final Environmental Impact Statement ("Tier 1 FEIS") and Record of Decision ("ROD") for the Illiana Corridor project ("Illiana Corridor").  IDOT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in sentence 2 of Paragraph 1.

2.     The Illiana Expressway is a proposed new 46.8-mile tolled expressway in the exurban edge of the Chicago metropolitan area.  This tollroad would run east-west from Interstate 55, near Wilmington, Illinois in southwestern Will County, Illinois, to Interstate 65, near Lowell, Indiana in Lake County.

**ANSWER:**  IDOT denies the allegations in Paragraph 2, except to admit that the Illiana Corridor is approximately 46.8 miles in length and runs between Interstate 55 and Interstate 65. IDOT denies the remaining allegations of Paragraph 2.

3.     Defendants currently estimate that the Illiana Expressway would cost at least $1.25 billion. The new tollroad would cut through a corridor that currently is almost

entirely farmland and open land, causing the loss of over 1,500 acres of prime farmland, 65 acres of forests, and 34 acres of wetlands.

**ANSWER:** IDOT denies the allegations in sentence 1 of Paragraph 3, except to admit that the cost of the project is estimated to be $1.25 billion. IDOT denies the allegations in sentence 2 of Paragraph 3, except to admit that the Tier 1 FEIS estimates that the working alignment in selected Corridor B3 could impact between 1567-1607 acres of prime farmland, approximately 65.3 acres of forests and 34.4-34.6 acres of wetlands.

4.     The proposed new tollroad would cut across rivers and other waterways more than 30 times, degrading the quality of these waterways, and require the construction of new bridges over the Kankakee River and other rivers and waterways.

**ANSWER:** IDOT denies the allegations of Paragraph 4, except to admit that the Illiana Corridor contains 33 stream crossings and will require construction of new bridges and culverts for those crossings.

5.     The proposed new tollroad would be built along the southern border of the Midewin National Tallgrass Prairie ("Midewin"), which was established in 1996 by the United States Congress as the first national tallgrass prairie in the country. Midewin covers 18,225 acres, and it is the largest open space in the Chicago metropolitan area and northeastern Illinois. The Midewin National Tallgrass Prairie was created to conserve and enhance native populations and habitats of fish, wildlife and plants and provide a variety of recreational and research opportunities. Midewin's role in providing habitat for prairie wildlife is ecologically vital because less than 0.01 percent of Illinois' original 22 million acres of prairie remain. Car and truck traffic on and around the proposed new tollroad, as well as population growth and development induced by the new tollroad, would harm the Midewin National Tallgrass Prairie's natural resources and other important natural and cultural resources.

**ANSWER:** IDOT denies the allegations in sentence 1 of Paragraph 5. IDOT admits the allegations in sentence 2 of Paragraph 5. IDOT denies the allegations in sentence 3 of Paragraph 5 except to admit that the purposes for which the Midewin was created are established in the Illinois Land Conservation Act of 1995 (PL 104-106) and that law speaks for itself and is the best evidence of its contents. IDOT denies the remaining allegations in Paragraph 5.

6. On January 17, 2013, Defendant FHWA approved a Tier 1 FEIS and ROD for the Illiana Expressway. See 78 Fed. Reg. 9771 (February 11, 2013). These final federal actions are part of the tiered environmental review process under NEPA and its implementing regulations and determined certain issues relating to the proposed new tollroad, including the purported "purpose and need" for the new tollroad and a preferred corridor for the Project, identified as "Alternative B3".

**ANSWER:** IDOT admits the allegation in Paragraph 6 that, on January 17, 2013, the FHWA approved the Tier 1 FEIS and ROD. The remaining allegations purport to characterize the documents, which speaks for themselves and are the best evidence of their content.

7. Defendants violated NEPA and Section 4(f), in part, because they acted arbitrarily and capriciously, abused their discretion and acted contrary to law by relying on inflated population and employment forecasts for the Illiana Expressway study area. These inflated forecasts, in turn, became the basis for inflated traffic projections used to establish the proposed new tollroad's purpose and need, and for evaluating alternatives to fulfill that need. As a result, Defendants were unable to conduct a rigorous exploration and objective evaluation of the alternatives as required by NEPA and other federal laws. 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 702; see Sierra Club v. U.S. Dep't of Transp., 962 F. Supp. 1037, 1043 (N.D. Ill. 1997).

**ANSWER:** IDOT denies the allegations in Paragraph 7.

8. During the environmental study process, a number of stakeholders expressed concern regarding Defendants' reliance on these inflated population and employment forecasts, among them the Chicago Metropolitan Agency for Planning ("CMAP"). CMAP is the designated metropolitan planning organization for northeastern Illinois. Among other federally and state-mandated responsibilities, CMAP makes official population and employment forecasts for the Northeastern Illinois region that are used for transportation and other regional planning purposes. CMAP's official forecasts showed much less robust growth in the study area than the forecasts relied upon by Defendants. CMAP's comments during the environmental study process are attached as Exhibit A.

**ANSWER:** IDOT admits those parts of the allegations in Paragraph 8 that state that a number of stakeholders submitted comments on the project. The second and third sentences purport to characterize federal and State law, which speak for themselves and are the best evidence of their content. The remaining allegations purport to characterize the written comments, which speak for themselves and are the best evidence of their content.

9. Defendants also failed to adequately analyze Alternative B3's environmental impacts by ignoring or deferring study of significant areawide impacts. As a result of these errors, Defendants were unable to conduct a rigorous exploration and objective evaluation of the alternatives to and for the Illiana Expressway as required by NEPA and other federal laws. 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 702.

**ANSWER:** IDOT denies the allegations contained in Paragraph 9.

10. Defendants' approvals and other actions should be reversed and remanded to avoid causing irreparable harm to natural resources and environmental quality, to the Plaintiff organizations and their members' use and enjoyment of the Midewin National Tallgrass Prairie and other resources, to the NEPA process, and to the public in the manner described herein. Plaintiffs respectfully request that the Court enter an Order: (1) Declaring that the Defendants violated NEPA, Section 4(f) and the APA in approving the Tier 1 FEIS and ROD for the proposed Illiana Expressway; (2) Declaring that the Defendants' approval of the Tier 1 FEIS and ROD was arbitrary and capricious, an abuse of discretion, and contrary to law; (3) Vacating, setting aside,

reversing and remanding the Tier 1 FEIS and ROD; (4) Enjoining Defendants from using the Tier 1 decisions in subsequent proceedings, including decisions whether to grant licenses, permits, and approvals for the proposed Illiana Expressway unless and until the Defendants fully comply with the requirements of NEPA, Section 4(f) and the APA; (5) Directing that the Plaintiffs be allowed to recover their costs, including reasonable attorneys' fees, incurred in connection with this action, as provided for under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable laws; and (6) Providing such other and further relief as the Court may deem just and proper and in the public interest.

**ANSWER:** IDOT denies the allegations contained in Paragraph 10.


## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 2201 (declaratory relief), and § 2202 (injunctive relief), as this action presents cases and controversies under the National Environmental Policy Act, Department of Transportation Act, and Administrative Procedure Act.

**ANSWER:** The allegations of Paragraph 11 are conclusions of law to which no response is required.


12.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (e), because the proposed Illiana Expressway lies mostly within the Northern District of Illinois, and because all of the Plaintiffs, as well as Defendants, are present in and do business in the Northern District. Furthermore, a substantial portion of the events or omissions giving rise to the claims stated herein occurred in the Northern District. FHWA, in consultation with the Illinois and Indiana Departments of Transportation ("IDOT" and "IDOT", respectively) prepared the unlawful Tier 1 FEIS and ROD and violated the laws at issue in this Complaint.

**ANSWER:** The allegations inParagraph 12 are conclusions of law to which no response is required, except that IDOT admits a portion of the Project lies within the jurisdictional boundaries of the Northern District of Illinois.

13.     Plaintiffs have no adequate remedy at law.  The relief Plaintiffs seek will redress the injuries to their members, and, unless this Court grants the requested relief, the Defendants' actions will cause irreparable harm to the environment and natural resources, to Plaintiffs' and their members' interests, including their members' use and enjoyment of the affected land and natural resources, and to the public in violation of federal laws and contrary to the public interest.  No monetary damages or other legal remedy could adequately compensate Plaintiffs, their members, or the public for these harms.  Considering the balance of hardships between the Plaintiffs and Defendants, a remedy in equity is warranted.

**ANSWER:**  The allegations in Paragraph 13 constitute Plaintiffs' characterization of their case, conclusions of law and requests for relief to which no response is required, and which will be addressed as appropriate in the context of dispositive motions filed by the Parties.  To the extent that the allegations are considered allegations of fact, IDOT denies the allegations.

14.     Plaintiffs and their members are persons adversely affected or aggrieved by federal agency action within the meaning of Section 702 of the Administrative Procedure Act.  5 U.S.C. § 702.

**ANSWER:**  The allegations in Paragraph 14 constitute Plaintiffs' characterization of their case, conclusions of law and requests for relief to which no response is required, and which will be addressed as appropriate in the context of dispositive motions filed by the Parties.  To the extent that the allegations are considered allegations of fact, IDOT denies the allegations.

15.     On February 11, 2013, pursuant to 23 U.S.C. § 139(l)(1), Defendant FHWA published a notice in the Federal Register stating that any claim seeking judicial review of federal agency actions related to the Tier 1 FEIS and ROD would be barred unless the claim is filed on or before July 11, 2013.  This Complaint is filed on July 10, 2013, and therefore is not time-barred under 23 U.S.C. § 139(l)(1).

**ANSWER:** IDOT admits that FHWA published a notice in the *Federal Register*.

The remaining allegations in the first sentence of Paragraph 14 purport to characterize a

notice in the *Federal Register*, which speaks for itself and is the best evidence of its

content. IDOT admits the allegation in the second sentence that Plaintiffs' Complaint

was filed on or before July 10, 2013, but avers that the remainder of the sentence

consists of conclusions of law to which no response is required.


## PARTIES

16.     Plaintiff Openlands is a not-for-profit corporation organized and existing
under the laws of the State of Illinois. Openlands and its members use and enjoy and
work to protect and conserve natural and open spaces in northeastern Illinois and the
surrounding region to ensure cleaner air and water, to protect natural habitats and
wildlife and to help balance and enrich Illinoisians' lives. Openlands and its members
have been instrumental in forming, restoring and improving access to the Midewin
National Tallgrass Prairie's landscapes for the use and enjoyment of its members and
the public at large. Openlands has approximately 3,000 members. Openlands has
members living in the area of the proposed Illiana Expressway, and they use and enjoy
the land and natural areas that would be affected and degraded by the proposed new
tollroad construction and operation, related car and truck traffic and induced
development. Specifically, Openlands' members enjoy activities such as hiking,
paddling, volunteering, monitoring, stewarding and restoring natural areas at Midewin.
The Defendants' actions in issuing the Tier 1 FEIS and ROD and their other related
actions and omissions, as set forth in this Complaint, will irreparably harm Openlands
and its members, and the construction and operation of the Illiana Expressway would
significantly impair members' use and enjoyment of the affected land and natural
resources. Openlands participated in and commented extensively in administrative
proceedings concerning the proposed Illiana Expressway and the violations of federal
laws raised here.


**ANSWER:** IDOT lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in the first through six sentences of Paragraph 16,

and therefore deny them. IDOT admits that Openlands submitted comments to FHWA

on the Draft Environmental Impact Statement ("DEIS"). IDOT denies the remaining

allegations contained in Paragraph 16.


17.     Plaintiff Midewin Heritage Association ("MHA") is a not-for-profit corporation organized and existing under the laws of the State of Illinois.    MHA's purpose is to promote an understanding of the cultural and natural history of the land which, today, is the Midewin National Tallgrass Prairie, along with those surrounding areas having a historical connection to this land.  MHA's objectives include increasing the public's awareness of Midewin's history and promoting the preservation of historically significant sites, structures and artifacts.    MHA promotes the use and enjoyment of Midewin as a recreational resource.  MHA has approximately 40 individual members and organizational members, which, in turn, have many additional individual members.  MHA's members use and enjoy the land and natural areas that would be affected and degraded by the proposed Illiana Expressway.    Specifically, MHA members enjoy activities such as leading, and participating in, heritage tours at Midewin.  The Defendants' actions in issuing the Tier 1 FEIS and ROD and their other related actions and omissions, as set forth in this Complaint, will irreparably harm MHA and its members, and the construction and operation of the Illiana Expressway would significantly impair members' use and enjoyment of 40 individual members and organizational members, which, in turn, have many additional individual members. MHA's members use and enjoy the land and natural areas that would be affected and degraded by the proposed Illiana Expressway.    Specifically, MHA members enjoy activities such as leading, and participating in, heritage tours at Midewin.    The Defendants' actions in issuing the Tier 1 FEIS and ROD and their other related actions and omissions, as set forth in this Complaint, will irreparably harm MHA and its members, and the construction and operation of the Illiana Expressway would significantly impair members' use and enjoyment of the affected land and natural resources.    MHA participated in and commented extensively in administrative proceedings concerning the proposed Illiana Expressway and the violations of federal laws raised here.


**ANSWER:**  IDOT lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in the first through seven sentences of Paragraph

17, and therefore deny them.  IDOT admits that Openlands submitted comments to

FHWA on the Draft Environmental Impact Statement ("DEIS").  IDOT denies the

remaining allegations contained in Paragraph 17.

18.     Plaintiff Sierra Club is a not-for-profit corporation organized and existing under the laws of the State of California.  The Sierra Club is a national environmental organization with more than 596,000 members, with offices and programs authorized and doing business in the States of Illinois and Indiana.   More than 22,000 of these members live in the State of Illinois and more than 7,600 in the State of Indiana.  The Sierra Club's purpose is to protect the natural environment and promote the responsible use of the Earth's ecosystems and resources.  The Sierra Club has members living in the area of the proposed Illiana Expressway, and they use and enjoy the land and natural areas which would be affected and degraded.  Specifically, the Sierra Club's members enjoy such activities as birdwatching, hiking, bicycling and volunteering at the Midewin National Tallgrass Prairie, and bicycling on the adjacent Wauponsee Glacial Trail.  The Defendants' actions in issuing the Tier 1 FEIS and ROD and their other related actions and omissions, as set forth in this Complaint, will irreparably harm the Sierra Club and its members, and the construction and operation of the Illiana Expressway would significantly impair members' use and enjoyment of the affected land and natural resources.  The Sierra Club participated in and commented extensively in administrative proceedings concerning the proposed Illiana Expressway and violations of federal laws raised here.

**ANSWER:**  IDOT lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first through six sentences of Paragraph 18, and therefore deny them.  IDOT admits that Openlands submitted comments to FHWA on the Draft Environmental Impact Statement ("DEIS").  IDOT denies the remaining allegations contained in Paragraph 18.

19.     Defendant United States Department of Transportation ("U.S. DOT") is an executive department of the United States Government.  Its duties include ensuring the coordinated and effective administration of the transportation programs of the United States Government and encouraging cooperation of Federal, State and local governments to achieve transportation objectives.  49 U.S.C. § 101(b).

**ANSWER:**  IDOT admits that the United States Department of Transportation ("USDOT") is a component of the Executive Branch of the government of the United States.  The remaining allegations of Paragraph 19 are conclusions of law to which no response is required.

20.     Defendant Anthony Foxx is the Secretary of the U.S. DOT.  Secretary Foxx oversees the activities of the U.S. DOT and its agencies, including the Federal Highway Administration.  Secretary Foxx is sued in his official capacity.

**ANSWER:**  IDOT admits the allegations in the first sentence of Paragraph 20. IDOT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 20.

21.     Defendant Federal Highway Administration ("FHWA") is an agency within the U.S. DOT.  Among other things, FHWA is required to ensure compliance with NEPA before approving the proposed Illiana Expressway and other such transportation projects.  FHWA is responsible for overseeing the preparation of Environmental Impact Statements, reviewing Environmental Impact Statements to determine their compliance with NEPA and other federal laws and, when lawful and appropriate, approving or denying Environmental Impact Statements in the form of written Records of Decision. FHWA, through its office in Springfield, Illinois, issued the Tier 1 FEIS and ROD challenged in this action.

**ANSWER:**   IDOT admits the allegations contained in the first sentence of Paragraph 21 and that FHWA issued the Tier 1 FEIS and ROD challenged in this action.  The remaining allegations of Paragraph 21 are conclusions of law to which no response is required.

22.     Defendant Victor M. Mendez, the Administrator of the FHWA, is the director of FHWA.  He oversees the activities of FHWA and its various divisions. Administrator Mendez is sued in his official capacity.

**ANSWER**:  IDOT admits the allegations in the first sentence of Paragraph 22. IDOT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 22.

23.     Defendant Catherine Batey, Division Administrator of FHWA, is the director of FHWA's Illinois Division.  Administrator Batey oversees the activities of the Illinois Division, including the preparation and approval of Environmental Impact Statements and the issuance of Records of Decision.  Administrator Batey is sued in her official capacity.

**ANSWER:**  IDOT admits the allegations in the first sentence of Paragraph 23.

IDOT lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in Paragraph 23.

## APPLICABLE LAW

### The National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 et seq.

24.     NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA seeks to protect the environment by ensuring that public officials "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c)

**ANSWER:**  The allegations set forth in Paragraph 24 purport to quote from and

characterize NEPA, 40 C.F.R. § 1500.1(a) and 42 U.S.C. § 4332(2)(C), each of which

speaks for itself and is the best evidence of its content.

25.     NEPA requires all federal agencies to prepare a detailed Environmental Impact Statement ("EIS") on every proposal for a major federal action which will or may significantly affect the quality of the human environment.  42 U.S.C. § 4332(2)(C). NEPA defines the required elements of an EIS, which must include a detailed discussion of: i) the environmental impact of the proposed action;

(ii)  any adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii)  alternatives to the proposed action;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

**ANSWER:** The allegations set forth in Paragraph 25 purport to quote from and characterize NEPA, 42 U.S.C. § 4332(2)(C), each of which speaks for itself and is the best evidence of its content.

26. NEPA requires federal agencies to study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. § 4332(2)(E); Sierra Club v. U.S. Dep't of Transp., 962 F. Supp. 1037, 1042 (N.D. Ill. 1997).

**ANSWER:** The allegations set forth in Paragraph 26 purport to quote from and characterize NEPA, 42 U.S.C. § 4332(2)(E); Sierra Club v. U.S. Dep't of Transp., 962 F. Supp. 1037, 1042 (N.D. Ill. 1997), each of which speaks for itself and is the best evidence of its content.

27. NEPA regulations further require that an agency must identify the purpose and need of the proposed action in its EIS, 40 C.F.R. § 1502.13; must "rigorously explore and objectively evaluate all reasonable alternatives" for achieving the general goals of the proposed action, 40 C.F.R. § 1502.14(a); and must thoroughly analyze the environmental impacts of the proposed action and alternatives, 40 C.F.R. § 1502.16.

**ANSWER:** The allegations set forth in Paragraph 27 purport to quote from and characterize NEPA, 40 C.F.R. § 1502.13; 40 C.F.R. § 1502.14(a), and 40 C.F.R. § 1502.16, each of which speaks for itself and is the best evidence of its content.

28.     The environmental impacts that an EIS must consider include "indirect" impacts, including "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems," 40 C.F.R. § 1508.8(b), and "cumulative" impacts which result from incremental impact of the proposed action when combined with other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.7. See *North Carolina Wildlife Federation v. North Carolina Dep't of Transp.*, 677 F.3d 596, 602 (4th Cir. 2012).

**ANSWER:** The allegations set forth in Paragraph 28 purport to quote from and characterize NEPA, 40 C.F.R. § 1508.8(b) and 40 C.F.R. § 1508.7. See *North Carolina Wildlife Federation v. North Carolina Dep't of Transp.*, 677 F.3d 596, 602 (4th Cir. 2012), each of which speaks for itself and is the best evidence of its content.

29.     An EIS also must evaluate "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local . . . land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). "Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.F.R. § 1506.2(d).

**ANSWER:** The allegations set forth in Paragraph 29 purport to quote from and characterize NEPA, 40 C.F.R. § 1502.16(c) and 40 C.F.R. § 1506.2(d), each of which speaks for itself and is the best evidence of its content.

30.     FHWA's NEPA regulations provide that a NEPA study may, when appropriate, proceed in "tiers." At the first tier of study, FHWA is to consider "broad issues such as general location, mode choice, and areawide air quality and land use

implications of the major alternatives."  23 C.F.R. § 771.111(g).  FHWA is then to address "site-specific details" at the second tier.  *Id.*

**ANSWER:**  The allegations set forth in Paragraph 30 purport to quote from and characterize NEPA, 23 C.F.R. § 771.111(g), each of which speaks for itself and is the best evidence of its content.

## Section 4(f) of the Transportation Act ("Section 4(f)").

## 49 U.S.C. 303 and 23 U.S.C. 138

31.     Section 4(f) of the Transportation Act establishes as a national policy that "special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."  49 U.S.C. § 303(a); 23 U.S.C. § 138(a).  In order to achieve this national policy, Section 4(f) prohibits the U.S. Secretary of Transportation from approving any "transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site)" unless "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use."  49 U.S.C. § 303(c); see also 23 U.S.C. § 138.

**ANSWER:**  The allegations set forth in Paragraph 31 purport to quote from and characterize NEPA, 49 U.S.C. § 303(a); 23 U.S.C. § 138(a) and 49 U.S.C. § 303(c); see also 23 U.S.C. § 138, each of which speaks for itself and is the best evidence of its content.

32.     FHWA regulations implementing Section 4(f) define "use" to include both actual use and "constructive" use. 23 C.F.R. § 774.17.  Actual use occurs when "land is permanently incorporated into a transportation facility."  *Id.*  "Constructive" use occurs when "the project's proximity impacts are so severe that the protected activities,

features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired." 23 C.F.R. § 774.15.

**ANSWER:** The allegations set forth in Paragraph 32 purport to quote from and characterize NEPA, 23 C.F.R. § 774.17 and 23 C.F.R. § 774.15., each of which speaks for itself and is the best evidence of its content.

## The Administrative Procedure Act ("APA"), 5 U.S.C. 553-559, 701-706

33.    The APA provides for judicial review of final agency actions, such as those at issue here.  A reviewing court shall hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**ANSWER:** The allegations set forth in Paragraph 33 purport to quote from and characterize NEPA, 5 U.S.C. § 706(2)(A), each of which speaks for itself and is the best evidence of its content.

## FACTUAL BACKGROUND

## The Proposed New Illiana Expressway and Its Impacts

34.    The proposed new Illiana Expressway would be built through a corridor at the exurban edge of the Chicago metropolitan area that is now almost entirely agricultural lands, low-density residential homes, and open and natural spaces. Construction of the proposed new tollroad would destroy thousands of acres of farmland and change population growth and traffic patterns in a manner that would also threaten the long-term viability of the Midewin National Tallgrass Prairie.

**ANSWER:** IDOT admits that up to 2,725 acres of farmland could be affected by implementation of the project and denies the remaining allegations in Paragraph 34.

35.     Attached as Exhibit B is a map showing the three final expressway corridor alternatives surrounding the Midewin National Tallgrass Prairie, as they were described in the Tier 1 FEIS, including the selected Alternative B3 corridor.  The large green area on the western end of the study area is the Midewin National Tallgrass Prairie.

**ANSWER:**  The allegations in paragraph 35 purport to characterize referenced

Exhibit B, which speaks for itself and is the best evidence of its content.

36.     The proposed Alternative B3 corridor is located less than a mile south of the Midewin National Tallgrass Prairie.

**ANSWER:**  The allegations in Paragraph 36 purport to characterize referenced

Exhibit B, which speaks for itself and is the best evidence of its content.

37.     The proposed Alternative B3 corridor is about 10 to 15 miles south of existing developed residential and commercial communities in northern Will County.

**ANSWER:**  The allegations in Paragraph 37 purport to characterize referenced

Exhibit B, which speaks for itself and is the best evidence of its content.

38.     The proposed new Illiana Expressway would likely induce significant new nearby commercial, industrial, and residential development, changing the character of an area dominated by farming and natural spaces and attracting new "sprawl" development to the exurban, outlying edge of the Chicago metropolitan area.

**ANSWER:**  IDOT denies the allegations in Paragraph 38.

39.     The proposed new Illiana Expressway would likely induce new traffic onto the north-south Illinois Route 53, which runs through the Midewin National Tallgrass Prairie in an area used as habitat by grasslands birds and passes by the entrance to the

Abraham Lincoln National Cemetery, a federal military cemetery. Illinois Route 53, itself, is also a historic resource listed as Alternate Route 66 in the National Register of Historic Places, and designated by Defendant FHWA as a Federal Scenic Byway.

**ANSWER:** IDOT denies the allegations in sentence 1 of Paragraph 39 and admits the allegations in sentence 2 of Paragraph 39.

## Development of the Illiana Expressway Project's Purpose and Need

40. On June 8, 2011, Defendant FHWA published a Notice of Intent ("NOI") in the Federal Register (76 Fed. Reg. 33,401), announcing the initiation of the NEPA review process for "the Illiana Corridor Project." The environmental study process was divided into two tiers. Tier 1 was to include a "broad analysis" of project alternatives and conclude with the selection of a preferred corridor. Tier 2 would include more detailed environmental analyses of the preferred corridor.

**ANSWER:** IDOT admits the allegations in sentences 1 and 2 of Paragraph 40. The remaining allegations in Paragraph 40 purport to characterize the contents of the document referenced in sentence 1, which speaks for itself and is the best evidence of its contents.

41. On or about December 1, 2011, IDOT and INDOT released a Draft Transportation System Performance Report and a Draft Purpose and Need Statement for the proposed Illiana Expressway. The documents identified a project "study area" south of Interstate 80 (an existing east-west connector), including approximately 950 square miles of portions of southern Will County and northern Kankakee County in Illinois and southern Lake County in Indiana.

**ANSWER:** IDOT admits that the two documents referenced in sentence 1 of Paragraph 41 were issued by IDOT and INDOT. The remaining allegations in Paragraph 41 purport to characterize the contents of the referenced documents, which speak for themselves and are best evidence of their contents.

42.     The Draft Purpose and Need Statement set out three broad project needs: (1) Improving regional mobility; (2) Addressing local system deficiencies; and (3) Providing for efficient movement of truck freight.

**ANSWER:**  The allegations in Paragraph 42 purport to characterize the contents of the referenced document, which speaks for itself and is best evidence of its contents.

43.     Both the Draft Transportation System Performance Report and the Draft Purpose and Need Statement were premised on high expected future population and employment growth in the project study area focused on Will County, Illinois.  IDOT and INDOT relied on regional population forecasts for the year 2040 produced by a consultant retained by IDOT, which was proposing to build the new Illiana Expressway. The consultant forecasted a baseline population growth of over 170%, and employment growth of over 220%, in the project study area between 2010 and 2040.  By contrast, the  consultant forecasted population and employment growth of 29% and 35%, respectively, during the same period, for the overall eighteen-county northeastern Illinois and northwestern Indiana region.

**ANSWER:**  The allegations in Paragraph 43 purport to characterize the contents of those documents, which speak for themselves and are best evidence of their contents.

44.     The consultant's forecasts of rapid population growth for the project study area are not consistent with United States Census Bureau's official data showing that Will County, the primary driver for growth in the consultant's forecasts, has not been growing since the beginning of last decade's economic downturn.  For example, Will County's 2010 population of 677,560 was actually lower than the Census Bureau's estimated 2008 population of 679,069.  [footnote omitted]

**ANSWER:**  IDOT denies the allegations in Paragraph 44.

45.    The consultant's forecasts purported to be an analysis of population growth absent construction of the Illiana Expressway.  However, the consultant cited to the potential construction of the Illiana Expressway as one of the justifications for robust growth in Will County, Illinois and Lake County, Indiana.  The consultant therefore considered the potential existence of the proposed new Illiana Expressway in developing population forecasts that later were used to justify the need for the new tollroad.

**ANSWER:**  The allegations in Paragraph 45 purport to characterize the contents of the referenced documents, which speak for themselves and are the best evidence of their contents.

46.    IDOT's consultant also explicitly rejected 2040 population and employment forecasts that already had been produced by the region's metropolitan planning organizations ("MPOs").

**ANSWER:**  The allegations in Paragraph 46 purport to characterize the contents of the referenced documents, which speak for themselves and are the best evidence of their contents.

47.    MPOs are created under federal law to serve as regional transportation planning authorities.  Among other functions, MPOs develop long-range transportation plans to meet forecasted needs.  See 23 U.S.C. § 134(g); 23 C.F.R. § 450.322.

**ANSWER:**  The allegations set forth in Paragraph 47 purport to quote from and characterize NEPA, 23 U.S.C. § 134(g) and 23 C.F.R. § 450.322, each of which speaks for itself and is the best evidence of its content.

48.    Illinois state law has established CMAP as the MPO for the Chicago metropolitan area, including Will County.

**ANSWER:** IDOT admits the allegations in Paragraph 48.

49.     Indiana state law has established the Northwestern Indiana Regional Planning Commission ("NIRPC") as the MPO for northwestern Indiana, including Lake County.

**ANSWER:** IDOT admits the allegations in Paragraph 49.

50.     CMAP and NIRPC are responsible for making official population forecasts for the northeastern Illinois region and the northwestern Indiana region, respectively, that are used for regional planning purposes and to prioritize transportation projects in their areas.  The MPOs' long-range plans are designed to encourage population growth in existing communities and to discourage "sprawl" growth into less developed and undeveloped areas.    CMAP and NIRPC's population and employment forecasts reflected this policy.

**ANSWER:**  The allegations in Paragraph 50 purport to characterize Illinois and Indiana State law and MPO's undisclosed plans and forecasts, which speak for themselves and are the best evidence of their content.

51.     By contrast, IDOT's consultant based its population forecasts on the premise that "sprawl" growth would continue as in certain past decades.  Compared to the IDOT consultant's forecasts, the MPOs' forecasts showed much less robust growth in currently undeveloped areas, such as the southern half of the project study area in Will County, Illinois.

**ANSWER:**  The allegations in Paragraph 51 purport to characterize information contained in the Tier One Final EIS and MPO's undisclosed plans and forecasts, which speak for themselves and are the best evidence of their content.   To the extent a response is required, IDOT denies the allegations.

52.     On December 21, 2011, as part of the EIS process, CMAP submitted official written comments on the Draft Purpose and Need Statement for the Tier 1 environmental study process.   CMAP expressed concerns that IDOT had not considered CMAP's 2040 population forecasts in determining the purported need for the proposed new Illiana Expressway.  CMAP requested that IDOT prepare traffic demand forecasts for the project using CMAP's forecasts in order "to support current regional planning analyses and to remain consistent with requirements of the National Environmental Policy Act."  (See Exhibit A.)

**ANSWER:**  IDOT admits that CMAP submitted written comments on December 21, 2011.  The remaining allegations in Paragraph 53 purport to characterize the comments, which speaks for themselves and are the best evidence of their content.

## IDOT's and IDOT's "Preliminary Recommendation"

53.     On or about February 22, 2012, prior to the completion of the Tier 1 environmental study process, IDOT and INDOT announced a "preliminary recommendation" of Alternative B3 for the proposed new Illiana Expressway project corridor.

**ANSWER:**     IDOT admits that an announcement of a preliminary recommendation of Alternative B3 was made on or about February 22, 2012.  The remaining allegations of Paragraph 53 purport to characterize the announcement, which speaks for itself and is the best evidence of its content.

54.     On March 9, 2012, Plaintiffs Openlands, Midewin Heritage Association, and Sierra Club, among others, submitted detailed comments on the preliminary recommendation.  Among other things, they noted that IDOT's and IDOT's pre-selection of Alternative B3, to then be studied in conjunction only with a "no-action" alternative, would preclude a rigorous exploration and objective evaluation of all Illiana Expressway alternatives.  In the same comments, the Plaintiffs and others also: (1) Requested that IDOT and IDOT thoroughly evaluate more northern corridors that would better serve existing communities; and (2) Stated that Alternative B3 would cause direct, indirect and cumulative impacts on the Midewin National Tallgrass Prairie and other natural

resources, including by inducing truck traffic on Illinois Route 53 that would threaten Midewin's grassland bird habitat.

**ANSWER:** IDOT admits that Plaintiffs Openlands, Midewin Heritage Association and Sierra Club submitted comments on the preliminary recommendation on or about March 9, 2012. The remaining allegations of Paragraph 54 purport to characterize the document, which speaks for itself and is the best evidence of its content.

55. On March 8, 2012, the Midewin National Tallgrass Prairie, part of the United States Forest Service, a federal agency, submitted official written comments on the preliminary recommendation (attached hereto as Exhibit C). Among other things, the comments: (1) Described Alternative B3 as "not a viable alternative" because of its direct, indirect, and cumulative impacts on wildlife habitat at Midewin and throughout Will County; and (2) Urged IDOT and IDOT to consider both more northern and more southern corridors to avoid building an expressway in such close proximity to the Midewin National Tallgrass Prairie.

**ANSWER:** IDOT admits that the Midewin National Tallgrass Prairie submitted comments on the preliminary recommendation on or about March 8, 2012. The remaining allegations of Paragraph 55 purport to characterize the document, which speaks for itself and is the best evidence of its content.

## The Tier 1 Draft EIS for the Proposed Illiana Expressway Project

56. On or about July 13, 2012, IDOT and IDOT released the Tier 1 Draft EIS for the proposed Illiana Expressway project.

**ANSWER:** IDOT admits the allegations in Paragraph 56.

57. The Tier 1 Draft EIS modified the asserted needs for the proposed new Illiana Expressway from those listed in the Draft Purpose and Need Statement, now

identifying project needs as: (1) Improving regional mobility; (2) Alleviating local system congestion and improving local system mobility; and (3) Providing for efficient movement of freight.

      **ANSWER:** The allegations in Paragraph 57 purport to characterize the contents of the Tier 1 Draft EIS, which speaks for itself and is best evidence of its contents.

58.      The Tier 1 Draft EIS continued to rely on the population and employment forecasts produced by IDOT's consultant and it did not fully and fairly consider the need for the proposed new Illinois Expressway based on the MPOs' lower forecasts.

      **ANSWER:** The allegations in Paragraph 58 purport to characterize the contents of the Tier 1 Draft EIS, which speaks for itself and is best evidence of its contents.

59.      In response to comments from Plaintiffs and other stakeholders, the Tier 1 Draft EIS did compare Alternative B3 to two newly proposed corridors, a more northern Alternative A3S2, and Alternative B4, a variation of Alternative B3.

      **ANSWER:** The allegations in Paragraph 59 purport to characterize the contents of the Tier 1 Draft EIS, which speaks for itself and is best evidence of its contents.

60.      Again, however, the Tier 1 Draft EIS indicated that Alternative B3 remained the preferred alternative. Using traffic projections based on the consultant's population and employment forecasts, the Tier 1 Draft EIS concluded that Alternative B3 addressed the project's purpose and need criteria.

      **ANSWER:** The allegations in Paragraph 60 purport to characterize the contents of the Tier 1 Draft EIS, which speaks for itself and is best evidence of its contents.

61. The Tier 1 Draft EIS did not acknowledge, explain, or discuss any inconsistencies with the CMAP and NIRPC's long-range transportation plans and their associated population forecasts notwithstanding the fact that MPOs are created under federal law to serve as the regional authorities for transportation planning activities.

**ANSWER:** The allegations in Paragraph 61 purport to characterize the contents of the Tier 1 Draft EIS, which speaks for itself and is best evidence of its contents.

## Comments on the Tier 1 Draft EIS

62. The Plaintiffs, CMAP, NIRPC, the Midewin National Tallgrass Prairie, the United States Department of Interior, and other stakeholders filed comments raising legal and factual concerns with the Tier 1 Draft EIS. Plaintiffs' and other stakeholders' comments expressed concern that: (1) The Tier 1 Draft EIS did not consider the need for the proposed Illiana Expressway based on the MPOs' population forecasts, and that Alternative B3 was sited too far south to meet expected transportation needs; and (2) The Tier 1 Draft EIS did not adequately consider environmental impacts on the Midewin National Tallgrass Prairie and other natural resources.

**ANSWER:** IDOT admits that part of Paragraph 62 that alleges that various individuals, public agencies and other stakeholders submitted comments on the DEIS. The remaining allegations in Paragraph 62 purport to characterize the contents of the comments, which speaks for themselves and are the best evidence of their contents.

63. On and around August 29, 2012, Plaintiffs and other groups filed written comments demonstrating that the Tier 1 Draft EIS had either ignored or deferred consideration of a number of Alternative B3's significant environmental impacts, including noise, light, and air pollution caused by car and truck traffic on the proposed Illiana Expressway, as well as by induced traffic on Illinois Route 53. Plaintiffs stated that the Defendants' incomplete consideration of these impacts at the Tier 1 stage would preclude a meaningful evaluation of project alternatives.

**ANSWER:** IDOT admits that part of Paragraph 63 that alleges that Plaintiffs and other groups submitted comments on the Tier 1 Draft EIS on or about August 29, 2012.

The remaining allegations in Paragraph 63 purport to characterize the contents of the comments, which speaks for themselves and are the best evidence of their contents. To the extent the allegations in Paragraph 63 also purport to characterize the Tier 1 Draft EIS, the Tier 1 Draft EIS speaks …

64.     Plaintiffs and other groups also stated in their written comments: (1) Support for CMAP and NIRPC's concerns that the MPOs' population forecasts had been ignored; and (2) Concerns that Alternative B3 was sited too far south to serve existing populations and to fulfill the proposed Illiana Expressway's still-unclear purpose and need.

**ANSWER:** The allegations in Paragraph 64 purport to characterize the contents of comments submitted on the Tier 1 Draft, which speak for themselves and are the best evidence of their contents.

65.     On August 29, 2012, CMAP submitted written comments (attached hereto in Exhibit A) on the Tier 1 Draft EIS.  CMAP:  (1) Again requested that IDOT and IDOT evaluate project alternatives using CMAP's forecasts and cautioned that "[t]he comparative results for the three alternatives could be significantly different" if CMAP's forecasts were used; (2) Expressed "serious concerns" that Alternative B3 would promote new sprawled development throughout the southern portion of Will County in direct conflict with CMAP's policies to foster growth in existing communities; and (3) Requested that IDOT and IDOT consider the costs to "provide and maintain the necessary infrastructure to serve" this new low-density, sprawled development.

**ANSWER:** IDOT admits that on or about August 29, 2012, CMAP submitted written comments on the Tier 1 DEIS.  The remaining allegations in Paragraph 65 purport to characterize the contents of the comments, which speaks for themselves and are the best evidence of their contents.

66.     On August 24, 2012, NIRPC submitted written staff comments (attached hereto as Exhibit D) on the Tier 1 Draft EIS, also stating concerns about the study. NIRPC: (1) Stated that it disagreed with the consultant's forecasts and that, if, instead, NIRPC's forecasts were used, "there would be a basis to predict significantly less travel and traffic congestion in the study area, and the need for the project would be greatly diminished"; and (2) Noted that the Tier 1 Draft EIS did not account for costs associated with increased population and traffic in the project study area.

**ANSWER:**  IDOT admits that on or about August 24, 2012, NIRPC submitted written comments on the Tier 1 DEIS.  The remaining allegations in Paragraph 66 purport to characterize the contents of the comments, which speaks for themselves and are the best evidence of their contents.

67.     On August 29, 2012, the Midewin National Tallgrass Prairie, United States Forest Service, submitted written comments (attached hereto in Exhibit C) on the Tier 1 Draft EIS raising significant environmental objections to Alternative B3.  Among other things, the Midewin National Tallgrass Prairie: (1) Stated that "all remaining alternatives, due to their close proximity to Midewin's borders, will cause irreparable damage to the habitat" and advised IDOT and IDOT that "now is the time in Tier 1 to find a better alternative than the ones you have elected to evaluate"; and (2) Stated that the Tier 1 Draft EIS had failed to identify Midewin, in its entirety, as being protected by Section 4(f) as a resource that provided wildlife habitat and recreational opportunities.

**ANSWER:**  IDOT admits that on or about August 29, 2012, the Midewin National Tallgrass Prairie, United States Forest Service, submitted comments on the Tier 1 DEIS.  The remaining allegations in Paragraph 67 purport to characterize the contents of the comments, which speaks for themselves and are the best evidence of their contents.

68.     On August 29, 2012, the United States Department of Interior ("DOI") submitted written comments (attached hereto as Exhibit E) stating concerns with the Tier 1 Draft EIS and its consideration of alternatives.  Among other things, DOI: (1) Stated that the Tier 1 Draft EIS had failed to fully identify the Midewin National Tallgrass

Prairie as a Section 4(f) resource, and failed to fully acknowledge impacts on Illinois Route 53 as a Section 4(f) resource; and (2) Stated that the Tier 1 Draft EIS's assessment of indirect and cumulative environmental impacts was insufficiently narrow, citing the example of impacts of traffic noise from Illinois Route 53 on the Midewin Tallgrass Prairie.

**ANSWER:** IDOT admits that on or about August 29, 2012, the United States Department of the Interior submitted comments on the Tier 1 DEIS. The remaining allegations in Paragraph 68 purport to characterize the contents of the comments, which speaks for themselves and are the best evidence of their contents.

## The Tier 1 Final EIS and ROD for the Illiana Expressway

69.     On or about October 12, 2012, notwithstanding these criticisms, IDOT and IDOT officially announced that they had selected Alternative B3 as the preferred project corridor for the proposed Illiana Expressway.

**ANSWER:** IDOT denies the allegations of paragraph 69, and avers that the Tier One Preferred Corridor Report was released on the Illiana Project website on October 12, 2012.

70.     On November 12, 2012, Plaintiffs and other groups submitted written comments regarding the announcement. In the comments, Plaintiffs and other groups noted the same deficiencies in the environmental study as they had identified in their earlier comments.

**ANSWER:** IDOT admits that on or about November 12, 2012, Plaintiffs and other groups submitted comments. The remaining allegations in Paragraph 70 purport to characterize the contents of the comments, which speaks for themselves and are the best evidence of their contents.

71.    On December 12, 2012, CMAP submitted written comments (attached hereto in Exhibit A) regarding the announcement of this preferred Illiana Expressway corridor.  CMAP stated disappointment that IDOT and INDOT had decided to advance only Alternative B3 for further study and reiterated its concerns that: (1) Alternative B3 would cause low-density "sprawl" development in Will County, Illinois; and (2) IDOT and INDOT had refused to conduct an analysis of need based on CMAP's population and employment forecasts that accounted for policies intended to limit sprawl and low-density development.

**ANSWER:**  IDOT admits that on or about December 12, 2012, CMAP submitted written comments about the Tier 1 project.  The remaining allegations in Paragraph 71 purport to characterize the contents of the comments, which speaks for themselves and are the best evidence of their contents.

72.    On January 17, 2013, FHWA signed the Tier 1 FEIS and ROD approving Alternative B3 as the selected alternative for the proposed Illiana Expressway project and advancing it for further study in Tier 2.

**ANSWER:**  IDOT admits the allegations in Paragraph 72.

73.    The Tier 1 FEIS perpetuated many of the same errors that Plaintiffs and others had identified in the Tier 1 Draft EIS, including reliance on inflated population and employment forecasts and failure to adequately analyze Alternative B3's environmental impacts.

**ANSWER:**  IDOT denies the allegations in Paragraph 73.

# CLAIMS FOR RELIEF

## COUNT I

74.     Plaintiffs reassert and reallege Paragraphs 1 through 73 above.

**ANSWER:**  The foregoing responses to the allegations in Paragraphs 1-73 are hereby incorporated by reference.

75.     The Defendants violated NEPA and its implementing regulations and the Administrative Procedure Act in approving the Tier 1 EIS and ROD for the proposed Illiana Expressway by: (1) Conducting a flawed analysis of the need for the proposed new tollroad and the performance of alternatives in meeting that need, based on inflated population and employment forecasts; (2) Failing to reasonably explain or justify the proposed Illiana Expressway's inconsistency with the long-range plans promulgated by CMAP and NIRPC; and (3) Failing to take a "hard look" at areawide environmental impacts of building the Illiana Expressway on the Alternative B3 corridor, including but not limited to the harmful impacts of noise, light, and air pollution from new car and truck traffic on the tollroad and on Illinois Route 53, and the harmful impacts of low-density sprawled population growth in currently less- developed and undeveloped areas.

**ANSWER:**  IDOT denies the allegations in Paragraph 75.

76.     The Defendants' failure to comply with NEPA and its implementing regulations and its approval of the Tier 1 FEIS and ROD was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and thus violates the Administrative Procedure Act, 5 U.S.C. § 706.

**ANSWER:**  IDOT denies the allegations in Paragraph 76.

## COUNT II

## VIOLATIONS OF SECTION 4(f) OF THE DEPARTMENT OF

## TRANSPORTATION ACT AND THE ADMINISTRATIVE PROCEDURE ACT

77.     Plaintiffs reassert and reallege Paragraphs 1 through 73 above.

**ANSWER:**  The foregoing responses to the allegations in Paragraphs 1-73 are hereby incorporated by reference.

78.     The Defendants violated Section 4(f) and its implementing regulations and the Administrative Procedure Act in approving the Tier 1 FEIS and ROD for the proposed Illiana Expressway by failing to (1) reasonably and adequately address the preferred Alternative B3's constructive use of lands protected by Section 4(f), including the Midewin National Tallgrass Prairie and Alternative Route 66, and (2) adequately consider reasonable, prudent and feasible alternatives to avoid harmful impacts to these protected lands.

**ANSWER:**  IDOT denies the allegations in Paragraph 78.

79.     Accordingly, the Defendants' failure to comply with Section 4(f) and its implementing regulations and its approval of the Tier 1 FEIS and ROD was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and thus violates the Administrative Procedure Act, 5 U.S.C. § 706.

**ANSWER:**  IDOT denies the allegations in Paragraph 79.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment in favor of Plaintiffs and against Defendants and enter an Order:

1.    Declaring that the Defendants' approval of the Tier 1 Final Environmental Impact Statement and Record of Decision for the proposed new Illiana Expressway project violated NEPA and Section 4(f).

2.    Declaring that the Defendants' approval of the Tier 1 Final Environmental Impact Statement and Record of Decision was arbitrary and capricious, an abuse of discretion and contrary to law, and thus violated the APA.

3.    Vacating, setting aside, reversing and remanding the Tier 1 Final Environmental Impact Statement and Record of Decision for the proposed Illiana Expressway project.

4.    Enjoining Defendants from using the Tier 1 decisions in subsequent proceedings, including decisions whether to grant licenses, permits, and approvals for the proposed Illiana Expressway project, unless and until the Defendants fully and fairly comply with the requirements of NEPA and Section 4(f).

5.    Allowing the Plaintiffs to recover their costs, including reasonable attorneys' fees, incurred in connection with this action, as provided for under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable laws; and

6.    Granting such other and further relief as the Court may deem just and proper and in the public interest.

**ANSWER:**  The remaining Paragraphs of the Complaint consist of Plaintiffs' request for relief, for which no response is required.  To the extent that any response is deemed necessary, IDOT denies that the Plaintiffs are entitled to any of the requested relief or any other relief.

## AFFIRMATIVE DEFENSES

IDOT, without assuming the burden of proof on issues upon which Plaintiffs have the burden of proof, alleges for its affirmative defenses in this action as follows:

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs lack standing to bring the claims raised in their complaint.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are not ripe.

**WHEREFORE**, IDOT demands judgment against the Plaintiffs as follows:

1.    For judgment dismissing with prejudice the Complaint;

2.    For costs and disbursements of this action; and

3.    For such other and further relief as the Court deems just and proper.

ILLINOIS DEPARTMENT OF
TRANSPORTATION

By:    s/Michael A. Forti
        One of Its Attorneys

LISA MADIGAN
Attorney General of Illinois
Michael A. Forti, Special Asst. Attorney General
100 W. Randolph, Suite 6-600
Chicago, Illinois 60601
Lance T. Jones, Special Asst. Attorney General
2300 S. Dirksen Parkway, Room 313
Springfield, Illinois 62764