**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| OPENLANDS, MIDEWIN HERITAGE ASSOCIATION and SIERRA CLUB, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, ANTHONY FOXX, Secretary, United States Department of Transportation, FEDERAL HIGHWAY ADMINISTRATION, VICTOR M. MENDEZ, Administrator, Federal Highway Administration, and CATHERINE BATEY, Division Administrator, Illinois Division, Federal Highway Administration, | ) ) ) ) ) ) ) ) ) ) | **Case No. 1:13-cv-04950**<br><br>**Judge Guzman** |
| Defendants. | ) | |

<u>**PLAINTIFFS' STATEMENT OF MATERIAL FACTS**</u>

In this administrative review proceeding, the relevant facts are contained in the administrative record and other public documents of which this Court may take judicial notice. These facts are related in the "Statement of Material Facts" section of Plaintiffs' Opening Memorandum in Support of Plaintiffs' Motion for Summary Judgment.

1.     This case involves the Illinois Department of Transportation's ("IDOT") and Indiana Department of Transportation's ("INDOT") plans to construct the proposed new "Illiana Tollway" costing about $1.25 billion and running for 47 miles through southern Will County, Illinois to near Lowell, Indiana.  AR1_000006, 7, and 18.

2.     The proposed Illiana Tollway would be located near the southern side of the nationally-recognized Midewin National Tallgrass Prairie.  AR1_000008.  The Illiana Tollway could also facilitate more heavy trucks running on Illinois Route 53 through the Tallgrass Prairie

to a proposed new interchange. AR1_007509. A map of the proposed Illiana Tollway in "Corridor B3" is attached as Exhibit A to Plaintiffs' Opening Memorandum in Support of Plaintiffs' Motion for Summary Judgment. *See also* AR1_000008. A map of the Illiana study area in relation to the larger region is attached as Exhibit B to Plaintiffs' Opening Memorandum in Support of Plaintiffs' Motion for Summary Judgment. *See also* AR1_000092.

**The National Environmental Policy Act and Its Environmental Impact Statement Process**

3.     The National Environmental Policy Act ("NEPA") is the cornerstone federal law designed to ensure that agency decisionmakers "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed federal action. 40 C.F.R. § 1502.14(a). NEPA "declare[s] a national policy which will encourage productive and enjoyable harmony between man and his environment; [and will] promote efforts which will prevent or eliminate damage to the environment . . . ." 42 U.S.C. § 4321. "Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." 42 U.S.C. § 4331(c). NEPA's basic policy is to assure that all branches of government give full and proper consideration to environmental impacts prior to undertaking any major federal action that significantly affects the environment.

4.     NEPA's goals include ensuring that policymakers make better informed decisions by considering important environmental information and accurate data, and that the public better understands the responsible agency's environmental decisionmaking process. *See, e.g., Simmons v. U. S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997). "NEPA dictates a set of procedures that requires agencies to disseminate all relevant environmental information and to take a 'hard look' at the environmental consequences of any major federal action. The primary vehicle for the 'hard look' is the environmental impact statement. The impact statement must

'rigorously explore and objectively evaluate all reasonable alternatives' to the proposed action. 40 C.F.R. § 1502.14(a). Moreover, it must describe the environmental impact of the proposed action. 40 C.F.R. § 1502.16." *Sierra Club v. United States Dep't of Transp.*, 962 F. Supp. 1037, 1042 (N.D. Ill. 1997) (citations omitted).

5. The NEPA process is governed by the statute, by the Council on Environmental Quality's ("CEQ") regulations and binding "guidances" and by federal agencies' own implementing regulations, which must be consistent with the CEQ requirements. 40 CFR Parts 1500 – 1508. NEPA requires that an environmental review process be conducted when there is a "major federal action" involving either a federal approval (e.g., permit) or the use of federal funds for a project "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

6. The "responsible official" must prepare a detailed statement – here, the draft and final Environmental Impact Statements ("EIS") – assessing "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(i-v). "Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(2)(C).

7. The Federal Highway Administration ("FHWA") was the agency responsible for approving the Record of Decision ("ROD") and Tier 1 Final Environmental Impact Statement

("FEIS") for the proposed Illiana Tollway. NEPA required the FHWA to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). NEPA required the Defendants to specify the "purpose and need" for the proposed Illiana Tollway project and explore reasonable alternatives to meet it. 40 C.F.R. § 1502.13; 40 C.F.R. § 1502.14(a).

8. NEPA also required the FHWA to "coordinat[e]" and "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(2)(C).

9. That consultation included the United States Department of Interior and the United States Forest Service, both of which submitted formal comments criticizing aspects of the EIS because of the proposed Illiana Tollway's harmful environmental impacts to the Midewin National Tallgrass Prairie. AR2_005082; AR2_005199; AR2_14872.

10. In addition, the federally-required and state-designated Metropolitan Planning Organizations ("MPO") responsible for transportation planning in the region, the Chicago Metropolitan Agency for Planning ("CMAP") and the Northwestern Indiana Regional Planning Commission ("NIRPC"), also submitted comments criticizing the EIS process for its failure to consider the MPOs' population forecasts, among other issues. AR2_005204; AR2_005266.

**The Midewin National Tallgrass Prairie**

11. The Midewin National Tallgrass Prairie is the nation's first federally-protected tallgrass prairie. AR1_000541. The United States Congress established the Midewin National Tallgrass Prairie in the Illinois Land Conservation Act, Pub. L. 104-106. Its foremost purpose is to "conserve and enhance the native populations and habitats of fish, wildlife, and plants." *Id.*

Congress also dedicated the Midewin National Tallgrass Prairie "[t]o provide a variety of recreation opportunities" (Pub. L. 104-106), and it is used by the public for hiking, wildlife viewing, historical heritage tours and volunteer prairie restoration activities. *See*, *e.g.*, Pls.' Mtn. for Summary Judg., Exs. 2, 4, and 5, Declarations of John Field, Rita Renwick, and Lorin Schab.

12.     The Midewin National Tallgrass Prairie is the largest public open space in northeastern Illinois, comprising 18,225 total acres, and is an important link to the State's pre-settlement history. AR1_000541; AR1_000628. There are grassland bird management areas within the Midewin National Tallgrass Prairie along its southern border, near the proposed Illiana Tollway, as well as along Illinois Route 53. AR2_005085 (United States Department of Interior's August 29, 2012 comments); AR2_005160 (Plaintiffs' August 29, 2012 comments).

13.     The Midewin National Tallgrass Prairie is administered by the United States Forest Service, which raised concerns about the proposed Illiana Tollway's impacts throughout the EIS process. In particular, the Forest Service advised in the consultation process that the proposed Corridor B3 for the Tollway along the southern side of the Midewin National Tallgrass Prairie was "not a viable alternative" because of its harmful natural resource impacts. AR2_014872.

**The NEPA Environmental Impact Statement Process**

14.     Construction of the proposed Illiana Tollway is a major federal action subject to NEPA's requirements because of the proposed use of federal funds and necessary federal approvals. 42 U.S.C. § 4332(2)(C).

15.     The NEPA EIS process involved the FHWA as the "responsible" agency and officials for the Tier 1 FEIS and ROD, and IDOT and INDOT as the state transportation departments that proposed the Illiana Tollway.

16.     NEPA required mandatory consultations in which the lead agencies must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id*. Here, both the Unites States Department of Interior, with the United States Fish and Wildlife Service, and the United States Forest Service participated in the EIS process.

17.     CMAP and NIRPC, as the two primary MPOs in the region, also participated in the EIS process. MPOs are required under the Federal Aid-Highway Act, 23 U.S.C. § 101 *et seq.*, to develop long-range regional transportation plans to meet forecasted population, employment and traffic needs. 23 U.S.C. § 134(c); 23 C.F.R. § 450.322. MPOs produce these socioeconomic forecasts of population, employment and traffic data to achieve their transportation planning responsibilities. FHWA guidance describes "congressional intent that . . . metropolitan transportation planning should be the foundation for highway and transit project decisions." 23 C.F.R. Part 450, App. A. CMAP and NIRPC submitted detailed comments on their population and employment forecast data throughout the EIS process.

18.     In June 2011, Defendant FHWA published a Notice of Intent in the *Federal Register* announcing its initiation of a NEPA study process for "the Illiana Corridor Project" with "anticipated project termini" of I-55 in Will County, Illinois and I-65 in Lake County, Indiana. 76 Fed. Reg. 33,401, 33,402 (June 8, 2011). FHWA stated that its EIS would be divided into two "tiers." *Id*. The Tier 1 EIS would include a "broad analysis" of transportation alternatives for a study area of 950 square miles in Will and Kankakee Counties in Illinois and Lake County in Indiana, and evaluate environmental impacts at a "planning level of detail." 76 Fed. Reg. 33,402. The Tier 1 EIS would conclude with a "preferred corridor that can encompass one or more transportation alternatives," which would be evaluated in more detail in a Tier 2 EIS. *Id*.

19.     The proposed Illiana Tollway emerged from earlier studies commissioned by IDOT and INDOT.  AR1_000090.  One study in 2009 examined a potential new tollway between I-57 (a north-south connector east of I-55) in Illinois and I-65 in Indiana while another study in 2010 study extended the proposed tollway to run from I-55 to I-65.  AR2_039812 and AR2_039214.  In 2010, the Illinois and Indiana Governors signed a Memorandum of Agreement for a "mutual commitment to the project," and both states enacted legislation that would under certain circumstances allow for particular "public-private partnerships" to help finance construction and operation of the tollway.  AR1_000091.

20.     In 2010 and 2011, the Illiana Tollway was considered by CMAP and NIRPC, respectively, in adopting their long-range regional transportation plans.  AR1_000095.  The Illiana Tollway was not included in either MPOs' priority list of funded transportation projects. *Id*.

21.     Moreover, CMAP's long-range transportation plan – named "GO TO 2040" and including transportation projects through 2040 – identified a very different conception of the Illiana Tollway than what emerged from FHWA's EIS process as the selected "Corridor B3." CMAP's *GO TO 2040 Major Capital Projects* (Oct. 2010) describes the Illiana Tollway as running "from I-55 <u>south of Joliet</u> extending east into Indiana to I-65."[1]  This is a different corridor located up to 10 miles north of the selected Corridor B3.  CMAP stated in its GO TO 2040 Plan that the Illiana "has a 2030 time frame."[2]

---

[1] http://www.cmap.illinois.gov/documents/10180/31056/GO+TO+2040_major_capital_projects.pdf/53b76 8a0-28ac-4a53-b42b-2e1590ce5e1b at page 95.  The GO TO 2040 Plan is included in the administrative record by reference.  *See* AR1_000830 (Tier 1 FEIS References section).  Plaintiffs have included this specific GO TO 2040 document in the Appendix.
[2] *Id*.

**The Required Section 4(f) Determination**

22.     Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c), applies to protect the Midewin National Tallgrass Prairie.  Section 4(f) requires that prior to the "use" of any land from a publicly owned park, recreational area, wildlife or waterfowl refuge, or land from a historic property on or eligible for inclusion in the National Register of Historic Places, the responsible agency for the proposed transportation project must first determine that there are no "prudent and feasible" alternatives that would avoid such use.  Section 4(f) requires that project planning include all possible ways to minimize harm to such public resources.

**CMAP's Early Objections to IDOT's Exclusive Reliance on Its Hired Consultant's High Population Forecasts**

23.     Illinois law specifically provides that "CMAP's official forecasts and plans shall be the foundation for all planning in the region."  70 ILCS § 1707/51 (Illinois Regional Planning Act).

24.     CMAP made clear that the MPOs' 2040 socioeconomic forecasts and plans should be used to analyze alternative corridors for the Illiana Tollway in the EIS process.  On November 11, 2011, CMAP and NIRPC met with FHWA, IDOT and INDOT regarding the socioeconomic – population and employment – forecasts to be used in the EIS process.  CMAP and NIRPC explained that their official forecasts for the region assumed "revitalization of the urban core" and "more development to existing communities."  AR1_003752.  CMAP did not object to IDOT and INDOT including alternative forecasts in the NEPA study process.  AR1_003753.  CMAP did, however, request that the EIS include "build" and "no-build" scenarios based on the MPOs' population and employment forecasts for the region.  AR1_003753.

25.     IDOT and INDOT nonetheless hired their own private consultant, the al-Chalabi Group ("ACG"), to prepare separate population and employment forecasts.  IDOT, INDOT and their consultant ACG apparently understood CMAP's objection (AR3_041130), and that CMAP's staff was offering to create a "2040 'build' CMAP socio-economic scenario with an Illiana expressway" that could be used in conjunction with a "no-build" scenario reflecting the MPOs' forecasts.  *Id*.

**IDOT's and INDOT's Refusal to Use the MPOs' Forecasts in the EIS Process**

26.     Before initiating the NEPA-required EIS, IDOT determined that it would not use CMAP's 2040 population and employment forecast for the Illiana Tollway process or for any other new major planning studies.  AR2_038355.

27.     ACG prepared alternative 2040 socioeconomic forecasts that were not limited to the Illiana study area.  Instead, the forecasts began with CMAP and NIRPC's overall regional population forecasts for the Chicago metropolitan and Northwest Indiana region, but redistributed the population differently than the MPOs had done in their official forecasts. AR1_001387.

28.     The MPOs' forecasts assume that transportation investments will be targeted "whenever possible to foster growth in existing communities," leading to a revitalized urban core.  AR1_003752; AR1_007566.  ACG, on the other hand, assumed that growth trends would be dominated by sprawl into outlying areas, with transportation investments made to facilitate this growth.  AR1_001396.

29.     The ACG forecasts and their differences from CMAP and NIRPC's forecasts are documented in a report attached as an exhibit to the Tier 1 FEIS.  AR1_001378-001466.  A table summarizing the differences is available at AR1_001417.  For example, ACG predicted that over

300,000 fewer people would live in the City of Chicago in 2040 than CMAP projected. AR1_001417.  ACG also allocated more population to outer suburbs and exurbs, including in Will County, Illinois.  *Id*.  For 2040, ACG forecast a Will County population that would be 12.2 percent higher than CMAP's forecast.  *Id*.; AR1_001429.

30.    To support its high growth expectations for Will County, ACG cited potential transportation developments, including the Peotone Airport, the potential construction of the Illiana Tollway itself and the possible extension of a Metra line.  AR1_001429.

31.    The differences between the CMAP and ACG forecasts are even more pronounced for southern Will County.  For example, ACG forecast Southwest Will County's population would nearly quintuple from 42,226 in 2010 to 198,800 in 2040.  AR1_001410.  In comparison, CMAP forecast a population of approximately 100,000 in 2040.[3]  ACG forecast that Southeast Will County population would grow explosively from 55,968 in 2010 to 229,000 in 2040.  AR1_001411.  By contrast, CMAP forecast a 2040 population of approximately 130,000 in the same area.  *Id*.  ACG's population forecast of 427,800 by 2040 for southern Will County, as a whole, is thus almost twice as high as CMAP's population forecast of 230,000 by 2040.

---

[3] The ACG report does not provide exact numbers for CMAP's 2040 estimates.  They are graphically represented, though.  For Southwest Will County, for example, CMAP's 2040 population estimate is represented by the red dot on the 2040 y-axis.  AR1_001410.

32.     Both ACG and CMAP forecast much higher growth for Will County, however, than trends identified in United States Census Bureau data:

**Table 1: U.S. Census Bureau and Bureau of Labor Statistics Population and Employment Estimates for Will County, Illinois, 2007 to 2013**

| Year | Population[4] (as of July 1) | Employment[5] (annual average) |
|------|------|------|
| 2007 | 664,048 | 345,864 |
| 2008 | 671,392 | 344,921 |
| 2009 | 674,970 | 328,393 |
| 2010 | 678,859 | 328,134 |
| 2011 | 680,192 | 329,711 |
| 2012 | 681,590 | 336,919 |
| 2013 | 682,829 | 336,713 |

33.     County-level population and employment data for Will County from the U.S. Census Bureau and Bureau of Labor Statistics demonstrates flattening population and employment growth in Will County.[6]

34.     As depicted in Table 2, below, ACG's forecasts outpace actual population growth in Will County.  ACG's forecast for average annual population growth in Will County between 2010 and 2040 was 3.39%.  By contrast, the U.S. Census Bureau data shows that Will County population increased by only 0.47% from 2007 to 2013.  The population "growth" rate decreased to 0.19% annually from 2010 to 2013.

---

[4] Population data for 2010-2013 is available at http://www.census.gov/popest/data/index.html. Population data for 2007-2009 is available at http://www.census.gov/popest/data/intercensal/county/CO-EST00INT-01.html.

[5] Employment data for 2007-2012 is available at http://www.bls.gov/lau/home.htm#cntyaa. Employment data for 2013 is available at http://www.bls.gov/lau/laucntycur14.txt.

[6] This Court may take judicial notice of information contained in public records, including U.S. Census data and publications of the Bureau of Labor Statistics. *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) (holding that the Consumer Price Index, published by the Bureau of Labor Statistics, "belongs to the category of public records of which a court may take judicial notice"); *United States v. Bailey*, 97 F.3d 982, 985 (7th Cir. 1996) (taking judicial notice of information from Census Bureau report); *Barnett v. Daley*, 32 F.3d 1196, 1198 (7th Cir. 1994) (stating that the court could take judicial notice of "census population figures").

**Table 2:** Average Annual Population Growth for Will County, Illinois—ACG and CMAP 2040 Forecasts Compared to United States Census Bureau Actual Estimates

|  | Year Range | Starting Pop | Ending Pop | Average Annual Growth |
|---|---|---|---|---|
| ACG | 2010 – 2040 | 677,560[7] | 1,366,456[8] | 3.39% |
| CMAP | 2010 – 2040 | 726,238[9] | 1,217,879[10] | 2.26% |
| Census Bureau | 2007 – 2013 | 664,048[11] | 682,829[12] | 0.47% |
| Census Bureau | 2010 – 2013 | 678,859[13] | 682,829[14] | 0.19% |

**The United States Forest Service's Early Objections to IDOT and INDOT Siting the Illiana Tollway Corridor Near the Midewin National Tallgrass Prairie**

35.     The United States Forest Service likewise made clear its concerns at the beginning of the NEPA study process.  On July 6, 2011, the Forest Service submitted written comments to IDOT expressing concern that a new tollway near the Midewin National Tallgrass Prairie could cause "irreparable environmental damage" to plant and animal habitats, and requested that "only viable routes should be analyzed and considered as alternatives that give wide berth to the natural lands, restored lands, and future lands at Midewin."  AR1_002200.

**IDOT's and INDOT's Draft Purpose and Need Statement**

36.     In December 2011, IDOT and INDOT issued their Draft Purpose and Need Statement and a Draft Transportation System Performance Report for the proposed Illiana Tollway.  AR3_040527 and AR2_018209.  These documents were based on population and

---

[7] ACG's population forecast lists 677,560 as the population for Will County in 2010.  AR1_001417.
[8] AR1_001417.
[9] http://www.cmap.illinois.gov/data/demographics/population-forecast.  This forecast is part of the GO TO 2040 Plan and therefore included in the administrative record by reference.  *See* n.1, *supra*.
[10] AR1_001417.
[11] http://www.census.gov/popest/data/intercensal/county/CO-EST00INT-01.html.
[12] http://www.census.gov/popest/data/index.html.
[13] Population data for 2010-2013 is available at http://www.census.gov/popest/data/index.html.
[14] http://www.census.gov/popest/data/index.html.

employment forecasts prepared by ACG, the private consultant that they had hired. AR1_001378. They were not based on CMAP's and NIRPC's population and employment forecasts.

37.    ACG's socioeconomic forecasts were then used as the basis for IDOT's and INDOT's forecasting model that, first, projected 2040 traffic levels in the study area and, then, led to selection of Corridor B3 for the Illiana Tollway. AR2_018222, AR1_000160 and AR1_000220. Based on this analysis, the Draft Purpose and Need Statement identified three asserted needs for the study area:

(1) "Improve regional mobility" – "address[ing] the need to develop a transportation system improvement that serves the projected growth in east-west traffic in the Study Area; reduc[ing] regional travel times; and improve[ing] access to jobs," AR3_040536;

(2) "Address local system deficiencies" – "focus[ing] on the need to develop a transportation system improvement that serves the projected growth in local traffic, address[ing] the lack of continuous higher functional classification east-west routes through the Study Area, and improve[ing] Study Area travel times/reduces delay," AR3_040539; and

(3) "Provide for efficient movement of freight" – "focus[ing] on the need to improve the accessibility of freight movement to and from its distribution points throughout the region, and provid[ing] more efficient truck freight movement on the roadway network." AR3_040546.

38.    CMAP submitted comments, expressing concerns that IDOT had not considered CMAP's official 2040 population and employment forecasts in determining the purported need for the proposed new tollway. AR2_017613. CMAP requested that IDOT prepare traffic demand forecasts using CMAP's forecasts in order "to support current regional planning analyses and to remain consistent with requirements of the National Environmental Policy Act." AR2_017614.

**IDOT's and INDOT's "Preliminary Recommendation" of Corridor B3 for the Proposed Illiana Tollway**

39.     In February 2012, before the completion of the Tier 1 EIS, IDOT and INDOT announced their "preliminary recommendation" of Corridor B3 for the proposed Illiana Tollway. AR3_035240.  They recognized that "[t]ravel performance decreases as [the tollway's] location shifts south" (AR3_035218), but claimed Corridor B3 was "the best balance of performance, minimizing impacts, financial viability and compatibility with community plans."  AR3_035240.

40.     CMAP, the U.S. Forest Service and many civic groups opposed Corridor B3. CMAP explained that Corridor B3 is located "well south of any substantial development." AR1_003729.

41.     The map attached as Exhibit A to Plaintiffs' Opening Memorandum in Support of Summary Judgment depicts Corridor B3 in relation to Defendants' approved "study area" (designated by the dotted-line rectangle) for the NEPA process.  *See also* AR1_000008.

42.     Corridor B3 is generally located about 10 miles south of existing development in northern Will County, Illinois and Lake County, Indiana.  *Id.*  The area through which Corridor B3 runs is currently used primarily as agricultural land, with other land uses including "scattered rural housing, small lakes and streams, and natural areas."  AR1_000602.

43.     Locating and constructing the Illiana Tollway in Corridor B3 would result in significant adverse natural resources impacts including:  the loss of up to 2,725 acres of farmland, including up to 1,607 acres of "prime" farmland; destroying and fragmenting up to 34 acres of wetlands; crossing 33 ecologically-significant rivers and streams, comprising up to 12 acres of stream surface area; and adversely impacting federal and state protected historic and natural areas.  AR1_000228-230; *see generally* Tier 1 FEIS Chapter 3 at AR1_000224.

44. The Illiana Tollway would also create substantial adverse impacts on the Midewin National Tallgrass Prairie by causing noise, air and light pollution that would drive away wildlife. AR1_000658; AR1_006198-6200.

45. The Illiana Tollway would also create new traffic on existing nearby roads, including up to an asserted 11,000 vehicles per day on Illinois Route 53 (AR1_007509), which is listed in the National Register of Historic Places as a part of Alternate Route 66. AR1_000225.

46. Illinois Route 53 runs north-south through the Midewin National Tallgrass Prairie and alongside the Abraham Lincoln National Cemetery, a national military cemetery. AR1_006193; AR1_006226. Noise and pollution from additional traffic would adversely impact both of these resources. AR1_006193; AR1_06199-6200.

47. On March 9, 2012, Plaintiffs and other groups submitted detailed comments stating that the pre-selection of Corridor B3 would preclude a rigorous exploration and objective evaluation of all alternatives. AR1_003704; AR1_003707. Plaintiffs requested that IDOT and INDOT evaluate more northern corridors that would better serve existing developed areas (AR1_003708), and they explained why traffic generated by Corridor B3 would cause harmful impacts to the Midewin National Tallgrass Prairie and other natural resources. AR1_003706.

48. On March 14, 2012, CMAP submitted comments criticizing IDOT's pre-selection of Corridor B3: "[b]y choosing an alignment that is well south of any substantial development . . . the corridor has little positive effect on regional mobility and local system deficiencies." AR1_003729. CMAP summed up the screening results as "clearly" showing that "as the location shifts south, travel performance decreases." AR1_003728. "Also, since it is assumed that this will be a toll facility of some type, the B3 alternative's decrease in performance not only fails to fully address the purpose and need, it also will likely not generate sufficient revenue to

construct and maintain the facility." *Id.* (emphasis added). CMAP also stated concerns with the Tollway's indirect and cumulative land use impacts:

> Focusing primarily on the B3 alternative may encourage future development outside existing communities. Continued analysis of alternative routes is necessary, to consider whether they can provide a focus for development and redevelopment within existing communities that is consistent with GO TO 2040.

AR1_003729.

49. In March 2012, the U.S. Forest Service submitted comments stating that Corridor B3 was "not a viable alternative" because of its direct, indirect, and cumulative impacts on wildlife habitat at the Midewin National Tallgrass Prairie and throughout Will County. AR2_014872. This consulting federal agency urged IDOT to consider other corridors in order to avoid building a new tollway so close to the Midewin National Tallgrass Prairie. AR2_014872-14873.

50. The Illiana Tollway would also adversely impact regional transportation planning and funding. Defendants estimate the required capital expenditures to build the Illiana Tollway in Corridor B3 at $1.25 billion or more. AR1_000018. In a draft financial feasibility analysis prepared in October 2012, but never released to the public until its inclusion in the administrative record, consultants for IDOT and INDOT assumed that this expressway would be tolled. AR3_007941. They estimated the amount of "public subsidy" still needed would range from $249 million to $707 million in order to "fully finance" the tollway. AR3_007962 and AR3_007934. The financial feasibility analysis concluded that "[i]n all cases toll revenues alone are not sufficient to cover the entire initial capital cost of the facility." AR3_007962. Their analysis further concluded that this public subsidy could require IDOT and INDOT to shift their transportation funding priorities away from other projects. AR3_007966.

**The Tier 1 Draft Environmental Impact Statement**

51.     On July 13, 2012, IDOT and INDOT released their Tier 1 Draft Environmental Impact Statement ("DEIS") for the proposed Illiana Tollway project.  AR1_007967.  It slightly modified the asserted purpose and need (AR1_008022) and compared Corridor B3 to a more northern Alternative A3S2 and to Alternative B4, which is a variation of Corridor B3. AR1_007998.

52.     The Tier 1 DEIS relied exclusively on consultant ACG's population and employment forecasts (AR1_008079) and did not consider alternatives based on CMAP's and NIRPC's lower forecasts.  Based on traffic projections using ACG's forecasts, the Tier 1 DEIS concluded that each of the three above alternatives addressed the project's purpose and need criteria.  AR1_008117.

53.     The Tier 1 DEIS discussed other potential tollway configurations that it rejected, including the "A Corridors" located in the northern part of the study area, which corresponded to the Illiana Tollway as described in CMAP's GO TO 2040 Plan.  IDOT and INDOT recognized that "the alternative corridors located in the northern portion of the Study Area tended to have better travel performance than the alternative corridors located in the central or southern portion of the Study Area" (AR1_008084), but nonetheless still selected Corridor B3.

**Plaintiffs', CMAP's, NIRPC's, the United States Forest Service's and the United States Department of Interior's Written Comments on the Tier 1 DEIS**

54.     On August 29, 2012, Plaintiffs and other civic groups submitted detailed written comments explaining that the Tier 1 DEIS had failed to adequately consider a number of environmental impacts, including noise, light and air pollution from traffic on the Illiana Tollway, as well as from new induced traffic on Illinois Route 53.  AR2_005150.  Plaintiffs' comments were supported by references to additional studies demonstrating the impacts of traffic

noise on neighboring bird habitat and maps showing grassland bird habitat along the southern edge of the Midewin National Tallgrass Prairie adjacent to Corridor B3 and, also, near Illinois Route 53. AR2_005160. Plaintiffs stated their agreement and support for CMAP's and NIRPC's concerns that the MPOs' population forecasts had been bypassed and ignored. AR2_005152. Plaintiffs also explained concerns that Corridor B3 was sited too far south to serve existing populations and to fulfill the proposed Illiana Expressway's still-unclear purpose and need. *Id.*

55. On August 28, 2012, CMAP submitted written comments on the Tier 1 Draft EIS. CMAP: (1) Requested that IDOT and INDOT evaluate project alternatives using CMAP's official forecasts and cautioned that "[t]he comparative results for the three alternatives could be significantly different" if CMAP's forecasts were used; (2) Expressed "serious concerns" that the Corridor B3 alternative would promote new sprawled development throughout the southern portion of Will County in direct conflict with CMAP's policies to foster growth in existing communities; and (3) Requested that IDOT and INDOT consider the costs to "provide and maintain the necessary infrastructure to serve" this new low-density, sprawled development. AR2_005204-5205.

56. On August 24, 2012, NIRPC submitted written comments on the Tier 1 Draft EIS. NIRPC: (1) Stated that it disagreed with the consultant's forecasts and that, if, instead, NIRPC's forecasts were used, "there would be a basis to predict significantly less travel and traffic congestion in the study area, and the need for the project would be greatly diminished"; and (2) Stated that the Tier 1 Draft EIS did not account for costs associated with increased population and traffic in the project study area. AR2_005266; AR2_005269.

57. The United States Forest Service submitted comments stating that "all remaining alternatives, due to their close proximity to Midewin's borders, will cause irreparable damage to the habitat" and advised IDOT and INDOT that "now is the time in Tier 1 to find a better alternative than the ones you have elected to evaluate." AR2_005199. The Forest Service also explained the Tier 1 DEIS had failed to identify the Midewin National Tallgrass Prairie, in its entirety, as a Section 4(f) protected area providing wildlife habitat and recreational opportunities. *Id.* The Forest Service stated that "[a]ll of Midewin lands are considered protected under the provisions of [Section 4(f)], and you must afford us the protection and consideration set forth in this act." *Id*.

58. On August 29, 2012, the United States Department of Interior submitted written comments also explaining that the Tier 1 Draft EIS failed to fully identify the Midewin National Tallgrass Prairie as a Section 4(f) resource and did not fully recognized the impacts of Illinois Route 53 traffic on the Section 4(f) resources. The Department criticized the Draft EIS's assessment of indirect and cumulative environmental impacts as too narrow. AR2_005090. For example, the Department cited academic studies demonstrating the impacts of traffic noise on neighboring bird habitat, such as that along the Midewin National Tallgrass Prairie's southern border near Corridor B3, and adjacent to Illinois Route 53. AR2_005085-5086.

**IDOT's and INDOT's Selection of Corridor B3 for the Proposed Illiana Tollway**

59. In early October, 2012, IDOT and INDOT announced their selection of Corridor B3 for the proposed Illiana Tollway. AR3_011160.

60. On November 12, 2012, Plaintiffs and other groups submitted written comments identifying many of the same deficiencies they had previously explained. AR3_003906.

61.     On December 12, 2012, CMAP submitted written comments expressing disappointment and reiterating concerns that: (1) Corridor B3 would cause low-density "sprawl" development in Will County; and (2) IDOT and INDOT had refused to conduct an analysis of need based on CMAP's population and employment forecasts that were the official projections for the region.  AR1_003739-740.

62.     On December 20, 2012, FHWA staff sent an email to a FHWA manager Scott McGuire with draft language for the Final EIS "to address the recent comments by CMAP." AR3_002786.  The FHWA manager responded to the draft language as follows:

> The response does not address CMAP's 12/12/12 letter, and it looks like it is addressing a different letter.  My thoughts are the project team either needs to: work with CMAP and get them to send another letter changing their position; OR bring A3S2 into the ROD and into Tier II if the schedule is most critical.  My interpretation of CMAP's letter:

> "without the inclusion of Alternative A3S2, that comparison is not possible." – it demonstrates FHWA rushed to prejudgment with a pre-ordained alignment. It also creates a major impediment for defending Tier 2 decisions.

> "location can greatly affect usage and revenues" – the context is for revenue, but it also demonstrates a lack of consideration for secondary and cumulative impacts:  Especially combined with "the real costs… will add significantly to the projects and the overall development patterns."

> Although I personally disagree with the MPO's letter, I think it is inadvisable to sign the ROD without more corrective action.  Also, I personally support throwing CMAP under the bus when the politicians start yelling.

> It is tough to write-off the MPO, and the submitted language does not come close to providing a defensible basis for the significant comments raised (add your favorite curse words).

AR3_002786 ("McGuire Email").

**FHWA's Record of Decision, Tier 1 Final Environmental Impact Statement and Section 4(f) Determination**

63.     On January 17, 2013, FHWA approved the Tier 1 FEIS and ROD selecting the proposed new Illiana Tollway in Corridor B3 for further study in comparison only to a "no-build" alternative scenario.  *See* AR1_000001 (ROD); AR1_000043 (FEIS).  FHWA eliminated all other alternatives from further study.  AR1_000006-07.

64.     Regarding CMAP's comments on using its official population and employment forecasts, the Tier 1 FEIS included substantially the same FHWA staff response that had prompted the McGuire Email reply, as well as a December 20, 2012 letter from IDOT purporting to respond to CMAP.  *Compare* AR1_000809 (Tier 1 FEIS) and AR3_002814 (draft response); AR1_003741 (IDOT letter).

65.     The Tier 1 FEIS and ROD included an evaluation of the studied alternatives' potential impacts to Section 4(f) resources pursuant to 23 C.F.R. 774.7(e), which allows for a "preliminary Section 4(f) approval" in the case of tiered EISs.  AR1_000022.  Defendants identified potential impacts to several resources, specifically Alternate Route 66, the Wauponsee Glacial Trail and the Des Plaines State Fish and Wildlife Area.  *Id.*[15]

66.     FHWA concluded, however, that the Illiana Tollway in Corridor B3 would have "[n]o impact" on the Midewin National Tallgrass Prairie.  AR1_000545.  The Tier 1 FEIS stated that the proximity of Corridor B3 "may impact grassland and migratory bird species," acknowledging the academic studies that Plaintiffs cited regarding the destruction of habitat by traffic noise.  AR1_000548; AR1_000550.  The Tier 1 FEIS nonetheless said that "[i]mpacts from such sources as highway noise, air quality, and lighting . . . are not expected to be adverse

---

[15] The Wauponsee Glacial Trail is a 22 mile-long multi-use public trail in western Will County, and is owned and operated by the Forest Preserve District of Will County.  AR1_000540.  The Des Plaines State Fish and Wildlife Area is a 4,950-acre property owned by the Illinois Department of Natural Resources in western Will County that provides various outdoor recreation opportunities for the public.  *Id.*

since it is commonly believed that relatively mobile birds and wildlife would move away from such sources." AR1_000550.

67. The Tier 1 FEIS stated that FHWA did not anticipate, based on the information in Tier 1, that Corridor B3 would constructively "use" the Midewin National Tallgrass Prairie, but would "further analyze[]" the issue in Tier 2. *Id*.

68. Internal FHWA email correspondence demonstrates that FHWA had already reached a final decision on Section 4(f) impacts. In a November 29, 2012 email, one FHWA staffperson requested that "[i]n the [Tier 1 FEIS's] 4(f) discussion, if a draft Tier II schedule has been established, this should be disclosed in the Section 4(f) section." AR3_005301. Another FHWA staffperson responded that no Section 4(f) evaluation schedule would be included because FHWA already knew how it would address the impacts:

> We do not have a schedule to complete a section 4(f) evaluation for tier 2 at this time. Our intention is to either completely avoid known 4(f) resources, issue deminimis [sic] 4(f) determinations for any 4(f) impacts, and/or work with [officials with jurisdiction] and apply the temporary occupancy exception.

*Id*.

**Plaintiffs' Complaint for Declaratory and Injunctive Relief**

69. On July 10, 2013, Plaintiffs Openlands, Midewin Heritage Association and Sierra Club filed their Complaint for Declaratory and Injunctive Relief alleging that Defendants' approvals of the Tier 1 FEIS and ROD violated NEPA, Section 4(f) and the Administrative Procedure Act.

70. Plaintiffs are not-for-profit conservation and civic organizations, which each have members who use and enjoy the land and resources that would be affected adversely by the construction of the Illiana Tollway in the proposed Corridor B3 in Will County that runs just to the south of the Midewin National Tallgrass Prairie. Complaint ¶¶ 16-18; *see also* declarations

attached to Plaintiffs' Motion for Summary Judgment. Plaintiffs participated extensively in the environmental study process for the Illiana Tollway, including submitting multiple sets of comments during the process. *See, e.g.,* Complaint ¶¶ 54; 63-64; and 70; AR1_003704 (Plaintiffs' Comments on the "preliminary recommendation" of Corridor B3); AR1_006189 (Plaintiffs' Comments on the Tier 1 DEIS); AR3_003906 (Plaintiffs' Comments on announcement of Corridor B3 as the "preferred" alternative).

Respectfully submitted,

/s Howard A. Learner
Howard A. Learner
Andrew B. Armstrong
Environmental Law and Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
phone: (312) 673-6500
fax: (312) 795-3730
HLearner@elpc.org

Attorney for Openlands, Midewin Heritage
Association and Sierra Club

Date: April 22, 2014

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify on April 22, 2014, a copy of the foregoing PLAINTIFFS' STATEMENT OF MATERIAL FACTS was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**AUSA**
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604
USAILN.ECFAUSA@usdoj.gov

**Albert M Ferlo**
Perkins Coie Llp
700 Thirteenth Street Nw
Suite 600
Washington, DC 20005
(202) 654-6262
aferlo@perkinscoie.com

**Harpreet Kaur Chahal**
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604
(312)353-1996
harpreet.chahal@usdoj.gov

**Kathleen A. Stetsko**
Perkins Coie LLP
131 S. Dearborn St.
Suite 1700
Chicago, IL 60603
312 324 8400
kstetsko@perkinscoie.com

**Michael A. Forti**
Illinois Department of Transportation
100 W. Randolph Street
Suite 6-600
Chicago, IL 60601
(312)793-2255
Michael.Forti@Illinois.gov

**Cindy K Bushur-hallam**
Ill Dept. Of Trans. - Office Of Chief Counsel
2300 South Dirksen Parkway
Room 313
Springfield, IL 62794
(217) 782-3215
cindy.bushur-hallam@illinois.gov

**Lance T. Jones**
Illinois Department of Transportation
2300 S. Dirksen Parkway
Room 313
Springfield, IL 62764
(217) 725-3215
Lance.Jones@illinois.gov

/s/ Andrew B. Armstrong
Andrew B. Armstrong
Environmental Law and Policy Center