UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| OPENLANDS, MIDEWIN HERITAGE ASSOCIATION, AND SIERRA CLUB, | |
| Plaintiffs, | No. 13-cv-4950 |
| v. | Judge Ronald A. Guzman |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al*., | |
| Defendants, | |
| and | |
| ILLINOIS DEPARTMENT OF TRANSPORTATION, INDIANA DEPARTMENT OF TRANSPORTATION, | |
| Defendant-Intervenors. | |

**JOINT MEMORANDUM OF LAW BY DEFENDANTS AND DEFENDANT-INTERVENORS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

    I.      STATUTORY AND REGULATORY FRAMEWORK ............................ 2

          A.     National Environmental Policy Act ............................ 2

          B.     Section 4(f) of The Department of Transportation Act ............ 4

          C.     The Role of MPOs in Transportation Planning ................ 6

               1.    Designation and Composition of MPOs ................ 7

               2.    MPOs' Planning Responsibilities ................ 7

               3.    Coordination of MPO Planning and NEPA Reviews .......... 8

    II.     STATEMENT OF FACTS ................................................ 10

          A.     The Project ................................................ 10

          B.     The NEPA and Section 4(f) Process ........................ 10

                1.    Purpose and Need and Development of Alternatives ......... 11

                2.    Analysis of the Environmental Impacts of the Alternatives and Selection of the Preferred Corridor ................ 13

                3.    Compliance with Section 4(f) ........................ 13

          C.     Development of Population and Employment Forecasts Used in Establishing the Purpose and Need ........................ 14

                1.    Development of the "No-Build" Forecasts ............... 15

                2.    Use of "No-Build" Forecasts To Identify Purpose and Need ...... 18

          D.     Development of Separate Build Forecasts for Evaluating Alternatives ................................................ 19

ARGUMENT ................................................................ 19

    I.      STANDARD OF REVIEW ................................................ 19

    II.     THE AGENCIES' FORMULATION OF THE PURPOSE AND NEED FOR THE PROJECT WAS REASONABLE AND SHOULD BE UPHELD ................................................ 21

          A.     The Agencies Reasonably Exercised Their Discretion in Defining the Purpose and Need for the Project ........................ 22

          B.     The Agencies Made a Reasoned Decision To Use Well-Established Methodology To Forecast Expected Population and Employment Growth ................................................ 23

                1.    The Agencies' Exercise of Discretion in Selecting a Forecasting Methodology Is Entitled To Deference ......... 24

                2.    The Agencies Expressed Legitimate Concerns that CMAP's Policy-Based Forecast Does Not Accurately Project Future Conditions ........................ 26

3.    The Agencies Engaged a Qualified Expert To Develop a Reasonable Market-based Socioeconomic Forecast for the Study Area ................................................................................ 29

4.    Plaintiffs' Argument That the Agencies Were Legally Required To Adopt CMAP's 2040 Socioeconomic Forecast Is Meritless.................................................................................. 30

C.    Plaintiffs Have Made No Credible Arguments That Would Undermine the Validity of the Agencies' Forecasts ............................... 32

1.    The Agencies' Baseline "No-Build" Forecasts Did Not Include the Proposed Project ...................................................... 33

2.    The Agencies Appropriately Evaluated Separate "No-Build" and "Build" Scenarios in Accordance with the *Sierra Club* Decision.................................................................. 35

3.    None of the Other Case Law Plaintiffs Cite Cast Doubt on the Agencies' Development and Use of Forecasts ..................... 37

4.    Plaintiffs' Comparisons to Limited Short-Term Census Estimates Does Not Discredit the Agencies' Forecasts.............. 39

III.    THE AGENCIES TOOK THE REQUIRED "HARD LOOK" AT THE ENVIRONMENTAL EFFECTS OF PROJECT ALTERNATIVES ................. 42

A.    The Agencies Thoroughly Evaluated the Indirect Socioeconomic and Environmental Effects of the Project Alternatives.......................... 42

B.    The Agencies Adequately Addressed Any Potential Conflicts or Inconsistencies with Applicable State and Local Plans.......................... 45

IV.    PLAINTIFFS' CLAIMS UNDER SECTION 4(F) OF THE DEPARTMENT OF TRANSPORTATION ACT FAIL.................................... 46

A.    Plaintiffs' Section 4(f) Claims Are Not Justiciable ................................. 47

1.    Plaintiffs' Section 4(f) Claims Fail Because FHWA's Preliminary Section 4(f) Approval Is Not a Final Agency Action....................................................................................... 47

2.    Plaintiffs' Section 4(f) Claims Are Unripe ................................. 51

B.    Plaintiffs' Section 4(f) Claims Also Fail as a Matter of Law ................. 52

CONCLUSION.................................................................................................................... 53

# TABLE OF AUTHORITIES

**Page**

CASES

*Alaska Ctr. for Env't v. Armbrister*,
131 F.3d 1285 (9th Cir. 1997) ........................................................................5

*Alliance for Legal Action v. FAA*,
69 Fed. Appx. 617 (4th Cir. 2003) ...............................................................22

*Arizona Past & Future v. Lewis*,
722 F.2d 1423 (9th Cir. 1983) ........................................................................5

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
524 F. Supp. 2d 642 (D. Md. 2007) ..............................................................34

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council*,
462 U.S. 87 (1983) ...........................................................................2, 20, 24

*Bennett v. Spear*,
520 U.S. 154 (1997) .....................................................................................48

*Blagojevich v. Gates*,
519 F.3d 370 (7th Cir. 2008) ........................................................................47

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ......................................................................22

*Citizens for Appropriate Rural Roads, Inc. v. Foxx*,
No. 1:11–cv–01031–SEB–DML, --- F. Supp. 2d ---, 2014 WL 1323189 (S.D. Ind.
Mar. 31, 2014) ...............................................................................................48

*Citizens for Smart Growth v. Peters*,
716 F. Supp. 2d 1215 (S.D. Fla. 2010), *aff'd sub nom.*, 669 F.3d 1203
(11th Cir. 2012) .................................................................................22, 25, 32

*City of Alexandria v. Slater*,
198 F.3d 862 (D.C. Cir. 1999) ......................................................................22

*Coal. of Concerned Citizens Against I-670 v. Damian*,
608 F. Supp. 110 (S.D. Ohio 1984) ..............................................................34

*Conservation Law Foundation v. Federal Highway Administration*,
630 F. Supp. 2d 183 (D.N.H. 2007) ..............................................................38

*Cronin v. USDA*,
919 F.2d 439 (7th Cir. 1990) ........................................................................21

*Envtl. Law & Policy Ctr. v. U.S. Nuclear Regulatory Com'n,*
470 F.3d 676 (7th Cir. 2006) ................................................................................2

*Fla. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985).............................................................................................21

*Highway J Citizens Grp. v. Mineta,*
349 F.3d 938 (7th Cir. 2003) ...........................................................2, 20, 32, 42

*Hoosier Envtl. Council v. U. S. Dep't of Transp.,*
No. 1:06-cv-1442, 2007 WL 4302642 (S.D. Ind. Dec. 10, 2007) ...........................................4

*Hughes River Watershed Conservancy v. Johnson,*
165 F.3d 283 (4th Cir. 1999) ..............................................................................24

*Hunger v. Leininger,*
15 F.3d 664 (7th Cir. 1994) ...............................................................................21

*Ind. Forest Alliance, Inc. v. U.S. Forest Serv.,*
325 F.3d 851 (7th Cir. 2003) .........................................................................19, 20

*Kleppe v. Sierra Club,*
427 U.S. 390 (1976)...................................................................................... passim

*Lands Council v. McNair,*
629 F.3d 1070 (9th Cir. 2010) ...........................................................................20

*Marsh v. Or. Natural Res. Council,*
490 U.S. 360 (1989)............................................................................................20

*Michigan v. U.S. Army Corps of Eng'rs,*
667 F.3d 765 (7th Cir. 2011) .............................................................................48

*Milwaukee Inner-City Congregations Allied for Hope v. Gottleib,*
944 F. Supp. 2d 656 (W.D. Wisc. 2013)..............................................................46

*Nevada v. Dep't of Energy,*
457 F.3d 78 (D.C. Cir. 2006) .............................................................................51

*North Carolina Alliance for Transportation Reform, Inc. v. United States Department of
Transportation,*
151 F. Supp. 2d 661 (M.D.N.C. 2001) ...............................................................38

*Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.,*
475 F.3d 1136 (9th Cir. 2007) ...........................................................................20

*Nw. Motorcycle Ass'n v. USDA,*
    18 F.3d 1468 (9th Cir. 1994) ............................................................21

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
    523 U.S. 726 (1998).........................................................................52

*Piedmont Heights Civic Club, Inc. v. Moreland,*
    637 F.2d 430 (5th Cir. 1981) ...........................................................25

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989)....................................................................3, 42

*Route 9 Opposition Legal Fund v. Mineta,*
    75 Fed. Appx. 152 (4th Cir. 2003)...................................................25

*Save the Dunes Council v. Alexander,*
    584 F.2d 158 (7th Cir. 1978) ...........................................................48

*Senville v. Peters,*
    327 F. Supp. 2d 335 (D. Vt. 2004)...................................................25

*Sierra Club, Illinois Chapter v. United States Department of Transportation,*
    962 F. Supp. 1037 (N.D. Ill. 1997) ...............................35, 36, 37, 43

*Sierra Club v. FHWA,*
    715 F. Supp. 2d 721 (S.D. Tex. 2010), *aff'd*, 435 F. Appx. 368 (5th Cir. 2011) ....................34

*Sierra Club v. U.S. Dep't of Transp.,*
    310 F. Supp. 2d 1168 (D. Nev. 2004)...............................................25

*Sierra Club v. USDA,*
    116 F.3d 1482, 1997 WL 295308 (7th Cir. May 28, 1997)..................25

*Sprint Spectrum L.P. v. City of Carmel, Ind.,*
    361 F.3d 998 (7th Cir. 2004) ...........................................................52

*Stop H-3 Ass'n v. Dole,*
    740 F.2d 1442 (9th Cir. 1984) .........................................................25

*Swain v. Brinegar,*
    517 F.2d 766 (7th Cir. 1975) .....................................................38, 39

*Texas Indep. Producers & Royalty Owners Ass'n v. EPA,*
    435 F.3d 758 (7th Cir. 2006) ...........................................................51

*Van Abbema v. Fornell,*
807 F.2d 633 (7th Cir. 1986) ..................................................................39

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,*
435 U.S. 519 (1978) .................................................................................3

STATUTES

5 U.S.C. § 551(13) .......................................................................................47

5 U.S.C. §§ 701–706 ....................................................................................19

5 U.S.C. § 704 ..............................................................................................47

5 U.S.C § 706(2)(A) .....................................................................................19

23 U.S.C. §§ 134, 135 ...................................................................................6

23 U.S.C. § 134(b)(2) ....................................................................................7

23 U.S.C. § 134(d) .........................................................................................7

23 U.S.C. § 134(k)(5) ....................................................................................7

42 U.S.C. § 4332 ............................................................................................2

42 U.S.C. § 4332(C) ......................................................................................3

49 U.S.C. § 303(c) ................................................................................ passim

Pub. L. 89-670, 80 Stat. 931 .........................................................................4

RULES AND REGULATIONS

23 C.F.R. Part 450..............................................................................6, 8, 9, 30

23 C.F.R. Part 771 ..........................................................................................2

23 C.F.R. Part 774...........................................................................................2

23 C.F.R. § 322(c) ..........................................................................................8

23 C.F.R. § 450.310(f) ...................................................................................7

23 C.F.R. § 450.318 ........................................................................................9

23 C.F.R. § 450.322 ............................................................................................7, 32

23 C.F.R. §§ 450.322(i) ...........................................................................................8

23 C.F.R. § 450.324 ...............................................................................................32

23 C.F.R. § 450.324(a) .............................................................................................8

23 C.F.R. § 771.111(g) ............................................................................................4

23 C.F.R. § 774.3(a) .................................................................................................5

23 C.F.R. § 774.5(b)(2) ............................................................................................6

23 C.F.R. § 774.7(e) .................................................................................................6

23 C.F.R. § 774.7(e)(1) ...............................................................................6, 46, 52

23 C.F.R. § 774.7(e)(2) .....................................................................................2, 48

23 C.F.R. § 774.7(e)(3) ............................................................................................6

23 C.F.R. § 774.7(f) .................................................................................................6

23 C.F.R. § 774.11 ...................................................................................................5

23 C.F.R. § 774.15 .............................................................................................5, 49

23 C.F.R. § 774.17 ...............................................................................................5, 6

40 C.F.R. §§ 1500-1508 ...........................................................................................2

40 C.F.R. § 1501.7 ...................................................................................................3

40 C.F.R. § 1502.13 ...........................................................................................3, 22

40 C.F.R. § 1502.14 ...............................................................................................33

40 C.F.R. § 1502.16 .........................................................................................42, 45

40 C.F.R. § 1502.20 .................................................................................................4

76 Fed. Reg. 33401 ................................................................................................10

77 Fed. Reg. 42802-01, 42823 (July 20, 2012) .....................................................49

**Page**

78 Fed. Reg. 10249 (Feb. 13, 2013) .............................................................................13

79 Fed. Reg. 4158 (Jan. 24, 2014) ..............................................................................13

Fed. R. Civ. P. 56(a) ...................................................................................................20

**OTHER AUTHORITIES**

FHWA, *Interim Guidance on the Application of Travel and Land Use Forecasting in
NEPA* at 33 (March 2010) ...................................................................................16, 30, 34

FHWA, *Interim Guidance on MAP-21 Section 1319 Accelerated Decisionmaking in
Environmental Reviews* (Jan. 14, 2013)........................................................................4

FHWA, "Transportation Planning Requirements and Their Relationship to NEPA
Approvals" (Feb. 9, 2011) ...........................................................................................9

# INTRODUCTION

Plaintiffs contend that the Federal Highway Administration ("FHWA") violated both the National Environmental Policy Act ("NEPA") and Section 4(f) of the Department of Transportation Act in analyzing and selecting amongst reasonable alternatives for a transportation project to provide an east-west transportation corridor south of Chicago. The FHWA conducted a tiered environmental NEPA study in order to select the location for the "Illiana Corridor," as this project is now known. Tier 1 was designed to broadly examine transportation problems in the Study Area, identify reasonable alternative corridors for the transportation project, and consider the environmental and social impacts of those alternatives, leading to the selection of a corridor to be analyzed further in Tier 2. The Tier 2 phase would consider alternative alignments within the corridor selected in Tier 1 and evaluate environmental impacts of those alignments at a greater level of detail. Plaintiffs object to the FHWA's selection of "Alternative B3" as the location of the Illiana Corridor during the agency's Tier 1 analysis, incorrectly arguing that FWHA was required to accept population and employment forecasts prepared by the Chicago Metropolitan Agency for Planning ("CMAP"), when selecting an alternative. NEPA, however, affords FHWA wide discretion in making an independent judgment regarding the forecasts that are most germane to its analysis. Here, because the forecasts CMAP presented were a radical departure from the forecasting methodology it (and other planning agencies) had historically used, FHWA, along with the Illinois Department of Transportation ("IDOT") and Indiana Department of Transportation ("INDOT"), prepared their own forecasts using the methodology previously utilized by CMAP and its predecessor agency. As such, Plaintiffs cannot establish that FHWA's decision not to rely upon forecasts that were a marked departure from those historically used was arbitrary or capricious under the Administrative Procedures Act ("APA").

Plaintiffs' claim that the state and federal agencies violated Section 4(f) is similarly without basis. Because this is a tiered project, FHWA's regulations implementing Section 4(f), 23 C.F.R. Part 774, do not require FHWA to make a final determination under that statute until the end of the Tier 2 process. 23 C.F.R. § 774.7(e)(2). Plaintiffs' claim that FHWA has "ignored a constructive use" of a federally protected area (the Midewin National Tallgrass Prairie) in Tier 1 is simply not justiciable at this time—it is either not ripe, or lacks a final agency action subject to review under the APA. Thus, Plaintiffs' motion for summary judgment should be denied on this ground as well, and summary judgment should be granted in favor of the Defendants.

## BACKGROUND

### I.  STATUTORY AND REGULATORY FRAMEWORK

#### A.  National Environmental Policy Act

Congress enacted NEPA in 1969 as a framework to foster informed decision making and informed public participation with respect to major Federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332. Regulations implementing NEPA have been issued by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500-1508, and by individual Federal agencies, including FHWA, 23 C.F.R. Part 771.

The Supreme Court has held that, in enacting NEPA, Congress "did not require agencies to elevate environmental concerns over other appropriate considerations," but rather "required only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983); *see also Envtl. Law & Policy Ctr. v. U.S. Nuclear Regulatory Com'n*, 470 F.3d 676, 682 (7th Cir. 2006); *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003). The Court has also emphasized the procedural nature of the statute, explaining that "NEPA itself does not mandate

particular results but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978) ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.").

The primary vehicle for meeting the goals of NEPA is an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(C). As defined in the CEQ regulations, the starting point for an EIS is the statement of "purpose and need" for the project, which "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. The EIS should also "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action, including the "alternative of no action." *Id.* § 1502.14(a) and (d). For alternatives eliminated without detailed study, the EIS should briefly explain the reasons for their elimination. *Id.* § 1502.14(a). Each alternative that is not eliminated from detailed study should receive "substantial treatment" so that "reviewers may evaluate their comparative merits." *Id.* § 1502.14(b).

Under the CEQ regulations, the preparation of an EIS begins with publication of a Notice of Intent ("NOI") in the Federal Register. 40 C.F.R. § 1501.7. The NOI is followed by scoping, which provides an opportunity for early input into the study. *Id.* After scoping, the agency prepares and issues the draft EIS ("DEIS"), which defines the purpose and need, identifies a range of reasonable alternatives, describes the affected environment, and evaluates environmental consequences of the alternatives. *Id.* § 1502.9. After the DEIS, the agency must provide a comment period of at least 45 days after which it can issue a Final EIS ("FEIS"). *Id.* § 1506.10. The FEIS must respond to any comments received during the comment period for the DEIS and identify a preferred alternative. *Id.* §§ 1502.9(b) and

1502.14(e).  The process concludes with a Record of Decision ("ROD"), in which the agency states its decision, describes the alternatives it considered, and identifies efforts to minimize environmental harm.  *Id*. § 1505.2.  The FEIS and ROD may be published as a single document in FHWA-led NEPA analyses.[1]

Both the CEQ and FHWA regulations allow agencies to "tier" their NEPA analysis into separate phases.  *Id*. § 1508.28; 23 C.F.R. § 771.111(g).  Tiering is encouraged to make efficient use of administrative resources and to "focus on the actual issues ripe for decision at each level of environmental review."  40 C.F.R. § 1502.20.  A tiered study generally includes two stages.  The FHWA regulations describe the scope of each tier:

> [t]he first tier EIS would focus on broad issues such as general location, mode choice, and areawide air quality and land use implications of the major alternatives. The second tier would address site-specific details on project impacts, costs, and mitigation measures.

23 C.F.R. § 771.111(g).  Tiering is particularly appropriate for complex transportation projects.  As Judge Hamilton reasoned in upholding FHWA's use of a tiered NEPA analysis for a highway project in Indiana, "[i]f every major Federal action required the level of analysis proposed for the second tier for every alternative considered, public works could easily grind to a halt and become hopelessly mired in their own bureaucracy."  *Hoosier Envtl. Council v. U. S. Dep't of Transp.*, No. 1:06-cv-1442, 2007 WL 4302642, at *7 (S.D. Ind. Dec. 10, 2007).

### B.      Section 4(f) of The Department of Transportation Act

Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c) ("Section 4(f)")[2], prohibits the Secretary of Transportation from approving a transportation program or

---

[1] *See* FHWA, *Interim Guidance on MAP-21 Section 1319 Accelerated Decisionmaking in Environmental Reviews* (Jan. 14, 2013), *available at* http://www.fhwa.dot.gov/map21/guidance/guideaccdecer.cfm.

[2] Now codified at 49 U.S.C. § 303, the "Section 4(f)" nomenclature remains because the requirements originated in Section 4(f) of the *Department of Transportation Act of 1966* (Pub. L. 89-670, 80 Stat. 931).

project requiring the "use" of certain protected lands, unless the Secretary finds that (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm. The resources protected under Section 4(f) include (1) "publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance," and (2) "land of an historic site of national, State, or local significance."[3] 49 U.S.C. § 303(c).

Compliance with Section 4(f) requires several distinct determinations. First, FHWA must determine which resources are subject to Section 4(f). This determination involves: (1) identifying any publicly owned lands that are designated as, or function primarily as, publicly accessible parks, recreation areas, or refuges; and (2) identifying historic sites that are listed in or eligible for the National Register. 23 C.F.R. § 774.11. Second, FHWA must determine whether any of the alternatives would "use" land from a Section 4(f) resource. FHWA must consider the potential for both a "direct use," which involves a physical taking of land, as well as a "constructive use," which involves a "substantial impairment" resulting from indirect effects. 23 C.F.R. § 774.15. If there is a potential use, FHWA must determine whether there are any prudent and feasible alternatives that avoid the use. 23 C.F.R. § 774.3(a). If such an alternative exists, it must be selected. *Id.* Otherwise, FHWA may approve the use, as long as it incorporates "all possible planning to minimize harm" to the Section 4(f) resource. 23 C.F.R. § 774.3(a). An alternative that does not meet the purpose and need of the project is not considered to be a prudent alternative for the purposes of compliance with Section 4(f). *See Alaska Ctr. for Env't v. Armbrister*, 131 F.3d 1285, 1288 (9th Cir. 1997); *Arizona Past & Future v. Lewis*, 722 F.2d 1423, 1429 (9th Cir. 1983). FHWA carries

---

[3] Where the FHWA determines that the use of the Section 4(f) land is "de minimis," then it can authorize the use of that land. A de minimis impact for parkland "is one that will not adversely affect the features, attributes, or activities qualifying the property for protection under Section 4(f)." 23 C.F.R. § 774.17.

out its Section 4(f) obligations in conjunction with the NEPA process. For non-tiered projects subject to Section 4(f), a draft Section 4(f) evaluation is included in the DEIS; a final Section 4(f) evaluation is included in the FEIS; and a final decision is made in the ROD. 23 C.F.R. § 774.7(f).

FHWA Section 4(f) regulations specifically provide for tiering. 23 C.F.R. § 774.7(e). In Tier 1, a Section 4(f) evaluation "should address the potential impacts that a proposed action will have on Section 4(f) property and whether those impacts could have a bearing on the decision to be made." 23 C.F.R. § 774.7(e)(1). The regulations allow FHWA to make a "preliminary approval" at the Tier 1 stage. *Id.* Efforts to "minimize harm" in Tier 1 will normally "be limited to ensuring that opportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the first-tier stage." *Id.* The final Section 4(f) approval is made "in the second-tier . . . final EIS, [or] ROD. . . ." 23 C.F.R. § 774.7(e)(3).

Finally, FHWA may determine that a potential Section 4(f) use constitutes a "de minimis" impact on the protected property. 23 C.F.R. § 774.17. A "de minimis" impact is one that "will not adversely affect the features, attributes, or activities qualifying the property for protection under Section 4(f)." *Id.* In order to make a "de minimis" finding, FHWA must allow for public review and comment on the possible effects and obtain concurrence from the official with jurisdiction over the property in the finding that the project will not adversely affect the activities, features or attributes that make the property eligible for protection under Section 4(f). 23 C.F.R. § 774.5(b)(2).

### C.     The Role of MPOs in Transportation Planning

Federal law establishes the framework for conducting transportation planning within States and metropolitan areas. 23 U.S.C. §§ 134, 135. These planning requirements are implemented in regulations jointly issued by FHWA and the Federal Transit Administration ("FTA"). 23 C.F.R. Part 450. The regulations establish a system of checks and balances under

which Metropolitan Planning Organizations ("MPOs") have specific, limited responsibilities within the transportation planning process, subject to State and Federal oversight, while Federal agencies (such as FHWA) remain responsible for determining the assumptions and analyses that are used in the NEPA process for specific transportation projects.

## 1. Designation and Composition of MPOs

Federal law requires designation of an MPO in each urbanized area with a population greater than 50,000. 23 U.S.C. § 134(d)(1). The MPO is designated by agreement between the Governor of the State and local governments representing at least 75 percent of the affected population, or through other procedures as defined in State or local law. *Id*. The statute defines an MPO as "the policy board of an organization established as a result of the designation process under [23 U.S.C. § 134(d)]." 23 U.S.C. § 134(b)(2). The regulations expressly allow an MPO—i.e., the policy board—to "us[e] the staff resources of other agencies, non-profit organizations, or contractors to carry out selected elements of the metropolitan transportation planning process." 23 C.F.R. § 450.310(f). Metropolitan areas with population over 250,000 are subject to certain additional requirements, including a certification review by the U.S. Department of Transportation once every four years, to assess the MPO's compliance with Federal requirements. 23 U.S.C. § 134(k)(5).

## 2. MPOs' Planning Responsibilities

The MPO's principal responsibilities are to develop the long-range transportation plan and the transportation improvement program ("TIP"). The long-range plan identifies specific projects proposed for implementation over the next 20 years; the TIP lists projects that are funded for implementation within the next four years. The MPO is responsible for approving the "contents and supporting analyses" for the long-range plan. *See* 23 C.F.R. § 450.322. The long-range plan must be "submitted for information purposes" to the Governor and "copies . . .

provided to" the FHWA and FTA. 23 C.F.R. § 322(c). The TIP must be submitted to the Governor for approval. 23 C.F.R. § 450.324(a). FHWA and FTA do not approve the plan or TIP; they have only the limited role of determining that the MPO's plan and TIP are financially constrained and conform to the State's plan for achieving or maintaining the air quality standards. *See* 23 C.F.R. §§ 450.322(i) (plans) and 450.324(a) (programs).

The State department of transportation ("State DOT") is responsible for transportation planning at the statewide level. The State DOT prepares a statewide transportation plan, which sets out broad goals for a 20-year time period, as well as a statewide transportation improvement program ("STIP"). Within a metropolitan area, the STIP is required to include all projects that are included in the MPO's TIP—but only after the TIP has been approved by the Governor. 23 C.F.R. § 450.324(a). This framework ensures consistency between the STIP and TIP, while also ensuring that transportation funding decisions in metropolitan areas are subject to the authority of the Governor.

### 3.      Coordination of MPO Planning and NEPA Reviews

FHWA has issued regulations and guidance encouraging coordination of the metropolitan transportation planning process with the NEPA process. *See* 23 C.F.R. Part 450 (planning regulations) and 23 C.F.R. Part 450, Appendix A (guidance). The regulations and guidance confirm that (1) FHWA is responsible for determining what information and analysis, if any, should be adopted from planning for use in a NEPA study; and (2) the MPO's plan and TIP must be harmonized with decisions made in the NEPA process before the NEPA process is concluded.

First, the transportation planning regulations make clear that the responsibility for determining whether to use the MPO's or other regional planning agencies' forecasts in a NEPA document rests with FHWA. The regulations state that "[t]he results or decisions of these transportation planning studies *may* be used as part of the overall project development process

consistent with the National Environmental Policy Act." 23 C.F.R. § 450.318. Similarly, a guidance document attached to the planning regulations gives several examples of analyses that "can be used" in the NEPA process, including "demographic trends and forecasts" and "population and employment projections." 23 C.F.R. Part 450, App. A, Question 13.

In deciding whether to adopt a regional planning agency's analyses or projections, FHWA makes its own independent judgment regarding their appropriateness for use in the NEPA process. As stated in Appendix A to Part 450, "NEPA requires that the FHWA and the FTA be able to stand behind the overall soundness and credibility of analyses conducted and decisions made during the transportation planning process if they are incorporated into a NEPA document." 23 C.F.R. Part 450, App. A, Question 6. Thus, rather than mandating the use of planning agencies' forecasts, the transportation planning regulations and guidance vest FHWA with the discretion and responsibility to determine which forecasts are appropriate for use in the NEPA process.

Second, FHWA has issued guidance to ensure consistency of NEPA decisions with the contents of an MPO's plan and TIP.[4] The guidance states that before FHWA can issue a decision document concluding the NEPA process, the proposed project must be included in the MPO's transportation plan and at least one phase of the project must be included in the TIP; in addition, in air quality nonattainment and maintenance areas, FHWA must determine that the plan and TIP meet "financial constraint" requirements and conform to State plans for achieving national air quality standards. With regard to tiered NEPA studies, the guidance makes clear that these conditions must be satisfied before completion of Tier 2.

---

[4] FHWA, "Transportation Planning Requirements and Their Relationship to NEPA Approvals" (Feb. 9, 2011), available at http://www.fhwa.dot.gov/planning/tpr_and_nepa/tprandnepasupplement.cfm.

## II.     STATEMENT OF FACTS

### A.     The Project

The B3 alternative selected for the Illiana Corridor (the "Project") is approximately 47 miles long and connects Interstate 55 ("I-55") and Interstate 57 ("I-57") in Illinois with Interstate 65 ("I-65") in Indiana, in the south suburban area of the greater Chicago region.  (AR1_000006.) The Corridor is generally 2,000 feet wide except in areas where the width was reduced to avoid environmentally sensitive areas and the dense residential development in the City of Wilmington, Illinois.  (AR1_000007.)  In other areas, the B3 Corridor is wider than 2,000 feet in order to accommodate interchanges with other highways.  (AR1_000009.)[5]  The Project is expected to provide an economic benefit of approximately $3.87 billion and bring an additional 7,660 jobs to the Study Area.  (AR1_000014.)

### B.     The NEPA and Section 4(f) Process

FHWA initiated the Tier 1 NEPA process on June 8, 2011, with the publication of a Notice of Intent ("NOI") in the Federal Register.  (AR1_001627.)  76 Fed. Reg. 33401.   The Tier 1 NEPA study was a collaborative effort of the FHWA, IDOT and INDOT (collectively, the "Agencies").  (AR1_001628.)  The NOI announced that the Project would be conducted in two "tiers."  (*Id*.)  The Tier 1 study involved "an examination of the transportation problems in the Study Area, a study of alternate corridors to address the problems, and consideration of the environmental and social impacts of reasonable alternatives."  (AR1_000005.)  The "Study Area" (shown in Exhibit A to this Memorandum) is a 950 square mile portion of southern Will County and northern Kankakee County in Illinois and southern Lake County in Indiana. (AR1_000093.)  The northern portion of the Study Area is "suburban or urban in character and

---

[5] In order to analyze the reasonably foreseeable impacts of the Project, the Tier 1 FEIS assumes a "working alignment" located within the corridor.  The working alignment is generally 400 feet wide. (AR1_000225.)

served by a well-developed transportation system." (*Id*.) The southern portion of the Study Area "is more rural in nature, served by a lesser-developed transportation system." (*Id*.) The Study Area is home to many new "intermodal" freight facilities which allow transfer of rail, port, and truck freight between the different modes of transportation, thus adding substantial demand for truck transport. (AR1_000091; AR1_000111.) There are currently no roads in the Study Area that provide a continuous "higher functional class east-west route[]…", in other words, a four-lane divided highway. (AR1_000110.)

### 1. Purpose and Need and Development of Alternatives

In order to determine the need for the Project, the Agencies analyzed the expected growth in population, employment, and traffic in the Study Area. The Agencies also took into account the important role the Study Area plays in the national freight transportation network, including being home to the largest inland intermodal transportation facility in the United States. (AR1_000096.) Using forecasts of expected population and employment growth in the Study Area, the Agencies projected that the population was likely to increase by 176 percent and employment by nearly 225 percent by the year 2040. (*Id*.)

An analysis of the existing transportation network in the Study Area demonstrated that it was insufficient to meet the projected growth in population and employment and freight transportation. (*Id*.) In particular, the forecasts indicated that daily truck trips within the Study Area would increase by 193%—from 87,800 to 257,100 daily trips—between 2010 and 2040. (AR1_000111.) This increase would result in 2,600 hours of daily truck delay by 2040, at a cost of nearly $34 million annually. (AR1_000110–AR_1-000111.) Based on this analysis, the Agencies established a three part "Purpose and Need" for the Project: (1) improve regional mobility by addressing regional and national traffic traversing the area; (2) alleviate local system

congestion and improve local system mobility; and (3) provide for efficient movement of freight. (AR1_000097–AR1_000116.)

The Agencies then engaged in a robust process to develop alternatives that would meet the Purpose and Need. (AR1_000118–AR1_000222.) The alternatives initially examined included the "no-build" alternative, a "congestion management process," arterial road improvements, transit alternatives, freight rail alternatives, and multiple alternative limited access highway corridors suggested by various governmental agencies, private organizations, and individuals. (AR1_000118–AR1_000119.) From the dozens of suggestions, the Agencies developed ten unique alternative corridors that were representative of the various comments and suggestions received from stakeholders. (AR1_000142; *see also* AR1_000143–AR1_000154 for a series of maps depicting the ten unique alternative corridors.) Each of those alternatives was then assessed for its ability to meet the Purpose and Need. (AR1_000158–AR1_000172.) Of these ten alternatives, the Agencies eliminated three alternatives that had comparatively poor travel performance or disproportionately high socioeconomic or environmental impacts. (AR1_000172–AR1_000191.)

After further evaluating each of the seven second round alternatives and considering extensive stakeholder input, the Agencies selected three alternatives for further consideration that best satisfied the Purpose and Need while minimizing impacts to the environment. These three corridors are A3S2 (the northernmost alternative), B3 (the corridor ultimately selected to advance to the Tier 2 study), and B4 (a variation of Alternative B3 with a more southerly terminus in Indiana). (AR1_000191–AR1_000222.)

### 2. Analysis of the Environmental Impacts of the Alternatives and Selection of the Preferred Corridor

The Agencies undertook an extensive evaluation of the direct environmental and socioeconomic effects of each of the proposed three alternatives, as compared to the "no-build" scenario. (AR1_000242–AR1_000331; AR1_001483–AR1_001496.) The agencies evaluated the alternatives' impacts on agriculture, cultural resources, and natural resources (such as air and water), as well as short- and long-term economic impacts, impacts to existing and planned neighborhoods and communities, effects on minority and low-income populations, impacts to public services and facilities, effects on businesses, and impacts to local land use planning. (AR1_000242–AR1_000331.) The Agencies also closely analyzed the indirect and cumulative impacts of each alternative, focusing primarily on the induced population and employment growth and land development from a new facility. (AR1_000606–AR1_000663; AR3_002156.) Based on extensive modeling, the Agencies projected that all three "build" alternatives under consideration would increase population and employment growth by less than one percent, as compared to the growth expected in the Study Area if the project was not built. (AR1_000630–AR1_000647; AR1_000661.) Based on the analysis of the environmental and social impacts, travel performance, constructability, cost, stakeholder input, and other factors, the Agencies determined that Corridor B3 performed best.[6] (AR1_000692.) As a result, FHWA selected B3 as the corridor to advance to the Tier 2 study.[7] (*Id.*)

### 3. Compliance with Section 4(f)

The Agencies prepared a preliminary analysis under Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), and included that analysis in the Tier 1 FEIS.

---

[6] The comparison of the alternatives is found at AR1_000672–AR1_000700.

[7] The Agencies have initiated the Tier 2 study. *See* 78 Fed. Reg. 10249 (Feb. 13, 2013) (notice of intent to prepare a Tier Two EIS); 79 Fed. Reg. 4158 (Jan. 24, 2014) (notice of availability of Tier 2 Draft EIS); *The Illiana Corridor Study Tier Two Draft Environmental Impact Statement*, available at http://www.illianacorridor.org/tier_2/tier2_deis.aspx.

(AR1_000534–AR1_000558.) The preliminary Section 4(f) analysis determines that the Midewin National Tallgrass Prairie is subject to the requirements of Section 4(f). (AR1_000534.) The preliminary conclusion made by FHWA was that the Project would not impact the Midewin National Tallgrass Prairie. (AR1_000545.) FHWA determined that a "constructive use" of the Midewin National Tallgrass Prairie was not likely to occur, but that the "potential for constructive use will be further analyzed in the Tier Two NEPA studies." (AR1_000550.)

### C. Development of Population and Employment Forecasts Used in Establishing the Purpose and Need

Accurate projection of the future socioeconomic conditions in an area is a fundamental step in the identification of transportation needs. To analyze the expected population and employment growth in the Study Area, the Agencies first looked to the forecasts that regional planning agencies, including CMAP, had prepared for use in the long-range transportation planning process.[8] (AR1_000095.) The CMAP long-range forecasts were based on a planning horizon extending to the year 2040. In 2010, CMAP incorporated the most recent long-range transportation plan into its "GO TO 2040 Comprehensive Regional Plan." (AR4_000001–AR4_000416.) In developing its 2040 forecasts, CMAP abandoned its (and its predecessor agency's) prior methodology for preparing population and employment forecasts, which was a market-based approach to forecasting that takes into account historical trends and local land use policies.[9] (AR1_001401; AR3_041105.)

---

[8] CMAP is commonly referred to as a Metropolitan Planning Organization, but the MPO designated in Illinois to carry out provisions of federal transportation law for the Chicago region is a separate entity, the MPO Policy Committee. CMAP provides the staff support for the MPO Policy Committee. The MPO for the Indiana portion of the project is the Northwestern Indiana Regional Planning Commission ("NIRPC").

[9] Until CMAP's GO TO 2040 forecast, it (and its predecessor agency) used a market-based approach to forecasting population and employment. (AR1_001401; AR3_041105.) CMAP's previous forecast, using 2030 as the planning horizon, used a marked-based methodology focused primarily on trends and an inventory of local development patterns. (AR1_001401.)

Instead of the traditional market-based forecasting approach, CMAP adopted a methodology it described as a "radical departure" from its previous forecasts, making a "wholesale shift" to policy-based forecasting. (AR4_000417.) CMAP's new "policy-based" forecasting methodology is based on its own preferred planning strategies for the region—primarily, encouraging "infill" of mature areas,[10] which will require significant redevelopment of existing housing stock to higher density housing.[11] (AR1_003752; AR4_000060–AR4_000070.)

While CMAP's forecasts represent its "preferred regional scenario" for development, the Agencies recognized that the implementation of CMAP's vision relied on a multitude of decisions made at different levels of local, state and Federal government. (AR4_000417.) CMAP, in fact, candidly acknowledged that it does not have authority to determine local land use issues and that "authority over local land use resides with local government." (AR4_000418.)

The Agencies determined that a strict policy-based forecast, such as CMAP's 2040 forecast, was not appropriate for evaluating specific transportation facilities because it relies on aggressive assumptions of redevelopment in mature areas. (AR2_038304.) The Agencies determined that a refined market-based forecast, similar to the type of forecasts previously prepared by CMAP, was required in order to determine transportation needs for the Study Area as precisely as possible. (*Id*.; AR1_003752; AR3_002571.)

### 1. Development of the "No-Build" Forecasts

Because developing forecasts requires a high level of technical ability, the Agencies hired the al Chalabi Group ("ACG"), a consultant with significant experience in socioeconomic

---

[10] Specifically, CMAP's forecast shows significant population growth in the urban core of Chicago and nearby areas. (*See* AR1_001477.)

[11] NIRPC also developed a 2040 socioeconomic forecast using a similar policy-based approach instead of the market-driven approach the agency used for its prior forecasts. (AR1_001387.) Because Plaintiffs have limited their argument to the population and employment forecasts developed by CMAP, no further discussion of the NIRPC forecasts will be included in this memorandum.

forecasting for regional planning and major transportation infrastructure projects, to prepare the necessary population and employment forecasts.[12]  (AR1_001479.)  Following FHWA guidance,[13] ACG developed a set of baseline, "no-build" forecasts using long-term market trends to predict population and employment in 2040 in the Study Area.  (AR1_001378–AR1_001466.) ACG developed these market-based forecasts in collaboration with CMAP, over a period of approximately a year.[14]  (AR1_001387; AR1_001474; AR3_002569.)

ACG's population and employment forecasts were based on current and previous MPO forecasts, official 2010 U.S. Census data, ninety years of historic population and employment data for the region, current development trends, land available for development, population holding capacity, demographic data and trends, local land use policies, and independent economic forecasts for the region.  (AR1_001402–AR1_001404; AR3_041107; AR3_041121.)

ACG's baseline "no-build" forecasts reflect 2040 conditions, assuming that no Illiana Expressway will be built.  (AR1_000248; AR1_001474; AR3_041121.)  Consistent with FHWA guidance, ACG's "no-build" socioeconomic forecast takes into account the improvements that are committed and planned for implementation by 2040 (minus any new transportation facility in the Illiana Corridor).  FHWA Guidance at 21 (n.13, *supra*).  As the Transportation System Performance Report prepared on April 25, 2012 explains:

---

[12] CMAP itself has acknowledged ACG's expertise in the area of population and employment forecasts for transportation and has, in fact, hired ACG to conduct similar studies in the past.  CMAP Socioeconomic Inventory Validation and Forecasting Method, January 2011, at 22 (hereinafter "CMAP Socioeconomic Inventory").  This document is part of the Administrative Record, as it is listed as an appendix to CMAP's GO TO 2040 Comprehensive Regional Plan (AR4_000410).  The document is included as Exhibit B to this Memorandum and is also available in full on CMAP's webpage, at http://www.cmap.illinois.gov/documents/10180/31537/GT2040-SocEc-Validation_01-2011_final.pdf/e2083ac6-368b-45a1-a439-869bd8edb6c5.

[13] FHWA, *Interim Guidance on the Application of Travel and Land Use Forecasting in NEPA* at 33 (March 2010) (hereinafter "FHWA Guidance").  A copy of the FHWA Guidance has been attached as Exhibit    C    to    this    Memorandum    and    is    also    available    at http://environment.fhwa.dot.gov/projdev/travel_landUse.asp.

[14] Specifically, ACG followed CMAP's three recommended "forecast principles" for developing alternative forecasts, to: (1) articulate alternative assumptions; (2) show the math; and (3) produce standard outputs.  (AR1_001387; AR4_000418–AR4_000420.)

The 2040 population and employment forecasts are developed for a No Build (Baseline) scenario for the study area which includes only committed projects. Therefore, the 2040 No Build scenario does not include any proposed Illiana Corridor facilities.

(AR1_000881.) The FEIS confirms that the 2040 no-build "population projections do not include the proposed east-west transportation facility." (AR1_000248.)

ACG's market-based forecasts take into account the recognizable and well-documented pattern of growth of an urban area outward from a central core, incorporating existing older towns and creating new centers at nodes of high accessibility. (AR1_001389.) ACG's baseline forecasts also reflect the final results of the 2010 Census. (AR1_001390.) In contrast, CMAP chose not to update its GO TO 2040 forecasts when 2010 Census results became available, instead basing its forecasts on 2009 estimates.[15] Significantly, the actual 2010 results (used by ACG) showed a substantially lower population in the City of Chicago than the 2009 estimate (used by CMAP).[16] (AR1_001390.)

CMAP expressed acceptance of the Agencies' use of the ACG forecasts in the NEPA analysis and concurred with the methodology used to develop ACG's forecasts, but requested that the team additionally present modeling based on CMAP's policy-based forecasts in the EIS. (AR3_002569–AR3_002570; AR3_041393; AR3_041121; AR3_038835.) CMAP stated that it "understands the reasons behind" the project team's use of a forecasting methodology that differs from CMAP's policy-based forecasting. (AR3_002569.)

The Agencies considered CMAP's request but ultimately decided not to present both sets of forecasts in the FEIS because the Agencies did not find CMAP's policy-based forecast to

---

[15] CMAP itself explains that "[t]he 2010 estimates used as the base for the 2040 forecast were internally-derived and not based on 2010 Census data, which were not available during the GO TO 2040 process." https://www.cmap.illinois.gov/data/demographics/population-forecast.

[16] Of the approximately 300,000 more people CMAP projects for the City of Chicago in 2040 as compared to the ACG forecast, nearly two-thirds of that difference is attributable to CMAP's use of Census estimates for 2010 population of Chicago that significantly overestimated the actual Census results. (AR1_001390; AR1_001417.)

represent a credible or realistic projection of future distribution of growth. (AR2_038304; AR3_002154.) The Agencies also expressed to CMAP their concerns that using a policy-based socioeconomic forecast would create a "serious inconsistency in the Build/No-Build analysis." (AR3_041119; AR3_038835.) Citing CMAP's "aggressive assumptions regarding infill, redevelopment and densification," the Agencies determined that CMAP's 2040 forecasts were not suitable for project-level decision making. (AR2_038304; *see also* AR1_003752.)

## 2. Use of "No-Build" Forecasts To Identify Purpose and Need

Using the "no-build" socioeconomic forecast prepared by ACG, the Agencies prepared a travel demand forecast to predict future travel demand for the "no-build" transportation network. (AR1_000881.) This travel demand model was developed for the Study Area based on CMAP's existing model, and included refinements to more accurately account for regional and national freight movement through the region. (AR1_001326–AR1_001377; AR1_003979– AR1_004015; AR3_041120.)

Using the results of the travel demand modeling, the Agencies carefully evaluated the performance of the existing and projected transportation networks (based on a "no-build" scenario) against performance metrics to identify major deficiencies in the transportation system's ability to handle current and projected future travel demand. (AR1_000882.) Based on the results of the transportation system performance analysis, in combination with public and stakeholder input, the Agencies identified a set of needs to be addressed through the NEPA analysis. (AR1_000882.) Those needs are:

- Improve regional mobility, travel times, and access to jobs by addressing growing east-west regional and national traffic demand that is required to traverse the [area] regardless of the trip origin or destination;

- Alleviate local system congestion and improve local system mobility, and address lack of connectivity for Will, Kankakee, and Lake Counties to meet and support projected traffic growth from increased population, employment, transportation and economic development including the lack of continuous, higher functional classification east-west travel routes in the Study Area, and improving travel times; and

- Accommodate market demands for the increasing freight logistic transportation and more efficient freight movement including better accommodation of regional and national truck trips.  (AR1_000116.)

### D.    Development of Separate Build Forecasts for Evaluating Alternatives

ACG then generated separate socioeconomic forecasts for each of the three "build" alternatives under evaluation to account for the reallocation of regional population and employment that could result from the increased accessibility provided by a new facility. (AR1_001332; AR1_001359; AR1_001369; AR1_001478–AR1_001496.)   These "build" socioeconomic scenarios were incorporated into the travel demand model used to evaluate the impacts of each alternative.  (AR1_001332; AR1_001359; AR1_001369.)

## ARGUMENT

## I.    STANDARD OF REVIEW

Plaintiffs' Motion for Summary Judgment is limited to claims under NEPA and Section 4(f).  Because neither NEPA nor Section 4(f) specifically provides for judicial review, this Court reviews Plaintiffs' claims under the narrow standard of review provided by the Administrative Procedure Act, 5 U.S.C. §§ 701–706.  *See Ind. Forest Alliance*, *Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003).  Under the APA, a court may set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C § 706(2)(A).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotation marks and citation omitted); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

A court evaluating an agency's compliance with NEPA may not "substitute its judgment for that of the agency as to the environmental consequences of its actions."  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  Instead, courts review EISs under a "rule of reason" to determine whether the analysis contained a reasonably thorough discussion of the significant aspects of the probable environmental consequences and considered a reasonable range of alternatives.  *See Ind. Forest Alliance* 325 F.3d at 859; *Highway J Citizens*, 349 F.3d at 960.  In other words, the role of the court is limited to ensuring that the agency took "a 'hard look' at the environmental consequences before taking a major action."  *Balt. Gas & Elec.*, 462 U.S. at 97.

Under the APA, an agency is entitled to rely upon the opinions of its experts on issues relating to the agency's expertise, even in the face of other competing expert analysis.  *See Marsh*, 90 U.S. at 378 ("[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts"); *see also Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (a court must be "'at [its] most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise.") (quoting *Balt. Gas & Elec.*, 462 U.S. at 103).

Summary judgment is proper if the evidence "shows that there is no genuine [issue] as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under the APA, "courts are to decide, on the basis of the record the agency provides,

whether the action passes muster under the appropriate APA standard of review." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Because extra-record evidence and trials are inappropriate in APA cases, courts decide APA claims via summary judgment based on the administrative record the agency compiles. *Cronin v. USDA*, 919 F.2d 439, 445 (7th Cir. 1990) ("Because the plaintiffs are not entitled to present evidence in court to challenge the [decisionmaker's] decision . . . , there will never be an evidentiary hearing in court."); *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir. 1994). In an administrative record review case such as this, a district court is "authorized to grant summary judgment to a party that has not requested it." *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994) (citing *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993)). As the Seventh Circuit states in *Leininger*, "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record. . . . It informs the judge that he should resolve the case as a matter of law; that there are no triable issues of fact." 15 F.3d at 669.

## II. THE AGENCIES' FORMULATION OF THE PURPOSE AND NEED FOR THE PROJECT WAS REASONABLE AND SHOULD BE UPHELD

The Agencies properly defined the Purpose and Need for the Project, undertaking a comprehensive evaluation of existing transportation infrastructure, projected local population and employment growth, national and regional freight and non-freight travel demand, and other factors in identifying the transportation needs of the Study Area. Plaintiffs nevertheless attack the identified Purpose and Need, incorrectly alleging that the Agencies were required to rely on CMAP's policy-based socioeconomic forecasts to identify future travel demand. Plaintiffs also mistakenly allege that the Agencies' baseline socioeconomic forecasts were not true "no-build" forecasts and created a "self-fulfilling prophecy" of future travel demand. Neither argument

withstands scrutiny, and both are belied by extensive evidence in the record.  In fact, Plaintiffs cannot articulate any valid grounds to find the Agencies' Statement of Purpose and Need arbitrary or capricious.

**A.  The Agencies Reasonably Exercised Their Discretion in Defining the Purpose and Need for the Project**

Agencies are given considerable deference in defining the Purpose and Need for their projects, and the Agencies exercised their discretion reasonably in this case, based on their substantial transportation expertise.  The NEPA regulations require that an EIS "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. § 1502.13.  In reviewing an agency's formulation of Purpose and Need under the arbitrary and capricious standard, courts "defer to the agency if the statement is reasonable," giving "considerable deference to the agency's expertise and policy-making role."  *Alliance for Legal Action v. FAA*, 69 Fed. Appx. 617, 622 (4th Cir. 2003); *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("We uphold an agency's objectives so long as the objectives that the agency chooses are reasonable."); *Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1223 (S.D. Fla. 2010) (citations omitted), *aff'd sub nom.*, 669 F.3d 1203 (11th Cir. 2012).

The Agencies followed a reasonable process to evaluate the transportation needs of the Project area in accordance with NEPA.  First, the Agencies projected future population and employment for each township in the Study Area based upon historical growth patterns, amounts of available land, and local land use policies.  (AR1_000095.)  Contrary to Plaintiffs' assertions, these projections did ***not*** include future construction of the proposed Illiana Corridor Project.  (*Id.*; AR1_001378–AR1_001466.)  The Agencies then used those socioeconomic forecasts to

predict future travel demand within the Project area. (AR1_000095; AR1_001326–AR1_001377.) Finally, the Agencies evaluated the ability of the existing transportation system to accommodate the projected demand. (AR1_000095; AR1_000886–AR1_001023.) This allowed the Agencies to identify where weaknesses in the transportation network are likely to occur. Specifically, the Agencies identified the lack of an east-west Interstate or multi-lane highway in the Study Area as a significant deficiency that leads to delay, congestion, and limited access to jobs and other resources. (AR1_000110.)

After reviewing the travel demand data, and considering input from resource agencies and the public, the Agencies identified the Purpose and Need for the Project as: (1) to improve regional mobility by addressing regional and national traffic traversing the area; (2) to alleviate local system congestion and improve local system mobility; and (3) to provide for efficient movement of freight. (AR1_00097; AR1_000116.) This process drew on the Agencies' significant transportation expertise, and the outcome—the Statement of Purpose and Need in the FEIS—is well within the bounds of reason, and is therefore entitled to deference.

### B. The Agencies Made a Reasoned Decision To Use Well-Established Methodology To Forecast Expected Population and Employment Growth

In evaluating the regional and local transportation needs that make up a portion of the Purpose and Need for the Project, the Agencies reasonably chose to use a customary, widely accepted forecasting methodology that would accurately predict the future socioeconomic conditions in the area and serve as the basis for projecting future local travel demand. Plaintiffs' claim that the Agencies were required to rely on CMAP's socioeconomic forecasts, and could not develop their own Project-specific forecasts using recognized forecasting procedures, is both legally and factually incorrect. (Pls.' Mem. at 32–37.) The Agencies' choice of methodology is precisely the type of professional judgment, based on technical expertise, to which reviewing

courts are the most deferential under NEPA.  *See Balt. Gas & Elec.*, 462 U.S. at 103 ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential.").

The Agencies considered CMAP's forecasts, and took them into account in setting the population and employment totals for the region.  But the Agencies reasonably determined that the policy assumptions underlying CMAP's projected distribution of population and employment within the region were not appropriate for the type of project-level forecasting NEPA requires.  Consequently, the Agencies engaged independent forecasting experts to develop more specific forecasts of the distribution of population and employment in the Study Area based on well-established principles of socioeconomic forecasting.  The Agencies explained their reasoning for this choice, which is documented throughout the record.  (AR1_000095; AR1_003741–AR1_003742; AR1_003755–AR1_003770; AR2_038304.)  Plaintiffs make no credible argument that the Agencies' exercise of their technical expertise and professional judgment in selecting a forecasting methodology was arbitrary or capricious—only that Plaintiffs would have preferred that the Agencies use a different methodology.  Plaintiffs' preference for CMAP's policy-based methodology to forecast population and employment simply cannot overcome the rational and reasonable determination by the Agencies to use a different, and more reliable, methodology.

> **1.     The Agencies' Exercise of Discretion in Selecting a Forecasting Methodology Is Entitled To Deference**

Choosing a forecasting method for a NEPA analysis is the type of technical determination for which courts defer to agency expertise.  Agencies are entitled to select their own methodology to comply with NEPA requirements, as long as that methodology is reasonable.  *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir.

1999); *Sierra Club v. USDA*, 116 F.3d 1482, 1997 WL 295308, at *13 (7th Cir. May 28, 1997) (table) ("an agency's choice of methodology is entitled to substantial deference"). A reviewing court owes deference to the agency in such matters, and "may not call into question any reasonable agency methodologies used in arriving at its conclusion." *Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d at 1225–26.

Deference is particularly appropriate when a court is faced with a challenge to a transportation agency's traffic and growth forecasting methods—a matter that directly involves the agency's technical expertise. In such cases, "a district court should properly recognize that it cannot designate itself a 'super professional transportation analyst' or decide which party utilized the better methodology." *Id.* (internal citation omitted). In upholding an EIS's reliance on disputed population projections, the Court of Appeals for the Fifth Circuit held that "a conflicting projection does not prove the invalidity of another projection." *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 442 (5th Cir. 1981); *see also Route 9 Opposition Legal Fund v. Mineta*, 75 Fed. Appx. 152 (4th Cir. 2003) (deferring to agency's future travel projections and growth assumptions); *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442 (9th Cir. 1984) (deferring to population and traffic forecasts selected by FHWA); *Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168 (D. Nev. 2004) (same); *Senville v. Peters*, 327 F. Supp. 2d 335, 367 (D. Vt. 2004) ("dispute over inputs" into forecasting model "is the kind of technical determination that requires deference to the agency"). Here, the Agencies reasonably chose not to use forecasts developed by CMAP that were based on a methodology that CMAP itself describes as a "radical departure" from established practices. The Agencies' choice to use well-established market-based methods of forecasting to analyze the proposed Project under NEPA is entitled to deference.

## 2. The Agencies Expressed Legitimate Concerns that CMAP's Policy-Based Forecast Does Not Accurately Project Future Conditions

The Agencies reasonably determined that the methods and assumptions underlying CMAP's latest socioeconomic forecast are not sufficiently reliable to fulfill the Agencies' obligations under NEPA. Plaintiffs are incorrect in alleging that the Agencies were obligated to adopt CMAP's questionable forecast without modification. (Pls.' Mem. at 36.) For decades, planning agencies in the region forecasted population and employment growth using an approach that takes into account historic growth trends, the amount of land available for development, and local land use policies. (AR1_001401; AR3_003756.) This "market-based" approach to forecasting recognizes that population growth in a metropolitan region typically follows a distinctive pattern of stable low density, rapid "take-off" development, and steady higher density as areas reach maturity. (AR1_001388; CMAP Socioeconomic Inventory at 22 (n.13, *supra*).) When graphed, this pattern results in a characteristic S-shaped growth curve that is widely used in the socioeconomic forecasting field. (AR1_001389.)

CMAP's new population and employment forecast, prepared in association with its GO TO 2040 Comprehensive Regional Plan, abandoned the traditional forecasting approach in favor of a markedly different method—a method that CMAP itself described as a "radical departure from previous long-range planning forecasts in the Chicago region." (AR4_000417.) Instead of predicting how population and employment are *likely* to grow, the purpose of CMAP's 2040 forecast is to show CMAP's "preferred future" for the region. (AR4_000418.) CMAP's forecast is based on a set of transportation and land use policies and strategies—many of which are outside CMAP's authority to implement—and predicts how population and employment would be distributed *if* all of CMAP's preferred policies are implemented by local authorities who control land use decisions. CMAP acknowledged that its policy-based approach is a "wholesale

shift" and a "significant methodological departure" from its past forecasting efforts. (AR4_000417–AR4_000418; CMAP Socioeconomic Inventory at 46 n. iii.) Importantly, CMAP admitted that its new forecast is subject to "significant uncertainty about future conditions." (CMAP Socioeconomic Inventory at 46 n. iii.)

At the outset of the NEPA process for the Illiana Corridor, the Agencies considered CMAP's latest socioeconomic forecast and determined that this "radical departure" from traditional forecasting principles was not appropriate for use in a project-level NEPA study. (AR1_003770; AR1_003752; AR2_038304.) CMAP's forecast is premised upon significant policy-based assumptions that the Agencies found to be unrealistic, given market and political realities. (*Id.*; AR1_003741–AR1_003742.) Indeed, CMAP itself recognized that its new forecast "is meant to embody desirable future conditions in the region, *but for it to happen would be a significant break from the past.*" (CMAP Socioeconomic Inventory at 31 (emphasis added).)

The Agencies reasonably concluded that the underlying assumptions about land use in the CMAP forecast do not reflect the reality of how development in large metropolitan areas actually occurs. CMAP's forecast is based on increasing the population density in urban areas and close-in suburbs that are already fully developed, while discouraging development in areas farther from the urban core. (AR4_000066; AR4_000069.) To achieve this goal, CMAP acknowledges that "it will likely be necessary to replace lower density housing with higher density housing or to convert other non-vacant lands to residential." (CMAP Socioeconomic Inventory at 33.) CMAP advocates for increasing urban and suburban density as a policy matter, but it does not have the power to effectuate these changes because it has no land use planning authority. (AR4_000418.)

Substantial redevelopment of existing housing stock to high density use is a policy goal of CMAP, not a prediction. CMAP recognized that efforts to increase density would face "significant and complex" obstacles. (AR4_000067.) The Agencies similarly expressed legitimate doubt that the market would support such high levels of redevelopment in the urban core and close-in suburbs. (AR1_003741–AR1_003742; AR1_003770; AR2_038304.) Instead, the Agencies reasoned that growth in outlying areas would follow predictable patterns that have played out throughout the greater Chicago region for almost a century. (*Id.*; AR1_003756.)

Not only did the Agencies reasonably disagree with the policy-based assumptions of the CMAP forecast, they expressed concern that the CMAP forecast was based on *estimates* of the 2010 baseline population, rather than actual 2010 Census results. (CMAP Socioeconomic Inventory at 5.) For several key geographical areas, the official Census results varied significantly from the estimates that CMAP used. (AR1_001390.) In particular, the estimate on which CMAP relied for the City of Chicago overestimated the results by more than 200,000 people.[17] That discrepancy alone accounts for most of the approximately 300,000-person difference between the population CMAP forecasted for Chicago in 2040 and ACG's 2040 Chicago population forecast.

CMAP itself recognized the limitations of relying upon Census estimates. CMAP cautioned that "the 2010 Census release [] will necessitate a complete revalidation of the forecasts." (CMAP Socioeconomic Inventory at 29.) But this was not done. After the Census results were released, CMAP chose not to update its forecasts.[18] As a result, the Agencies reasonably concluded that a forecast that takes into account the official 2010 Census results

---

[17] Compare CMAP's estimated 2010 Chicago population of 2,865,598 to official 2010 Census results of 2,654,078. *See* https://www.cmap.illinois.gov/documents/10180/13313/GT2040-Pop-Emp-Forecast-Summary-Table_09-11-12.xlsx/2f374220-eccf-437b-9d75-38ae2846467f.

[18] *See* https://www.cmap.illinois.gov/data/demographics/population-forecast.

would yield a more accurate prediction of growth than a forecast based on estimates. The forecasts used to identify the Project's Purpose and Need relied on those up-to-date Census results—not the outdated estimates used by CMAP.

        **3.**        **The Agencies Engaged a Qualified Expert To Develop a Reasonable Market-based Socioeconomic Forecast for the Study Area**

To evaluate the Project under NEPA, the Agencies chose to develop a baseline socioeconomic forecast for the region that follows the traditional market-based approach used for years by transportation planners and agencies. (AR1_000095.) The Agencies determined that a prudent forecast based on actual patterns of growth, taking into account the limits on development imposed by local land use authorities and land availability, is a more accurate predictor of where population and employment growth in the region will actually occur. (AR1_003741–AR1_003742; AR1_003770; AR2_038304.) The Agencies made the reasonable decision to engage an experienced consultant, the al Chalabi Group ("ACG"), to assist in developing this forecast. (AR1_001479.)

Consistent with established principles used by planning agencies for decades (including CMAP and its predecessor agency), ACG based its forecast on official 2010 Census results, ninety years of historic population and employment trends for individual townships, local land use policies, the amount of land available for development, and independent economic forecasts for the region. (AR1_001402–AR1_001404.) The Agencies' decision to follow the traditional market-based forecasting approach to comply with NEPA was reasonably based on sound planning principles. (AR1_001402–AR1_001404.) The differences between the ACG forecast and the CMAP forecast reflect the fundamentally different purposes for which these forecasts were developed. The CMAP forecast shows the distribution of population and employment that CMAP would *like* to see for the region based on policies it advocates, whereas the ACG forecast

is designed to accurately predict where population and employment growth will ***actually*** occur. In their professional judgment, the Agencies determined that ACG's market-based forecast was the most realistic projection of future conditions. Thus, the Agencies reasonably concluded that using the ACG forecast would allow them to best meet the objectives of NEPA by accurately evaluating the environmental and socioeconomic effects of the Project.

      **4.**      **Plaintiffs' Argument That the Agencies Were Legally Required To Adopt CMAP's 2040 Socioeconomic Forecast Is Meritless**

There is no legal requirement for FHWA to adopt a regional planning agency's socioeconomic forecast in conducting a NEPA analysis. Plaintiffs first claim that FHWA guidance required the Agencies to use CMAP's forecast. (Pls.' Mem. at 33–34.) This guidance encourages a link between environmental review and the transportation planning process, but does not mandate use of any particular planning forecast or other document. 23 C.F.R. Part 450, App. A, *Background and Overview*. The guidance makes clear that forecasts and other products of the transportation planning process should only be incorporated into NEPA studies if they "meet certain standards established by NEPA regulations and guidance." *Id.* In particular, the guidance cautions agencies to ensure that any studies or forecasts brought in from the transportation planning process involve only policy assumptions that are consistent with the requirements of NEPA and are based only on reliable and defensible methods. *Id.* at Section I, Question 6. Here, the Agencies determined that CMAP's 2040 forecast diverged from established forecasting principles, and instead relied upon significant land use assumptions motivated by policy preferences, leading to what CMAP acknowledged as "significant uncertainty." (AR2_038304; CMAP Socioeconomic Inventory at 46 n. iii.) The Agencies concluded that CMAP's new method was not the most accurate way to predict likely growth

patterns, and thus CMAP's 2040 forecast was not suitable for a project-specific NEPA study. (AR1_003770; AR2_038304.)

Plaintiffs' suggestion that Illinois state law required the Agencies to use CMAP's forecast in the NEPA process is similarly without merit. NEPA is a Federal statute, and compliance with NEPA is the responsibility of FHWA, a Federal agency. State law does not dictate how a Federal agency must comply with a Federal statute. Illinois law may designate CMAP as the agency responsible for generating forecasts for the regional planning process, but different concerns are implicated in deciding whether a forecast is suitable for a NEPA study. Here, FHWA made the reasoned decision that CMAP's policy-based forecast would not serve the need for a realistic projection of reasonably foreseeable future socioeconomic conditions as required by NEPA.

Throughout the NEPA process, the Agencies acknowledged, considered, and responded to CMAP's concerns regarding use of its policy-based forecast. (AR1_003741–AR1_003742; AR1_003755–AR1_003770.) The Agencies expressed valid reasons for adjusting the projected distribution of population and employment in the region to reflect land use trends and market forces.[19]  (*Id.*; AR1_001401–AR1_001405.) CMAP may have wanted to impose its policy recommendations onto the NEPA process, but FHWA, as the Federal agency charged with the ultimate responsibility to comply with NEPA, retained discretion to determine how best to meet the requirements imposed by NEPA. Even if CMAP (or the Plaintiffs) disagrees with the

---

[19]  CMAP also suggested that the Agencies (or CMAP itself) develop "build" forecasts for the Project alternatives using CMAP's 2040 forecasts, and asked that these results be presented in the EIS alongside the results of the project-specific modeling. (AR1_003739.) The Agencies considered this suggestion, but ultimately determined (and explained) that the aspirational assumptions and associated uncertainty of the CMAP forecasts made it unsuitable for the level of analysis that NEPA requires. (AR1_001544; AR3_041377; AR3_038835.) Thus, the Agencies reasonably chose not to include CMAP's forecasts as part of the FEIS. (*Id.*)

Agencies' decision not to adopt CMAP's forecast, mere disagreement with an agency's reasoned choice is not actionable under NEPA or the APA. *Highway J Citizens*, 349 F.3d at 952–53.

Ultimately, the MPO Policy Committee—the official transportation planning entity for the Chicago region—will have the opportunity to evaluate the proposed Project, including its relationship to CMAP's socioeconomic forecasts and policy preferences, and determine whether to include the Project in its fiscally-constrained transportation plan. 23 C.F.R. §§ 450.322 and 450.324. That is the avenue that Federal law provides for the MPO to implement its policy preferences for the transportation system—not by inserting them into FHWA's NEPA environmental review process.

The Agencies acted well within their discretion in choosing a market-based forecasting methodology to evaluate the Project under NEPA. This type of technical judgment falls squarely within the Agencies' area of expertise in transportation planning. An agency's choice of methodology in conducting a NEPA analysis should not be disturbed, as long as that choice is reasonable. *See Citizens for Smart Growth*, 716 F. Supp. 2d at 1225–26. Here, the forecasting methodology the Agencies chose was based on sound planning principles, and the Agencies explained why they determined this methodology to be the most appropriate under NEPA. Plaintiffs' arguments regarding CMAP's forecasts amount to, at most, a "battle of the experts," which is not enough to render the Agencies' choices arbitrary and capricious. *Id*. at 1226.

<h3>C.    Plaintiffs Have Made No Credible Arguments That Would Undermine the Validity of the Agencies' Forecasts</h3>

Other than criticizing the Agencies' decision to use a realistic market-driven forecast instead of CMAP's policy-based one, Plaintiffs do not point to any flaw in the Agencies' forecasting method itself that would render it arbitrary or capricious. The three arguments they make find no support in the Record. First, Plaintiffs incorrectly claim that the Agencies'

baseline forecast is not a true "no-build" forecast because it assumed that the Illiana Corridor Project would be constructed. (Pls.' Mem. at 37.) They then suggest that the Agencies failed to follow the proper procedure of developing separate "build" and "no-build" forecasts. (*Id.* at 37–38.) Finally, they attempt to cast doubt on the Agencies' long-term population forecasts by comparing them to short-term Census estimates for portions of the Project area. (*Id.* at 38–39.) However, the record makes clear that the baseline socioeconomic forecast the Agencies used to evaluate the "no-build" scenario did ***not*** include the Illiana Corridor Project and that separate "build" socioeconomic forecasts were then generated to enable the Agencies to appropriately evaluate the effects of each "build" alternative. (AR1_001474; AR_001359.) Lastly Plaintiffs' reliance on recent short-term population estimates for the region—representing the worst effects of the Great Recession—does not call into question the validity of the Agencies' long-range forecasting methodology.

**1. The Agencies' Baseline "No-Build" Forecasts Did Not Include the Proposed Project**

NEPA requires that agencies identify the baseline environmental and socioeconomic conditions that would be expected in the absence of a proposed project (i.e., the "no-action" or "no-build" alternative) in order to properly evaluate the expected impacts of the project under review. 40 C.F.R. § 1502.14. Here, Plaintiffs mistakenly argue that the Agencies' baseline socioeconomic forecast did not represent a true "no-build" scenario because they claim that it assumed the existence of the Project. (Pls.' Mem. at 37.) However, the record makes clear that ACG's initial forecast, which was used to develop the Purpose and Need and evaluate the "no-build" baseline conditions did ***not*** assume construction of the Illiana expressway project. (AR1_000248; AR1_001474; AR3_041121.) A detailed explanation of the development of the "no-build" forecast is given in Appendix E of the FEIS. (AR1_001378–AR1_001466.) This

forecast was based upon current and historic population and employment data for individual townships, local land use policies, land available for development, and independent economic projections. (AR1_001402–AR1_001404.) The inputs used to generate this forecast were independent of any particular transportation facilities.[20] (*Id.*) No adjustments were made to the "no-build" forecast based on any type of Illiana Corridor proposal. In discussing ACG's "no-build" baseline forecast, the FEIS makes clear that "the population projections do not include the proposed east-west transportation facility." (AR1_000248.)

Plaintiffs can point to nothing in the record to show that ACG's "no-build" socioeconomic forecast assumed construction of the Illiana Expressway. Instead, Plaintiffs mischaracterize two lines in a section of the appendix to ACG's report that reviews the broader context of development in the counties in the Study Area. (Pls.' Mem. at 38.) Whereas the actual forecasts are presented and discussed in the body of the ACG report, the appendix provides narrative descriptions of past trends and potential projects in individual counties to put the "no-build" forecasts into context. (AR1_001422.) In sections discussing potential future developments in Will County, Illinois and Lake County, Indiana, the appendix briefly mentions "[p]otential construction of the Illiana Expressway" as one of several developments that are in various planning stages. (AR1_001429; AR1_001452.) Considering that an east-west expressway in this vicinity has been under discussion since the early 1900s, and was already

---

[20] The next step in the analysis, modeling the travel demand under a "no-build" scenario, required the Sponsors to input the details of the "no-build" transportation network into the model. Consistent with case law and FHWA guidance, the "no-build" transportation network did not include any improvements other than those that were already underway, or are financially committed and planned to be in place by 2040. (AR1_000880.) *See* FHWA Guidance at 21; *Sierra Club v. FHWA*, 715 F. Supp. 2d 721, 730 (S.D. Tex. 2010), *aff'd*, 435 F. Appx. 368 (5th Cir. 2011); *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 668–69 (D. Md. 2007); *Coal. of Concerned Citizens Against I-670 v. Damian*, 608 F. Supp. 110, 118 (S.D. Ohio 1984). Here, the list of committed improvements included in the "no-build" network did not include any new facility in the Illiana Corridor. (AR1_000896.)

included in CMAP's GO TO 2040 plan as an unfunded need (AR4_000284; AR1_000095), it was reasonable for ACG to mention this potential project in the appendix as an example of a transportation project that has been proposed to address the anticipated level of growth. Noting the Illiana proposal in the appendix does not mean that ACG used the construction of an Illiana Corridor facility as an input into its forecast, or otherwise made any sort of adjustment to account for the proposed Project in the baseline forecast. Plaintiffs cite to no other evidence in the ACG report or elsewhere in the record that would show the construction of the proposed Project being factored into the "no-build" analysis. And in fact, the record is replete with statements to the contrary. (AR1_000248; AR1_000881; AR1_001474; AR3_041121.)

Plaintiffs' claim that ACG used the potential Illiana Expressway to "justify" its baseline forecast is patently incorrect. The detailed explanation of ACG's forecasting methodology in the body of the report makes clear that proposed transportation facilities—and the Illiana Expressway in particular—played no part in generating the baseline forecast. (AR1_001387–AR1_001420.) As the FEIS explains, the growth trends reflected in the "no-build" forecast "were well established before the Illiana Corridor began," and are "fueled by several factors including the continuing western and southern expansion of the Chicago metropolitan area, the availability of less expensive and developable land, and the lower housing prices as compared with areas closer to Chicago." (AR1_000623.)

## 2. The Agencies Appropriately Evaluated Separate "No-Build" and "Build" Scenarios in Accordance with the *Sierra Club* Decision

Plaintiffs attempt to question the Agencies' overall development and use of socioeconomic forecasts by citing to case law that actually supports the process the Agencies followed. Plaintiffs rely heavily on *Sierra Club, Illinois Chapter v. United States Department of Transportation*, 962 F. Supp. 1037 (N.D. Ill. 1997) which set the foundation for the type of

"build/no-build" evaluation process the Agencies used here. (Pls.' Mem. at 37–38.) Specifically, the *Sierra Club* decision directs Agencies to use socioeconomic forecasts representing the "no-build" condition as the baseline for the analysis, and to develop separate "build" forecasts for each alternative that reflect the expected changes in growth patterns, or explain why such a forecast is not possible. 962 F. Supp. at 1043. The Agencies followed the *Sierra Club* framework for the forecasts here, and Plaintiffs' argument to the contrary does not hold water.

The FEIS outlines the process whereby the Agencies, through their consultant, developed a separate socioeconomic forecast for each "build" alternative to reflect the changes in land use and population distribution that would be expected with the construction of each such alternative. (AR1_001467–AR1_001504.) These forecasts were used in comparison to the "no-build" baseline projections to evaluate the environmental and socioeconomic effects of each alternative. (AR1_000609.)

Chapter 3 of the FEIS explains that the separate "build" forecasts were generated by separately incorporating each proposed alternative corridor into the regional transportation network, and then running the travel demand model for each alternative and measuring how changes in accessibility to transportation would be expected to shift the location of development in the area, based on the change in corridor location. (AR1_000609–AR1_000610.) Similarly, the Travel Forecasting Model Technical Memorandum in Appendix D describes "the development of 2040 No Build and Build socioeconomic data inputs" to "account for the reallocation of regional population and employment that could result from the increased accessibility" provided by each alternative. (AR1_001332; AR1_001359; AR1_001369.)

ACG's "Build Socioeconomic Forecast" report in Appendix E explains the "build" forecasting process in further detail. (AR1_001467–AR1_001504.)

The forecasting process held to be inadequate in *Sierra Club* is easily distinguishable from the process the Agencies followed here. In *Sierra Club*, the agency had used a single socioeconomic forecast from the MPO to evaluate all alternatives, including the "no-build" alternative. 962 F. Supp. at 1040. This Court found that the MPO forecast on which the agency relied explicitly assumed construction of the project under consideration, so it was not a true "no-build" forecast. *Id.* at 1043. That level of analysis was typical for NEPA studies at the time, but the import of the *Sierra Club* decision was to require agencies to separately forecast "build" and "no-build" conditions. The Agencies recognized this requirement here, noting that they are "careful to use No Build and Build population and employment forecasts as a result of" the *Sierra Club* decision. (AR2_038295.)

The Agencies' forecasting methodology for this Project was designed specifically to comply with the framework set out in *Sierra Club*. Unlike in *Sierra Club*, the Agencies here used a baseline forecast for the "no-build" scenario that did not assume construction of the Project, and then developed separate "build" forecasts to evaluate the socioeconomic effects of the alternatives. (AR1_001474–AR1_001496.) Plaintiffs' argument that the forecasting process used by the Agencies for the Illiana Project is equivalent to the process found inadequate in *Sierra Club* is completely contrary to fact, and is belied by the record's comprehensive explanation of the use of separate "build" and "no-build" Illiana Corridor forecasts. (AR1_000609–AR1_000610; AR1_001332; AR1_001359; AR1_001369; AR1_001467–AR1_001504.)

### 3. None of the Other Case Law Plaintiffs Cite Cast Doubt on the Agencies' Development and Use of Forecasts

Plaintiffs cite additional case law in an attempt to call into question the validity of the Agencies' forecasts, but none of these cases support Plaintiffs' claims. (Pls.' Mem. at 37.) In *North Carolina Alliance for Transportation Reform, Inc. v. United States Department of Transportation*, the agency based its analysis on traffic volume estimates that the agency *itself* had previously admitted were inaccurate, and ignored updated estimates the agency *itself* had developed. 151 F. Supp. 2d 661, 688 (M.D.N.C. 2001). This is certainly not the case here, where the socioeconomic forecasts the Agencies used reflect the most recent official Census results and are based on well-established forecasting methods. (AR1_001388–AR1_001396.) Moreover, the agency in *North Carolina Alliance* used a single socioeconomic forecast to evaluate the "build" and "no-build" scenarios. 151 F. Supp. 2d at 689. Here, in contrast, the Agencies used separate "build" and "no-build" forecasts developed specifically for the Project. (AR1_000609.)

Plaintiffs also mistakenly attempt to rely on *Conservation Law Foundation v. Federal Highway Administration*, in which an agency chose to disregard the most recent forecast prepared by its *own* experts. 630 F. Supp. 2d 183 (D.N.H. 2007). Again, this set of facts is readily distinguishable. The Agencies here relied on their experts' most recent and up-to-date forecast in evaluating the Project under NEPA. (AR1_001388–AR1_001396.)

The last two cases Plaintiffs cite have no relevance to the issues presented here. (Pls.' Mem. at 37.) First, Plaintiffs cite general language from an early NEPA case about the importance of analyzing the need for a Project, instead of simply asserting that a need exists. *Swain v. Brinegar*, 517 F.2d 766, 777 (7th Cir. 1975). This is precisely why the Agencies here undertook such a rigorous analysis of projected demographic conditions and the future

performance of the transportation system. *Swain* did not involve a challenge to any particular forecasting method. There, the agencies did not present *any* analysis of the Purpose and Need in the FEIS, but instead simply referred to a corridor selection process that took place before NEPA was enacted. *Id*. at 774. The complete absence of analysis addressed in *Swain* is not at all comparable to the extensive evaluation of needs that the Agencies undertook for this Project. Moreover, the Court of Appeals did not actually rule on the adequacy of the FEIS in *Swain*, but based its decision on the narrower issue of the extent to which a Federal agency can delegate the research and drafting of an EIS to a state agency, an issue Plaintiffs do not raise here. *Id*. at 779. Plaintiffs' reliance on this case in an attempt to cast doubt upon the Agencies' forecasting methods is entirely misplaced.

Finally, Plaintiffs' citation to *Van Abbema v. Fornell* does nothing to bolster their argument. 807 F.2d 633, 640 (7th Cir. 1986). As a threshold matter, the part of the holding that Plaintiffs cite does not implicate NEPA. Earlier in the opinion, the court upheld the Corps of Engineers' decision that an EIS was not required for its issuance of a permit for a new coal loading facility. *Id*. at 637. The court then addressed a separate regulatory requirement that the Corps undertake a public interest review before issuing a permit, and criticized the agency for relying on "entirely false" figures to establish the economic benefits of the proposed facility. *Id*. at 638–9. Plaintiffs' attempt to equate the inaccurate data at issue in *Van Abbema* with the Agencies' comprehensive socioeconomic forecasting analysis for the Project completely misses the mark. Not only was the issue in *Van Abbema* entirely outside of the context of NEPA, Plaintiffs have pointed to no such inaccuracy in the Census results, historical data, or other information on which the Agencies' socioeconomic forecasts were based.

### 4. Plaintiffs' Comparisons to Limited Short-Term Census Estimates Does Not Discredit the Agencies' Forecasts

Plaintiffs' final attempt to cast doubt on the Agencies' forecasts by comparing them to short-term Census estimates demonstrates the Plaintiffs' lack of understanding of basic forecasting principles. Plaintiffs present population and employment estimates for a seven-year period for one county within the study area, and try to use these estimates to demonstrate the "inaccuracy" of ACG's long-term (thirty-year) projections. (Pls.' Mem. at 13–14, 39.) This argument is flawed on several levels. Fundamentally, demographic changes over short time periods are of limited value in making long-term projections. Forecasting population and employment growth over the long term must, by definition, take into account more than recent trends. This is why ACG studied 90 years of population change and 40 years of employment trends in developing its forecast for the region. (AR1_001402–AR1_001404.)

Plaintiffs also fail to acknowledge that the seven-year period they offer for comparison happened to coincide with a significant nationwide economic recession. Thus, this time period presents a particularly inappropriate basis for comparison to the long-term outlook. ACG's forecasting method recognizes that growth over the long term is not generally linear. ACG specifically cites the recent "Great Recession," along with the "baby boom" after WWII, as examples of anomalies where employment or population grows slower or faster than the longer-term average. (AR1_001405.) Will County, on which Plaintiffs focus their argument, has been one of the fastest-growing counties in the country, having nearly doubled in population between 1990 and 2010. (AR1_001428.) But Will County was not immune to the effects of the recession and housing market collapse, and population and employment growth understandably slowed during that period.

Drawing comparisons to population and employment estimates during the recession paints an incomplete picture of the county's long-term outlook for growth. ACG's comprehensive analysis predicts that Will County's relative proximity to the region's urban core, together with the low cost and availability of land, will continue to drive economic development and population growth in the county. (AR1_001410–AR1_001411.) This prediction is reasonable, based on well-established methods of forecasting socioeconomic conditions over the long term. Plaintiffs are not forecasting experts, and their misguided conclusions based on the first three years of a thirty-year forecast do not render ACG's projections "implausible."

Not only is Plaintiffs' attempt to criticize long-range projections based on short-term trends misguided, Plaintiffs misrepresent the very population information they cite. Plaintiffs repeatedly refer to Census bureau "data" from 2007 to 2013 as showing "actual population growth." (Pls.' Mem. at 13–14, 39.) But as Plaintiffs' own table makes clear, these figures are only *estimates* of population that the Census Bureau publishes for years in between the decennial Census. (*Id*. at 13–14, Tables 1 and 2.) Plaintiffs' characterization of these estimates as "actual population" figures is inaccurate. The disparity between Census estimates and actual Census results only serves to highlight the reasonability of the Agencies' decision to develop a forecast based on results, not estimates.

In sum, Plaintiffs have not shown that the Agencies' determination of the Purpose and Need for the Project was arbitrary or capricious. The Agencies' evaluation of local travel needs was informed by a comprehensive, credible market-based approach to forecasting future population and employment and resulting travel demand. In contrast, CMAP's approach to its 2040 forecasts constituted a "radical departure" that the agencies concluded was not appropriate for a project-level NEPA evaluation. This choice of methodology is particularly within the

transportation agencies' expertise, and should be afforded "considerable deference." The Agencies also developed a baseline forecast to evaluate the "no-build" scenario that did not assume construction of the Illiana Expressway—as required by case law cited by Plaintiffs themselves. Given the evidence cited above and the "considerable deference" given to agencies in defining Purpose and Need, the Court should grant summary judgment in the Defendants' favor on Count I.

## III.  THE AGENCIES TOOK THE REQUIRED "HARD LOOK" AT THE ENVIRONMENTAL EFFECTS OF PROJECT ALTERNATIVES

The Agencies complied fully with NEPA by taking a "hard look" at the socioeconomic and environmental consequences of the proposed Project and its alternatives. NEPA does not require agencies to reach a particular substantive outcome in evaluating proposed actions. *Methow Valley Citizens*, 490 U.S. at 350. As the Court of Appeals for the Seventh Circuit has held, "the only role for a court in applying the arbitrary and capricious standard in the NEPA context is to insure that the agency has taken a 'hard look' at environmental consequences. *Highway J Citizens*, 349 F.3d at 953 (quoting *Kleppe*, 427 U.S. at 410 n.21) (internal quotation marks omitted). None of the arguments Plaintiffs put forth under the guise of a "hard look" argument present any new or independent challenge to the Agencies' evaluation of alternatives in the FEIS. For the reasons summarized below (and discussed more fully in Section II, *supra*), none of these arguments demonstrates the Agencies' NEPA analysis to be arbitrary or capricious.

### A.  The Agencies Thoroughly Evaluated the Indirect Socioeconomic and Environmental Effects of the Project Alternatives

The NEPA regulations require agencies to discuss both the "direct effects" and the "indirect effects" of alternatives under consideration. 40 C.F.R. §§ 1502.16(a) and (b). "Direct effects" are "caused by the action and occur at the same time and place," whereas "indirect

effects" are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* at §§ 1508.8(a) and (b). Plaintiffs attempt to argue that the Agencies did not take a "hard look" at indirect effects, based on the Plaintiffs' earlier-asserted claim that the Agencies did not evaluate an appropriate "no-build" scenario. (Pls.' Mem. at 40–41.) Fundamentally, this argument is premised on Plaintiffs' incorrect assertion that the Agencies' "no-build" forecast assumed that the Project would be built. (*Id.* at 41.) As discussed on pages 16 through 18, *supra*, the record shows that this assertion is false. (*See* AR1_000248; AR1_000881; AR1_001474; AR3_041121.)

Plaintiffs also try again, unsuccessfully, to equate the comprehensive NEPA analysis the Agencies performed here to the one found inadequate in *Sierra Club*, where the agency used the same socioeconomic forecast to evaluate both the "no-build" and the "build" scenarios. 962 F. Supp. at 1045. (Pls.' Mem. at 41–42.) As explained in detail above, the FEIS for this Project documents the development and use of separate "no-build" and "build" socioeconomic forecasts, consistent with the *Sierra Club* framework. *See* pp. 18–19, *supra*. (AR1_000609–AR1_000610.)

Plaintiffs make no credible argument that the Agencies' evaluation of the indirect effects of the Project was arbitrary and capricious. The FEIS documents the Agencies' thorough evaluation of the indirect socioeconomic and environmental effects of a broad range of Project alternatives. (AR1_000606–AR1_000663.) Following extensive stakeholder involvement, the Agencies initially screened ten different corridors to evaluate their travel performance and impacts. (AR1_001206.) After eliminating the corridors with inadequate travel performance or disproportionate socioeconomic or environmental impacts, the Agencies undertook a more detailed analysis of the impacts of three alternative corridors, as compared to the projected conditions in the "no-build" scenario. (AR1_001267–AR1_001285.) This analysis contained a

comprehensive evaluation of the "indirect" effects of each alternative, including the potential to induce changes in land use, population density, and growth rate. (AR1_000606–AR1_000663; AR3_002156.)

The Agencies assessed each alternative using separate "build" socioeconomic forecasts to account for the potential reallocation of regional population and employment attributable to that alternative. (AR1_001359.) This analysis predicted that each of the three alternatives under review would only marginally increase population growth in the study area (less than a 1% increase), as compared to the growth expected if the Project was not built. (AR1_000630–AR1_000647.)

Finally, Plaintiffs fundamentally misrepresent an email from FHWA personnel in an attempt to illustrate a non-existent internal "debate" about the indirect and cumulative impacts of the Project. (Pls.' Mem. at 22, 43.) Plaintiffs claim that FHWA manager "recognized" that the Agencies had not adequately evaluated indirect or cumulative impacts. (*Id*. at 43.) But the FHWA manager was paraphrasing ***CMAP's*** comments in stating that the selection of a corridor "demonstrates a lack of consideration for secondary and cumulative impacts." (AR3_002786.) These are ***not*** the FHWA manager's own opinions, as Plaintiffs incorrectly state. (Pls.' Mem. at 43.) In the very next paragraph, the FHWA manager makes clear that "I personally disagree with the MPO's letter." (AR3_002786.) Plaintiffs' characterization of this email is disingenuous, and does not demonstrate any internal debate over the Project's secondary and cumulative impacts. In fact, the FHWA manager clarified later that same day that the response to CMAP's letter "quantifies that CMAP has no environmental basis for their objections and the environmental aspects of their letter were fully addressed." (AR3_002600.)

Ultimately, Plaintiffs have not shown the Agencies' evaluation of indirect effects to be arbitrary or capricious. The Agencies' comprehensive analysis of the indirect effects of the Project alternatives was reasonable and fully satisfied the requirements of NEPA.

**B.      The Agencies Adequately Addressed Any Potential Conflicts or Inconsistencies with Applicable State and Local Plans**

The Agencies properly considered applicable land use plans and other State and local requirements in evaluating the proposed Project. Plaintiffs argue that the FEIS fails to satisfy the requirement in 40 C.F.R. § 1502.16(c) and (d) to discuss "possible conflicts" with "land use plans, policies, and controls," as well as "any inconsistency" with a State or local law or approved plan. (Pls.' Mem. at 42–44.) This criticism is unfounded. The Agencies considered and discussed the governing local land use plans and policies throughout the NEPA process, recognizing that "authority for land use control remains at the municipal level." (AR1_000616.) The socioeconomic forecasts for the Project explicitly took into account local controls over development. (AR1_001402.) And the indirect effects analysis in the FEIS includes a thorough discussion of "probable induced development and its consistency with known local and county comprehensive plans and regional plans." (AR1_000640–AR1_000647.)

The FEIS also contains significant discussions of the role that the CMAP forecast played in the NEPA analysis. Specifically, the FEIS reflects the Agencies' consideration of the CMAP forecast and its determination that the aggressive, policy-based assumptions that the CMAP forecasts rely upon are not suitable for project-level NEPA analysis, which relies upon a projection of reasonably foreseeable future conditions. (AR1_001387; AR1_003741–AR1_003742; AR1_003770.) The FEIS also recognizes that, in order for the Project to proceed, the MPOs for the region will have to amend their short- and long-term transportation plans to include the Project. (AR1_007479; AR1_007488; AR1_007568.) That is the point at which the

MPOs have the opportunity to determine whether the Project is consistent with their approved plans, and to decide accordingly whether to include the Project in those plans. Before that step takes place, it is premature to assert that the Project is inconsistent with approved MPO plans.

Plaintiffs also argue that the FEIS should have taken into account the secondary impacts of "disregarding conflicts and inconsistencies" with the MPOs' long-range plans. (Pls.' Mem. at 44.) Again, the Agencies recognized that determining consistency with the MPOs' long-range plans occurs when the MPOs are given the choice of whether to amend those plans to include the Project—not at the forecasting step of the NEPA process. (AR1_007488.) Plaintiffs' reliance on *Milwaukee Inner-City Congregations Allied for Hope v. Gottleib*, a case involving FHWA's consideration of transit alternatives under NEPA, provides no support for this argument. 944 F. Supp. 2d 656 (W.D. Wisc. 2013). The court there took issue with a NEPA analysis that assumed implementation of an MPO's recommended transit improvement projects without explanation; and there is no challenge here that the Agencies improperly evaluated transit projects.[21] The Agencies' reasoned consideration and discussion of state and local plans throughout the environmental review process complies fully with the NEPA requirement to take a "hard look" at the impacts of proposed projects.

## IV. PLAINTIFFS' CLAIMS UNDER SECTION 4(F) OF THE DEPARTMENT OF TRANSPORTATION ACT FAIL

In accordance with Section 4(f) of the Department of Transportation Act's implementing regulations, FHWA made a "preliminary Section 4(f) approval" at the Tier 1 stage of project review. 23 C.F.R. § 774.7(e)(1). (AR1_000022–24; AR1_000028–29, AR1_000557 (explaining how the Section 4(f) decision-making process remains ongoing and that a final Section 4(f)

---

[21] Here, the analysis only included transit improvements that are committed in the MPOs' fiscally-constrained plans. (AR1_000906).

decision will be made after Tier 2 NEPA review is complete).) In its preliminary Section 4(f) evaluation, FHWA identified Section 4(f) properties that may be impacted by the proposed highway, discussed and ensured avoidance or mitigation of those potential impacts to the extent available information allowed, and ensured that "[o]pportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the Tier One stage." (AR1_000022–AR1_000023; *see also* AR1_000557.) Plaintiffs challenge FHWA's preliminary approval, arguing that FHWA violated Section 4(f) by failing to identify a "constructive use" of the Midewin National Tallgrass Prairie or determine "prudent and feasible alternatives." As explained below, these claims fail because FHWA did not, and was not required to, make a final Section 4(f) decision during the Tier 1 NEPA review.

### A. Plaintiffs' Section 4(f) Claims Are Not Justiciable

Plaintiffs' Section 4(f) claims are not justiciable for two related reasons, both of which stem from the fact that FHWA has not made a final Section 4(f) determination. The Tier 1 ROD includes only a "preliminary Section 4(f) evaluation," and explains that a final Section 4(f) evaluation will be prepared and incorporated into the Tier 2 ROD after further study, public comment, and review. (AR1_000024.) This Section 4(f) decision-making process remains ongoing, and thus Plaintiffs' Section 4(f) claims are not yet justiciable.

### 1. Plaintiffs' Section 4(f) Claims Fail Because FHWA's Preliminary Section 4(f) Approval Is Not a Final Agency Action

Plaintiffs' Section 4(f) claims cannot proceed under the APA because they seek judicial review of a "preliminary approval" rather than a "final agency action." (*See* Pls.' Mem. at 27 (acknowledging that "[t]his Court's adjudication of whether Defendants complied with [] Section 4(f) is governed by the Administrative Procedure Act").) Under Section 704 of the APA, only "final agency action" is judicially reviewable. 5 U.S.C. § 704; *Blagojevich v. Gates*, 519 F.3d

370, 372 (7th Cir. 2008) ("[F]inal agency action is a condition of review . . . ."). The APA defines "agency action" as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof . . . ." 5 U.S.C. § 551(13). To be "final," an action must satisfy two requirements: first, it must "mark[] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; second, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citation omitted).

As the name suggests, a "preliminary Section 4(f) approval" precedes a "final Section 4(f) approval," and does not itself conclude FHWA's Section 4(f) decision-making process. Section 4(f)'s implementing regulations make clear that a preliminary Section 4(f) approval is only tentative and interlocutory in nature. They explain that for tiered reviews, like the one at issue here, a preliminary "Section 4(f) approval will be finalized in the second-tier study." 23 C.F.R. § 774.7(e)(2). Consistent with the regulation, the record confirms that the preliminary Section 4(f) approval FHWA made during the Tier 1 review in this case was not final. "The final Section 4(f) approval," FHWA explained, "will be made in the Tier Two final environmental document," after additional coordination, public comment, data collection, and analysis. (AR1_000024.) Such preliminary findings made in an ongoing planning process are not final agency action within the meaning of the APA. *See, e.g., Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 786-87 (7th Cir. 2011) (actions were not final where they did "not represent the final outcome of any decisionmaking process by the Corps"); *Save the Dunes Council v. Alexander*, 584 F.2d 158, 164 (7th Cir. 1978) (action was not final because "the Corps' decision-making and planning processes were still ongoing").[22]

---

[22] While an agency's issuance of a *Tier 2* ROD may constitute "final agency action" for purposes of the agency's compliance with Section 4(f), *see Citizens for Appropriate Rural Roads, Inc. v. Foxx*, No. 1:11–

Indeed, Plaintiffs acknowledge that FHWA has yet to finalize its Section 4(f) analysis and approval. (Pls.' Mem. at 47–48 (noting that the Section 4(f) approval was "preliminary" and that "FHWA would 'further analyze[]' impacts on the Midewin National Tallgrass Prairie in Tier 2").) Plaintiffs incorrectly assert, however, that an internal FHWA email "demonstrates that FHWA had already reached a final decision on Section 4(f) impacts." (*Id*. at 24 (citing AR3_005301).) That email only explained that FHWA "did not have a schedule to complete a section 4(f) evaluation for tier 2 at this time," and listed some possible outcomes of the future review. (AR3_005301.) *See generally* 77 Fed. Reg. 42802-01, 42823 (July 20, 2012) ("Schedules to complete Section 4(f) evaluations, if available, should also be reported" in preliminary approvals.).

Plaintiffs also mischaracterize the record in asserting that FHWA made a final and "legally insufficient" determination that Corridor B3 would not constitute a "constructive use" of the Midewin National Tallgrass Prairie.[23] (Pls.' Mem. at 47.) Plaintiffs claim that FHWA's preliminary 4(f) analysis in Tier 1 "amounted to the finding" of no constructive use of the MNTP.[24] *Id.* But the record plainly shows that FHWA only found "[b]ased on the information available at Tier One, a constructive use of this resource *is not anticipated. The potential for a constructive use will be further analyzed in the Tier Two* NEPA studies." (AR1_000550

cv–01031–SEB–DML, --- F. Supp. 2d ---, 2014 WL 1323189, at *4 (S.D. Ind. Mar. 31, 2014), this case involves a *Tier 1* NEPA study. The Tier 1 ROD in this case clearly states that it does not include any final Section 4(f) decision. (AR1_000022–AR1_0000024.)

[23] As FHWA explained, "[a]ccording to 23 C.F.R. § 774.15, a constructive use does not occur when proximity impacts caused by a proposed project do not substantially impair the activities, features, or attributes that qualify a property for protection under Section 4(f); or proximity impacts will be mitigated to a condition equivalent to, or better than, that which would occur if the project were not built, as determined after consultation with the official(s) with jurisdiction." (AR1_000548–AR1_000549.) While FHWA did not make a constructive use determination with respect to the Midewin National Tallgrass Prairie, it did determine preliminarily that corridors A3S2, B3, or B4 would have no direct impact on the Prairie. (AR1_000544.)

[24] Specifically, Plaintiffs argue that "Defendants' Section 4(f) analysis amounted to the finding that noise, light, and air pollution from Corridor B3 would not adversely impact the Midewin National Tallgrass Prairie's habitat [and thus] not constitute a 'constructive use' under Section 4(f)." (Pls.' Mem. at 47.)

(emphasis added); *see also, e.g.*, AR1_007399 ("Detailed field studies will be performed as part of Tier Two environmental studies within reasonable limits to determine effects to habitat within and adjacent to the proposed Illiana Corridor.").)

Plaintiffs similarly mischaracterize a Department of the Interior comment on the Draft EIS as "undisputed evidence . . . that traffic noise from roads like the Illiana Tollway means that birds and other wildlife can no longer use adjacent land as habitat." (Pls.' Mem. at 46.) That comment letter actually "acknowledged that some bird species habituate to increased noise levels," but stated that further site-specific study would be required because "[r]are and declining bird species found at [Midewin National Tallgrass Prairie] and [Joliet Training Area] that would be subject to increased vehicular noise *may* not be able to habituate to the increased disturbance levels because they are not native generalists, non-native colonizers, or urban species." (AR1_006007 (emphasis added).) Far from ignoring this potential impact, FHWA also acknowledged that the "proximity of Corridors B3 and B4 to Midewin National Tallgrass Prairie and DPSFWA *may* impact grassland and migratory bird species." (AR1_000550 (emphasis added).) FHWA noted preliminarily that these impacts may not substantially impair birds, as some birds may habituate to increased noise levels: "[f]ederal listed species . . . are known to be located further north within the property away from the working alignments," and "[c]orridors B3 and B4 will not impact the grassland bird habitat no noise effect area." (AR1_000549–AR1_000550.) Ultimately, FHWA committed to further evaluate these potential impacts in Tier 2.

In any case, the legal sufficiency of FHWA's Section 4(f) preliminary analysis is not subject to review under the APA because it is not yet final. FHWA's preliminary Section 4(f) findings, including those mentioned above, did not preclude "[o]pportunities to minimize harm

later in the development process," (AR1_000557), and thus neither marked the consummation of decision-making nor determined legal consequences. "During the Tier Two NEPA studies, refinements to the design of all of the working alignments will occur and a range of minimization measures will be evaluated for Section 4(f) properties should they not be avoided." (AR1_000554.) Plaintiffs may seek to challenge the final Section 4(f) decision when FHWA makes it, should Plaintiffs still be aggrieved at that time. Accordingly, while FHWA carefully examined Section 4(f) impacts in the Tier 1 FEIS, its preliminary Section 4(f) approval was not final agency action subject to challenge and judicial review under the APA.

### 2. Plaintiffs' Section 4(f) Claims Are Unripe

Judicial review of Plaintiffs' Section 4(f) claims is similarly precluded because the claims are unripe. *Nevada v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006) ("[F]inal agency action pursuant to the Administrative Procedure Act is a crucial prerequisite to ripeness.") (internal alterations, quotations, and citation omitted). "In determining whether a case is ripe for review, this Court considers whether: (1) delayed review of an agency decision could cause hardship to the petitioner; (2) judicial intervention would inappropriately interfere with further administrative action; and (3) the court would benefit from further factual development of the issues presented." *Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 435 F.3d 758, 766 (7th Cir. 2006) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998)).

Applying these factors to review of FHWA's preliminary Section 4(f) approval demonstrates that Plaintiffs' Section 4(f) claims are unripe. First, given that FHWA has not finalized its Section 4(f) analysis—including by completing studies of impacts to Midewin National Tallgrass Prairie, making a constructive use determination, and completing analysis of prudent and feasible alternatives if necessary—the Court would benefit from further factual development of the issues presented. Second, judicial review of FHWA's preliminary Section

4(f) analysis would inappropriately interfere with the Agencies' work to complete their analysis, including by making the determinations that Plaintiffs seek. Third, Plaintiffs will not suffer any hardship if the Court withholds review, as they may participate in the Tier 2 analysis and final Section 4(f) review, which potentially could eliminate any concern Plaintiffs have regarding impacts to the Midewin National Tallgrass Prairie and other Section 4(f) resources. *See Ohio Forestry Ass'n*, 523 U.S. at 735 (requiring party to participate in further administrative or judicial proceedings is not sufficient hardship). In these circumstances, Plaintiffs' Section 4(f) claims are unripe and thus not subject to review. *See Sprint Spectrum L.P. v. City of Carmel, Ind.*, 361 F.3d 998, 1001-05 (7th Cir. 2004) (holding that a land use decision that mapped a procedural route that a cellular telephone service provider was required to take to construct an antenna was not "final action" within the meaning of the Telecommunications Act and, thus, not ripe for judicial review).

### B. Plaintiffs' Section 4(f) Claims Also Fail as a Matter of Law

Finally, Defendants are entitled to summary judgment on Plaintiffs' Section 4(f) claims because Section 4(f) does not require the constructive use determination or "prudent and feasible alternatives" analysis that Plaintiffs seek at the Tier 1 stage. "When [a] first-tier, broad-scale EIS is prepared," FHWA need not make final constructive-use determinations, perform a prudent and feasible alternatives analysis, or finalize any other aspect of its Section 4(f) review. 23 C.F.R. § 774.7(e)(1). Instead, a preliminary approval need only "include all possible planning to minimize harm to the extent that the level of detail available at the first-tier EIS stage allows[, which] may be limited to ensuring that opportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the first-tier stage." *Id.* As explained above and the record shows, FHWA more than satisfied this requirement in this case. (*See, e.g.*, AR1_000022–AR1_000023 (confirming that "[o]pportunities to minimize harm

at subsequent stages in the development process have not been precluded by decisions made at the Tier One stage"); AR1_000557 (explaining that "[t]his preliminary approval includes all possible planning to minimize harm to the extent of the level of detail available for this Tier One EIS"); AR1_000558 (committing that "[i]f FHWA determines that Corridor B3 would result in a Section 4(f) use of a resource, and if that use is not *de minimis*, FHWA will prepare a Section 4(f) evaluation, which would include a more detailed assessment of avoidance alternatives.").) FHWA thus appropriately deferred finalizing its constructive use and prudent and feasible alternatives determinations until its Tier 2 final Section 4(f) decision, and Plaintiffs' claims fail.[25]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be denied, and judgment should be entered on all claims in favor of all Defendants dismissing the case with prejudice.

---

[25] Plaintiffs' additional argument that "because the Defendants relied on flawed population and employment forecasts, the Tier 1 ROD and FEIS could not support a conclusion that there is no 'prudent and feasible' alternative as Section 4(f) requires," (Pls.' Mem. at 27), also fails for the reasons discussed in the NEPA section above.

Date:  June 4, 2014

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By: s/ Harpreet K. Chahal
     HARPREET K. CHAHAL
     Assistant United States Attorney
     219 South Dearborn Street
     Chicago, Illinois 60604
     Telephone:  (312) 353-1996
     Email:  harpreet.chahal@usdoj.gov

ILLINOIS DEPARTMENT OF
TRANSPORTATION

By: s/ Michael A. Forti
     MICHAEL A. FORTI
     IL ARDC No. 3127929
     100 West Randolph Street
     Suite 6-600
     Chicago, IL  60601
     Telephone:  (312) 793-2255
     Email: Michael.Forti@Illinois.gov

Cindy K. Bushur-Hallam
IL ARDC No. 6624594
2300 South Kirksen Parkway
Room 313
Springfield, IL  62794
Telephone:  (217) 782-3215
Email:  cindy.bushur-hallam@illinois.gov

*Attorneys for Defendant Illinois*
*Department of Transportation*

INDIANA DEPARTMENT OF
TRANSPORTATION

By: s/ Albert M. Ferlo *(pro hac vice)*
     ALBERT M. FERLO *(pro hac vice)*
     Perkins Coie LLP
     700 13th Street, NW
     Suite 600
     Washington, DC  20005
     Telephone:  (202) 654-6262
     Facsimile:  (202) 654-9143
     Email:  AFerlo@perkinscoie.com

s/ William G. Malley *(pro hac vice)*
WILLIAM G. MALLEY *(pro hac vice)*
Perkins Coie LLP
700 13th Street, NW
Suite 600
Washington, DC  20005
Telephone:  (202) 654-6250
Facsimile:  (202) 654-9153
Email:  WMalley@perkinscoie.com

Kathleen A. Stetsko, ARDC No. 6297704
Perkins Coie LLP
131 South Dearborn Street
Suite 1700
Chicago, IL  60603-5559
Telephone:  (312) 324-8512
Facsimile:  (312) 324-9512
Email:  KStetsko@perkinscoie.com

GREGORY F. ZOELLER
Indiana Attorney General
Atty. No. 1958-98I
Timothy J. Junk
Deputy Attorney General
Atty. No. 5587-02
OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN  46204
Telephone:  (317) 232-6247
Facsimile:  (317) 232-7979
Email:  tim.junk@atg.in.gov

*Attorneys for Defendant Indiana Department
of Transportation*