UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OPENLANDS, MIDEWIN HERITAGE ASSOCIATION, AND SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al*., <br><br> Defendants, <br><br> and <br><br> ILLINOIS DEPARTMENT OF TRANSPORTATION, INDIANA DEPARTMENT OF TRANSPORTATION, <br><br> Defendant-Intervenors. | Case No. 13-cv-4950 <br><br> Judge Ronald A. Guzman |

**DEFENDANTS' AND DEFENDANT-INTERVENORS'
JOINT STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1, Defendants and Defendant-Intervenors offer the following statement of uncontroverted material facts. Because this is a record review matter, all facts in the case are undisputed and are contained in the Administrative Record filed by the federal Defendants. The Administrative Record is found at ECF document No. 37. The material facts relevant to the issues raised by Plaintiffs' Motion for Summary Judgment are set forth below, with additional facts from the Administrative Record cited in the Joint Brief of Defendants and Defendant-Intervenors filed concurrently with this motion.

## Initiation of the NEPA Process

1. FHWA initiated the Tier 1 NEPA process on June 8, 2011, with the publication of a Notice of Intent ("NOI") in the Federal Register. Exhibit ("Ex.") 1 (AR1_001627).[1] 76 Fed. Reg. 33401. The Tier 1 NEPA study was a collaborative effort of the FHWA, IDOT and INDOT (collectively, the "Agencies"). Ex. 1 (AR1_001628). The NOI announced that NEPA study for the Project would be conducted in two "tiers." *Id*. The Tier 1 study involved "an examination of the transportation problems in the Study Area, a study of alternate corridors to address the problems, and consideration of the environmental and social impacts of reasonable alternatives." Ex. 2 (AR1_000005).

2. The "Study Area" is a 950 square mile portion of southern Will County and northern Kankakee County in Illinois and southern Lake County in Indiana. Ex. 2 (AR1_000093). The northern portion of the Study Area is "suburban or urban in character and served by a well-developed transportation system." *Id*. The southern portion of the Study Area "is more rural in nature, served by a lesser-developed transportation system." *Id.* The Study Area is home to many new "intermodal" freight facilities which allow transfer of rail, port, and truck freight between the different modes of transportation, thus adding substantial demand for truck transport. Ex. 2 AR1_000091). There are currently no roads in the Study Area that provide a continuous "higher functional class east-west route[]…", in other words, a four-lane divided highway in an east-west direction. Ex. 2 (AR1_000110).

---

[1] All documents cited herein are included in the Administrative Record (ECF No. 37) and referenced by the Administrative Record "AR" number. However, because of the voluminous size of the record and for convenience to the Court, the cited documents are also provided as a courtesy copy to the Court in the form of exhibits.

**Purpose and Need and Development of Alternatives**

3. In order to determine the need for the Project, the Agencies analyzed the expected growth in population, employment and traffic in the Study Area. The Agencies also took into account the important role the Study Area plays in the national freight transportation network, including being home to the largest inland intermodal transportation facility in the United States. Ex. 2 (AR1_000096).

4. Using forecasts of expected population and employment growth in the Study Area, the Agencies projected that the population was likely to increase by 176 percent and employment by nearly 225 percent by the year 2040. *Id.*

5. An analysis of the existing transportation network in the Study Area demonstrated that it was insufficient to meet the projected growth in population and employment and freight transportation. *Id.* In particular, the forecasts indicated that daily truck trips within the Study Area would increase by 193%—from 87,800 to 257,100 daily trips—between 2010 and 2040. Ex. 2 (AR1_000111). This increase would result in 2,600 hours of daily truck delay by 2040, at a cost of nearly $34 million annually. Ex. 2 (AR1_000110–AR1_000111). Based on this analysis, the Agencies established a three part "Purpose and Need" for the Project: (1) improve regional mobility by addressing regional and national traffic traversing the area; (2) alleviate local system congestion and improve local system mobility; and (3) provide for efficient movement of freight. Ex. 2 (AR1_000097–AR1_000116).

6. The Agencies then engaged in a robust process to develop alternatives that would meet the Purpose and Need. Ex. 2 (AR1_000118–AR1_000222).

7. The alternatives initially examined included the "no-build" alternative, a "congestion management process," arterial road improvements, transit alternatives, freight rail alternatives, and multiple alternative limited access highway corridors suggested by various governmental agencies, private organizations and individuals. Ex. 2 (AR1_000118–AR1_000119). From the dozens of suggestions, the Agencies developed ten unique alternative corridors that were representative of the various comments and suggestions received from stakeholders. Ex. 2 (AR1_000142; *see also* AR1_000143–AR1_000154 for a series of maps depicting the ten unique alternative corridors). Each of those alternatives was then assessed for its ability to meet the Purpose and Need. Ex. 2 (AR1_000158–AR1_000172). Of these ten alternatives, the Agencies eliminated three alternatives that had comparatively poor travel performance or disproportionately high socioeconomic or environmental impacts. Ex. 2 (AR1_000172–AR1_000191).

8. After further evaluating each of the seven second round alternatives and considering extensive stakeholder input, the Agencies selected three alternatives for further consideration that best satisfied the Purpose and Need while minimizing impacts to the environment. These three corridors are A3S2 (the northernmost alternative), B3 (the corridor ultimately selected to advance to the Tier 2 study), and B4 (a variation of Alternative B3 with a more southerly terminus in Indiana). Ex. 2 (AR1_000191–AR1_000222).

**Analysis of the Environmental Impacts of the Alternatives and Selection of the Preferred Corridor**

9. The Agencies undertook an extensive evaluation of the direct environmental and socioeconomic effects of each of the proposed three alternatives, as compared to the "no-build" scenario. Ex. 2 (AR1_000242–AR1_000331); Ex. 3 (AR1_001483–

AR1_001496).  The agencies evaluated the alternatives' impacts on agriculture, cultural resources, and natural resources (such as air and water), as well as  short- and long-term economic impacts, impacts to existing and planned neighborhoods and communities, effects on minority and low-income populations, impacts to public services and facilities, effects on businesses, and impacts to local land use planning.  Ex. 2 (AR1_000242–AR1_000331).

10. The Agencies also closely analyzed the indirect and cumulative impacts of each alternative, focusing primarily on the induced population and employment growth and land development from a new facility.   Ex. 2 (AR1_000606–AR1_000663); Ex. 4 AR3_002156).   Based on extensive modeling, the Agencies projected that all three "build" alternatives under consideration would increase population and employment growth by less than one percent, as compared to the growth expected in the Study Area if the project was not built.  Ex. 2 (AR1_000630–AR1_000647; AR1_000661).  Based on the analysis of the environmental and social impacts, travel performance, constructability, cost, stakeholder input, and other factors, the Agencies determined that Corridor B3 performed best.[2]  Ex. 2 (AR1_000692).  As a result, FHWA selected B3 as the corridor to advance to the Tier 2 study.[3]  *Id.*

**Development of Population and Employment Forecasts Used in Establishing the Purpose and Need**

11. To analyze the expected population and employment growth in the Study Area, the Agencies first looked to the forecasts that regional planning agencies, including CMAP,

---

[2] The comparison of the alternatives is found at Ex. 2 (AR1_000672–AR1_000700).
[3] The Agencies have initiated the Tier 2 study.  *See* 78 Fed. Reg. 10249 (Feb. 13, 2013) (notice of intent to prepare a Tier Two EIS); 79 Fed. Reg. 4158 (Jan. 24, 2014) (notice of availability of Tier 2 Draft EIS); *The Illiana Corridor Study Tier Two Draft Environmental Impact Statement*, available at http://www.illianacorridor.org/tier_2/tier2_deis.aspx.

had prepared for use in the long-range transportation planning process.[4]   Ex. 2 (AR1_000095).  In 2010, CMAP incorporated the most recent long-range transportation plan into its "GO TO 2040 Comprehensive Regional Plan."   Ex. 5 (AR4_000001–AR4_000416).   The forecasts CMAP developed in support of its Comprehensive Regional Plan were based on a planning horizon extending to the year 2040.   In developing its 2040 forecasts, CMAP abandoned its (and its predecessor agency's) prior forecasting methodology, which was a market-based approach that takes into account historical trends and local land use policies.[5]  Ex. 6 (AR1_001401); Ex. 7 (AR3_041105).

12. Instead of the traditional market-based forecasting approach, CMAP adopted a methodology it described as a "radical departure" from its previous forecasts, making a "wholesale shift" to policy-based forecasting.   Ex. 8 (AR4_000417).   CMAP's new "policy-based" forecasting methodology is based on its own preferred planning strategies for the region—primarily, encouraging "infill" of mature areas,[6] which will require significant redevelopment of existing housing stock to higher density housing.[7]  Ex. 9 (AR1_003752); Ex. 5 (AR4_000060–AR4_000070).   CMAP explains that it "chose to prepare a policy-based plan (dealing with the investments and high-level choices that

---

[4] CMAP is commonly referred to as a Metropolitan Planning Organization, but the MPO designated in Illinois to carry out provisions of federal transportation law for the Chicago region is a separate entity, the MPO Policy Committee.  CMAP provides the staff support for the MPO Policy Committee.  The MPO for the Indiana portion of the project is the Northwestern Indiana Regional Planning Commission ("NIRPC").

[5] Until CMAP's GO TO 2040 forecast, it (and its predecessor agency) used a market-based approach to forecasting population and employment. Ex. 6 (AR1_001401); Ex. 7 (AR3_041105).  CMAP's previous forecast, using 2030 as the planning horizon, used a marked-based methodology focused primarily on trends and an inventory of local development patterns. Ex. 6 (AR1_001401).

[6] Specifically, CMAP's forecast shows significant population growth in the urban core of Chicago and nearby areas. *See* Ex. 3 (AR1_001477).

[7] NIRPC also developed a 2040 socioeconomic forecast using a similar policy-based approach instead of the market-driven approach the agency used for its prior forecasts. Ex. 6 (AR1_001387).  Because Plaintiffs have limited their argument to the population and employment forecasts developed by CMAP, no further discussion of the NIRPC forecasts will be included in this Statement of Material Facts.

shape [the] region) as opposed to a land use plan (dealing with specific types of development in specific locations)." Ex. 5 (AR4_000026).

13. While CMAP's forecasts represent its "preferred regional scenario" for development, the Agencies recognized that the implementation of CMAP's vision relied on a multitude of decisions made at different levels of local, state and federal government. Ex. 8 (AR4_000417). CMAP, in fact, candidly acknowledged that it does not have authority to determine local land use issues and that "authority over local land use resides with local government." Ex. 8 (AR4_000418).

14. The Agencies determined that a strict policy-based forecast, such as CMAP's 2040 forecast, was not appropriate for evaluating specific transportation facilities because it relies on aggressive assumptions of redevelopment in mature areas. Ex. 10 (AR2_038304).

15. The Agencies determined that a refined market-based forecast, similar to the type of forecasts previously prepared by CMAP, was required in order to determine transportation needs for the Study Area as precisely as possible. *Id*.; Ex. 9 (AR1_003752); Ex. 11 (AR3_002571).

**Development of the "No-Build" Forecasts**

16. Because developing forecasts requires a high level of technical ability, the Agencies hired the al Chalabi Group ("ACG"), a consultant with significant experience in socioeconomic forecasting for regional planning and major transportation infrastructure projects, to prepare the necessary population and employment forecasts. Ex. 3 (AR1_001479).

17. Following FHWA guidance,[8] ACG developed a set of baseline, "no-build" forecasts using long-term market trends to predict population and employment in 2040 in the Study Area. Ex. 6 (AR1_001378–AR1_001466). ACG developed these market-based forecasts in collaboration with CMAP, over a period of approximately a year.[9] Ex. 6 (AR1_001387); Ex. 3 (AR1_001474); Ex. 11 (AR3_002569).

18. ACG's population and employment forecasts were based on current and previous MPO forecasts, official 2010 U.S. Census data, ninety years of historic population and employment data for the region, current development trends, land available for development, population holding capacity, demographic data and trends, local land use policies, and independent economic forecasts for the region. Ex. 6 (AR1_001402–AR1_001404); Ex. 7 (AR3_041107); Ex. 12 (AR3_041121).

19. ACG's baseline "no-build" forecasts reflect 2040 conditions, assuming that no Illiana Expressway will be built. Ex. 2 (AR1_000248); Ex. 3 (AR1_001474); Ex. 12 (AR3_041121).

20. Consistent with FHWA guidance, ACG's "no-build" socioeconomic forecast takes into account the improvements that are committed and planned for implementation by 2040 (minus any new transportation facility in the Illiana Corridor). FHWA Guidance at 21 (n.7, *supra*). As the Transportation System Performance Report prepared on April 25, 2012, explains:

> The 2040 population and employment forecasts are developed for
> a No Build (Baseline) scenario for the study area which includes

---

[8] FHWA, *Interim Guidance on the Application of Travel and Land Use Forecasting in NEPA* at 33 (March 2010) (hereinafter "FHWA Guidance"), available at http://environment.fhwa.dot.gov/projdev/travel_landUse.asp.
[9] Specifically, ACG followed CMAP's three recommended "forecast principles" for developing alternative forecasts, to: (1) articulate alternative assumptions; (2) show the math; and (3) produce standard outputs. Ex. 6 (AR1_001387); Ex. 8 (AR4_000418–AR4_000420).

only committed projects. Therefore, the 2040 No Build scenario
does not include any proposed Illiana Corridor facilities.

Ex. 13 (AR1_000881).

21. The FEIS confirms that the 2040 no-build "population projections do not include the
proposed east-west transportation facility." Ex. 2 (AR1_000248).

22. ACG's market-based forecasts take into account the recognizable and well-documented
pattern of growth of an urban area outward from a central core, incorporating existing
older towns and creating new centers at nodes of high accessibility. Ex. 6
(AR1_001389). ACG's baseline forecasts also reflect the final results of the 2010
Census. Ex. 6 (AR1_001390).

23. In contrast, CMAP chose not to update its GO TO 2040 forecasts when 2010 results
became available, instead basing its forecasts on 2009 estimates of the 2010 results.[10]
Significantly, the actual 2010 results (used by ACG) showed a substantially lower
population in the City of Chicago than the 2009 estimate (used by CMAP).[11] Ex. 6
(AR1_001390).

24. CMAP expressed acceptance of the Agencies' use of the ACG forecasts in the NEPA
analysis and concurred with the methodology used to develop ACG's forecasts, but
requested that the team additionally present modeling based on CMAP's policy-based
forecasts in the EIS. Ex. 11 (AR3_002569–AR3_002570); Ex. 14 (AR3_041393); Ex. 12
(AR3_041121); Ex. 15 (AR3_038835). CMAP stated that it "understands the reasons

---

[10] CMAP itself explains that "[t]he 2010 estimates used as the base for the 2040 forecast were internally-
derived and not based on 2010 Census data, which were not available during the GO TO 2040 process."
https://www.cmap.illinois.gov/data/demographics/population-forecast.

[11] Of the approximately 300,000 more people CMAP projects for the City of Chicago in 2040 as compared to the
ACG forecast, nearly two-thirds of that difference is attributable to CMAP's use of Census estimates for 2010
population of Chicago that significantly overestimated the actual Census results. Ex. 6 (AR1_001390;
AR1_001417).

behind" the project team's use of a forecasting methodology that differs from CMAP's policy-based forecasting.  Ex. 11 (AR3_002569).

25. The Agencies considered CMAP's request but ultimately decided not to present both forecasts in the FEIS because the Agencies did not find CMAP's policy-based forecast to represent a credible or realistic projection of future growth.  Ex. 10 (AR2_038304); Ex/ 4 (AR3_002154).

26. The Agencies also expressed to CMAP their concerns that using a policy-based socioeconomic forecast would create a "serious inconsistency in the Build/No-Build analysis."  Ex. 7 (AR3_041119); Ex. 15 (AR3_038835).  Citing CMAP's "aggressive assumptions regarding infill, redevelopment and densification," the Agencies determined that CMAP's 2040 forecasts were not suitable for project-level decision making.  Ex. 10 (AR2_038304); *see also* Ex. 9 (AR1_003752).

27. CMAP expressed acceptance of the Agencies' use of the ACG forecasts in the NEPA analysis and concurred with the methodology used to develop ACG's forecasts, but requested that the team additionally present modeling based on CMAP's policy-based forecasts in the EIS.  Ex. 11 (AR3_002569–AR3_002570); Ex. 14 (AR3_041393); Ex. 12 (AR3_041121); Ex. 15 (AR3_038835).  CMAP stated that it "understands the reasons behind" the project team's use of a forecasting methodology that differs from CMAP's policy-based forecasting.  Ex. 11 (AR3_002569).

28. The Agencies considered CMAP's request but ultimately decided not to present both sets of forecasts in the FEIS because the Agencies did not find CMAP's policy-based forecast to represent a credible or realistic projection of future distribution of growth.  Ex. 10 (AR2_038304); Ex. 4 (AR3_002154).   The Agencies also expressed to CMAP their

concerns that using a policy-based socioeconomic forecast would create a "serious inconsistency in the Build/No-Build analysis." Ex. 7 (AR3_041119); Ex. 15 (AR3_038835). Citing CMAP's "aggressive assumptions regarding infill, redevelopment and densification," the Agencies determined that CMAP's 2040 forecasts were not suitable for project-level decision making. Ex. 10 (AR2_038304); *see also* Ex. 9 (AR1_003752).

**Use of the "No-Build" Forecasts to Identify Purpose and Need**

29. Using the "no-build" socioeconomic forecast prepared by ACG, the Agencies prepared a travel demand forecast to predict future travel demand for the "no-build" transportation network. Ex. 13 (AR1_000881). This travel demand model was developed for the Study Area based on CMAP's existing model, and included refinements to more accurately account for regional and national freight movement through the region. Ex. 16 (AR1_001326–AR1_001377); Ex. 9 (AR1_003979–AR1_004015); Ex. 12 (AR3_041120).

30. Using the results of the travel demand modeling, the Agencies carefully evaluated the performance of the existing and projected transportation networks (based on a "no-build" scenario) against performance metrics to identify major deficiencies in the transportation system's ability to handle current and projected future travel demand. Ex. 13 (AR1_000882). Based on the results of the transportation system performance analysis, in combination with public and stakeholder input, the Agencies identified a set of needs to be addressed through the NEPA analysis. *Id*.

31. The set of needs the Agencies identified are:

    a.  Improve regional mobility, travel times, and access to jobs by addressing growing east-west regional and national traffic demand that is required to traverse the [area] regardless of the trip origin or destination;

    b.  Alleviate local system congestion and improve local system mobility, and address lack of connectivity for Will, Kankakee, and Lake Counties to meet and support projected traffic growth from increased population, employment, transportation and economic development including the lack of continuous, higher functional classification east-west travel routes in the Study Area, and improving travel times; and

    c.  Accommodate market demands for the increasing freight logistic transportation and more efficient freight movement including better accommodation of regional and national truck trips. Ex. 2 (AR1_000116).

**Development of Separate Build Forecasts for Evaluating Alternatives**

32. ACG then generated separate socioeconomic forecasts for each of the three "build" alternatives under evaluation to account for the reallocation of regional population and employment that could result from the increased accessibility provided by a new facility. Ex. 16 (AR1_001332; AR1_001359; AR1_001369); Ex. 3 (AR1_001478–AR1_001496).

33. These "build" socioeconomic scenarios were used as inputs into the travel demand model used to evaluate the impacts of each alternative. Ex. 16 (AR1_001332; AR1_001359; AR1_001369).

## Section 4(f) Compliance

34. FHWA's regulations implementing Section 4(f) allow the agency to make a "preliminary Section 4(f) approval" when FHWA is proceeding under NEPA with a tiered NEPA process. 23 C.F.R. § 774.7(e)(1). The regulation states that "in such cases, the documentation should address the potential impacts that a proposed action will have on Section 4(f) property and whether those impacts could have a bearing on the decision to be made."

35. FHWA's Section 4(f) regulations state that "the Section 4(f) approval will be finalized in the second-tier study." 23 C.F.R. § 774.7(e)(2).

36. The Agencies prepared a preliminary Section 4(f) analysis and included that analysis in the Tier 1 FEIS. Ex. 2 (AR1_000534–AR1_000558).

37. The preliminary Section 4(f) analysis determines that the Midewin National Tallgrass Prairie is subject to the requirements of Section 4(f). Ex. 2 (AR1_000534).

38. The preliminary conclusion made by FHWA was that the Project would not impact the Midewin National Tallgrass Prairie. Ex. 2 (AR1_000545). FHWA determined that a "constructive use" of the Midewin National Tallgrass Prairie was not likely to occur, but that the "potential for constructive use will be further analyzed in the Tier Two NEPA studies." Ex. 2 (AR1_000550).

Date: June 4, 2014                                      Respectfully submitted,

                                                        ZACHARY T. FARDON
                                                        United States Attorney

                                                By: s/ Harpreet K. Chahal
                                                        HARPREET K. CHAHAL
                                                        Assistant United States Attorney
                                                        219 South Dearborn Street
                                                        Chicago, Illinois 60604
                                                        Telephone:  (312) 353-1996
                                                        Email:  harpreet.chahal@usdoj.gov


ILLINOIS DEPARTMENT OF                          INDIANA DEPARTMENT OF
TRANSPORTATION                                  TRANSPORTATION

By: s/ Michael A. Forti                         By:  s/ Albert M. Ferlo *(pro hac vice)*
    MICHAEL A. FORTI                                  ALBERT M. FERLO *(pro hac vice)*
    IL ARDC No. 3127929                              Perkins Coie LLP
    100 West Randolph Street                         700 13th Street, NW
    Suite 6-600                                       Suite 600
    Chicago, IL  60601                                Washington, DC  20005
    Telephone:  (312) 793-2255                        Telephone:  (202) 654-6262
    Email: Michael.Forti@Illinois.gov                 Facsimile:  (202) 654-9143
                                                      Email: AFerlo@perkinscoie.com
    Cindy K. Bushur-Hallam
    IL ARDC No. 6224594                         By:  s/ William G. Malley *(pro hac vice)*
    2300 South Kirksen Parkway                        WILLIAM G. MALLEY *(pro hac vice)*
    Room 313                                          Perkins Coie LLP
    Springfield, IL  62794                            700 13th Street, NW
    Telephone:  (217) 782-3215                        Suite 600
    Email:  cindy.bushur-hallam@illinois.gov          Washington, DC  20005
                                                      Telephone:  (202) 654-6250
    *Attorneys for Defendant Illinois*                 Facsimile:  (202) 654-9153
    *Department of Transportation*                     Email: WMalley@perkinscoie.com

                                                      Kathleen A. Stetsko, ARDC No. 6297704
                                                      Perkins Coie LLP
                                                      131 South Dearborn Street
                                                      Suite 1700
                                                      Chicago, IL  60603-5559
                                                      Telephone:  (312) 324-8512
                                                      Facsimile:  (312) 324-9512
                                                      Email: KStetsko@perkinscoie.com

GREGORY F. ZOELLER
Indiana Attorney General
Atty. No. 1958-98I
Timothy J. Junk
Deputy Attorney General
Atty. No. 5587-02
OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204
Telephone: (317) 232-6247
Facsimile: (317) 232-7979
Email: tim.junk@atg.in.gov

*Attorneys for Defendant Indiana Department of Transportation*