**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| OPENLANDS, MIDEWIN HERITAGE ASSOCIATION, AND SIERRA CLUB, | |
| Plaintiffs, | **Case No. 1:13-cv-4950** |
| v. | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.,* | **Judge Guzman** |
| Defendants, | |
| and | |
| ILLINOIS DEPARTMENT OF TRANSPORTATION, INDIANA DEPARTMENT OF TRANSPORTATION, | |
| Defendant-Intervenors. | |

## DEFENDANTS' AND DEFENDANT-INTERVENORS' JOINT RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS

### I.     INTRODUCTION

Plaintiffs' Motion for Summary Judgment is limited to claims under the National Environmental Policy Act ("NEPA") and Section 4(f) of the Department of Transportation Act ("Section 4(f)").  Because NEPA and Section 4(f) do not specifically provide for judicial review, this Court can review this case only under the Administrative Procedure Act ("APA").  *See Ind. Forest Alliance, Inc. v. Forest Service*, 325 F.3d 851, 858 (7th Cir. 2003).  The APA allows courts to set aside agency actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  This standard of review "is a narrow one," and courts defer to the considered judgment of an agency.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).  The Court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.*  (quotations omitted).

Summary judgment is proper if the evidence "shows that there is no genuine [issue] as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the APA, "courts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Because extra-record evidence and trials are inappropriate in APA cases, courts decide APA claims via summary judgment based on the administrative record the agency compiles. *Cronin v. USDA*, 919 F.2d 439, 445 (7th Cir. 1990) ("Because the plaintiffs are not entitled to present evidence in court to challenge the [decisionmaker's] decision . . . , there will never be an evidentiary hearing in court."); *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir. 1994). Thus, in this response, statements of fact included by Plaintiffs that are found in the Administrative Record filed with the Court are deemed "admitted" to the extent that Plaintiffs have accurately and faithfully reproduced the "fact" as contained in the Administrative Record. The documents as they exist in the Administrative Record are the "best evidence" of their contents. To the extent that Plaintiffs have provided commentary or characterization of those "facts," Defendants and Defendant-Intervenors do not admit that the commentary or characterization is accurate.

## II.    RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS

1.    This case involves the Illinois Department of Transportation's ("IDOT") and Indiana Department of Transportation's ("INDOT") plans to construct the proposed new "Illiana Tollway" costing about $1.25 billion and running for 47 miles through southern Will County, Illinois to near Lowell, Indiana. AR1_000006, 7, and 18.

**ANSWER:**    Admitted.

2.    The proposed Illiana Tollway would be located near the southern side of the nationally-recognized Midewin National Tallgrass Prairie. AR1_000008. The Illiana Tollway could also facilitate more heavy trucks running on Illinois Route 53 through the Tallgrass Prairie to a proposed new interchange. AR1_007509. A map of the proposed Illiana Tollway in

"Corridor B3" is attached as Exhibit A to Plaintiffs' Opening Memorandum in Support of Plaintiffs' Motion for Summary Judgment. *See also* AR1_000008. A map of the Illiana study area in relation to the larger region is attached as Exhibit B to Plaintiffs' Opening Memorandum in Support of Plaintiffs' Motion for Summary Judgment. *See also* AR1_000092.

**ANSWER:**   Admitted.

**The National Environmental Policy Act and Its Environmental Impact Statement Process**

3.     The National Environmental Policy Act ("NEPA") is the cornerstone federal law designed to ensure that agency decisionmakers "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed federal action. 40 C.F.R. § 1502.14(a). NEPA "declare[s] a national policy which will encourage productive and enjoyable harmony between man and his environment; [and will] promote efforts which will prevent or eliminate   damage to the environment . . . . " 42 U.S.C. § 4321. "Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." 42 U.S.C. § 4331(c). NEPA's basic policy is to assure that all branches of government give full and proper consideration to environmental impacts prior to undertaking any major federal action that significantly affects the environment.

**ANSWER:** The allegations in Paragraph 3 contain legal conclusions to which no response is

required.

4.     NEPA's goals include ensuring that policymakers make better informed decisions by considering important environmental information and accurate data, and that the public better understands the responsible agency's environmental decisionmaking process. *See, e.g., Simmons v. U. S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997). "NEPA dictates a set of procedures that requires agencies to disseminate all relevant environmental information and to take a 'hard look' at the environmental consequences of any major federal action. The primary vehicle for the 'hard look' is the environmental impact statement. The impact statement must 'rigorously explore and objectively evaluate all reasonable alternatives' to the proposed action. 40 C.F.R. § 1502.14(a). Moreover, it must describe the environmental impact of the proposed action. 40 C.F.R. § 1502.16." *Sierra Club v. United States Dep't of Transp.*, 962 F. Supp. 1037, 1042 (N.D. Ill. 1997) (citations omitted).

**ANSWER:** The allegations in Paragraph 4 contain legal conclusions to which no response is

required.

5.     The NEPA process is governed by the statute, by the Council on Environmental Quality's ("CEQ") regulations and binding "guidances" and by federal agencies' own implementing regulations, which must be consistent with the CEQ requirements. 40 CFR Parts 1500 - 1508. NEPA requires that an environmental review process be conducted when there is a "major federal action" involving either a federal approval (e.g., permit) or the use of federal

funds for a project "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

**ANSWER:**  The allegations in Paragraph 5 contain legal conclusions to which no response is required.

6.      The "responsible official" must prepare a detailed statement - here, the draft and final Environmental Impact Statements ("EIS") - assessing "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(i-v). "Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(2)(C).

**ANSWER:**  The allegations in Paragraph 6 contain legal conclusions to which no response is required.

7.      The Federal Highway Administration ("FHWA") was the agency responsible for approving the Record of Decision ("ROD") and Tier 1 Final Environmental Impact Statement ("FEIS") for the proposed Illiana Tollway.  NEPA required the FHWA to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).  NEPA required the Defendants to specify the "purpose and need" for the proposed Illiana Tollway project and explore reasonable alternatives to meet it.  40 C.P.R. § 1502.13; 40 C.P.R.§ 1502.14(a).

**ANSWER:**  Admit that FHWA is the Federal agency responsible for approving the ROD and Tier 1 FEIS.  The remaining allegations in Paragraph 7 contain legal conclusions to which no response is required.

8.      NEPA also required the FHWA to "coordinat[e]" and "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(2)(C).

**ANSWER:**  The allegations in Paragraph 8 contain legal conclusions to which no response is required.

9.     That consultation included the United States Department of Interior and the United States Forest Service, both of which submitted formal comments criticizing aspects of the EIS because of the proposed Illiana Tollway's harmful environmental impacts to the Midewin National Tallgrass Prairie.  AR2_005082; AR2_005199; AR2_14872.

**ANSWER:**  Admit that the United States Department of Interior and the United States Forest Service submitted comments on the Draft Environmental Impact Statement for the Illiana Corridor ("Illiana Tier 1 DEIS").  These letters speak for themselves and are the best evidence of their contents.

10.     In addition, the federally-required and state-designated Metropolitan Planning Organizations ("MPO") responsible for transportation planning in the region, the Chicago Metropolitan Agency for Planning ("CMAP") and the Northwestern Indiana Regional Planning Commission ("NIRPC"), also submitted comments criticizing the EIS process for its failure to consider the MPOs' population forecasts, among other issues.  AR2_005204; AR2_005266.

**ANSWER:**  Admit that CMAP and NIRPC submitted comment letters on the Illiana Tier 1 DEIS.  These letters speak for themselves.  Deny that CMAP is the designated MPO for the Chicago region.  The designated MPO for the Chicago metropolitan area is a separate entity, the "Policy Committee."  *See* 70 ILCS 1707/60(a) ("The Policy Committee is the federally designated Metropolitan Planning Organization for the Chicago region under the requirements of federal regulations promulgated by USDOT.").

**The Midewin National Tallgrass Prairie**

11.     The Midewin National Tallgrass Prairie is the nation's first federally-protected tallgrass prairie.  AR1_000541.  The United States Congress established the Midewin National Tallgrass Prairie in the Illinois Land Conservation Act, Pub. L. 104-106.  Its foremost purpose is to "conserve and enhance the native populations and habitats of fish, wildlife, and plants."  *Id.* Congress also dedicated the Midewin National Tallgrass Prairie "[t]o provide a variety of recreation opportunities" (Pub. L. 104-1 06), and it is used by the public for hiking, wildlife viewing, historical heritage tours and volunteer prairie restoration activities.  *See, e.g.,* Pls.' Mtn. for Summary Judg., Exs. 2, 4, and 5, Declarations of John Field, Rita Renwick, and Lorin Schab.

**ANSWER:** Admit that the Midewin National Tallgrass Prairie is the nation's first federally-protected Tallgrass prairie. Exhibits 2, 4, and 5 to Plaintiffs' Motion for Summary Judgment speak for themselves and are the best evidence of their contents.

12. The Midewin National Tallgrass Prairie is the largest public open space in northeastern Illinois, comprising 18,225 total acres, and is an important link to the State's pre-settlement history. AR1_000541; AR1_000628. There are grassland bird management areas within the Midewin National Tallgrass Prairie along its southern border, near the proposed Illiana Tollway, as well as along Illinois Route 53. AR2_005085 (United States Department of Interior's August 29, 2012 comments); AR2_005160 (Plaintiffs' August 29, 2012 comments).

**ANSWER:** Admitted.

13. The Midewin National Tallgrass Prairie is administered by the United States Forest Service, which raised concerns about the proposed Illiana Tollway's impacts throughout the EIS process. In particular, the Forest Service advised in the consultation process that the proposed Corridor B3 for the Tollway along the southern side of the Midewin National Tallgrass Prairie was "not a viable alternative" because of its harmful natural resource impacts. AR2 014872.

**ANSWER:** Admit that the Midewin National Tallgrass Prairie is administered by the U.S. Forest Service. The letter at AR2_014872 speaks for itself and is best evidence of its contents.

**The NEPA Environmental Impact Statement Process**

14. Construction of the proposed Illiana Tollway is a major federal action subject to NEPA's requirements because of the proposed use of federal funds and necessary federal approvals. 42 U.S.C. § 4332(2)(C).

**ANSWER:** The allegations in Paragraph 14 contain legal conclusions to which no response is required.

15. The NEPA EIS process involved the FHWA as the "responsible" agency and officials for the Tier 1 FEIS and ROD, and IDOT and INDOT as the state transportation departments that proposed the Illiana Tollway.

**ANSWER:** Admitted.

16. NEPA required mandatory consultations in which the lead agencies must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* Here, both the Unites States

Department of Interior, with the United States Fish and Wildlife Service, and the United States Forest Service participated in the EIS process.

**ANSWER:** The first sentence in Paragraph 16 contains legal conclusions to which no response is required. Admit that the U.S. Department of the Interior, the U.S. Fish and Wildlife Service and the U.S. Forest Service participated in the EIS process.

17. CMAP and NIRPC, as the two primary MPOs in the region, also participated in the EIS process. MPOs are required under the Federal Aid-Highway Act, 23 U.S.C. § 101 *et seq.*, to develop long-range regional transportation plans to meet forecasted population, employment and traffic needs. 23 U.S.C. § 134(c); 23 C.F.R. § 450.322. MPOs produce these socioeconomic forecasts of population, employment and traffic data to achieve their transportation planning responsibilities. FHWA guidance describes "congressional intent that . . . metropolitan transportation planning should be the foundation for highway and transit project decisions." 23 C.F.R. Part 450, App. A. CMAP and NIRPC submitted detailed comments on their population and employment forecast data throughout the EIS process.

**ANSWER:** With respect to the first sentence in Paragraph 1, admit that CMAP and NIRPC participated in the EIS process. Deny that CMAP is one of the "primary MPOs in the region." The designated MPO for the Chicago metropolitan area is the Policy Committee. *See* 70 ILCS 1707/60(a). Admit that part of the last sentence that states that CMAP and NIRPC submitted comments during the EIS Process. The remaining allegations in Paragraph 17 contain legal conclusions to which no response is required.

18. In June 2011, Defendant FHWA published a Notice of Intent in the *Federal Register* announcing its initiation of a NEPA study process for "the Illiana Corridor Project" with "anticipated project termini" of I-55 in Will County, Illinois and I-65 in Lake County, Indiana. 76 Fed. Reg. 33,401, 33,402 (June 8, 2011). FHWA stated that its EIS would be divided into two "tiers." *Id.* The Tier 1 EIS would include a "broad analysis" of transportation alternatives for a study area of 950 square miles in Will and Kankakee Counties in Illinois and Lake County in Indiana, and evaluate environmental impacts at a "planning level of detail." 76 Fed. Reg. 33,402. The Tier 1 EIS would conclude with a "preferred corridor that can encompass one or more transportation alternatives," which would be evaluated in more detail in a Tier 2 EIS. *Id.*

**ANSWER:** Admit the first sentence of Paragraph 18. The Notice of Intent speaks for itself and is the best evidence of its contents.

I9.    The proposed Illiana Tollway emerged from earlier studies commissioned by IDOT and INDOT.  AR1_000090.  One study in 2009 examined a potential new tollway between I-57 (a north-south connector east of I-55) in Illinois and I-65 in Indiana while another study in 2010 study extended the proposed tollway to run from I-55 to I-65.  AR2_0398I2 and AR2_0392I4.  In 2010, the Illinois and Indiana Governors signed a Memorandum of Agreement for a "mutual commitment to the project," and both states enacted legislation that would under certain circumstances allow for particular "public-private partnerships" to help finance construction and operation of the tollway. AR1_000091.

**ANSWER:**  Admitted.

20.    In 2010 and 2011, the Illiana Tollway was considered by CMAP and NIRPC, respectively, in adopting their long-range regional transportation plans.  AR1_000095.  The Illiana Tollway was not included in either MPOs' priority list of funded transportation projects. *Id.*

**ANSWER:** Admit that the Illiana Corridor is described in the long range transportation plans adopted by the Policy Committee and NIRPC.  AR1_000095.  Deny that the cited page of the Administrative Record (AR1_000095) supports the allegations in the second sentence of Paragraph 20.

21.    Moreover, CMAP's long-range transportation plan - named "GO TO 2040" and including transportation projects through 2040 - identified a very different conception of the Illiana Tollway than what emerged from FHWA's EIS process as the selected "Corridor B3."  CMAP's *GO TO 2040 Major Capital Projects* (Oct. 2010) describes the Illiana Tollway as running "from I-55 south of Joliet extending east into Indiana to I-65."[1]  This is a different corridor located up to 10 miles north of the selected Corridor B3.  CMAP stated in its GO TO 2040 Plan that the Illiana "has a 2030 time frame."[2]

**ANSWER:**  The GO TO 2040 Comprehensive Regional Plan and the *GO TO 2040 Major Capital Projects* document speak for themselves and are the best evidence of their contents.

**The Required Section 4(f) Determination**

22.    Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c), applies to protect the Midewin National Tallgrass Prairie. Section 4(f) requires that prior to the "use" of any land from a publicly owned park, recreational area, wildlife or waterfowl refuge, or

---

[1] http://www.cmap.illinois.gov/documents/1 0180/31056/GO+T0+2040_major_capital_projects.pdf/53b768a0-28ac-4a53-b42b-2e1590ce5e1b at page 95.  The GO TO 2040 Plan is included in the administrative record by reference.  *See* AR1_000830 (Tier 1 FEIS References  section).  Plaintiffs have included this specific GO TO 2040 document in the Appendix.
[2] *Id.*

land from a historic property on or eligible for inclusion in the National Register of Historic Places, the responsible agency for the proposed transportation project must first determine that there are no "prudent and feasible" alternatives that would avoid such use. Section 4(f) requires that project planning include all possible ways to minimize harm to such public resources.

**ANSWER:**  Admit that Section 4(f) of the Department of Transportation Act applies to the Midewin National Tallgrass Prairie.  The remaining allegations in Paragraph 22 contain legal conclusions to which no response is required.

### CMAP's Early Objections to IDOT's Exclusive Reliance on Its Hired Consultant's High Population Forecasts

23.    Illinois law specifically provides that "CMAP's official forecasts and plans shall be the foundation for all planning in the region."  70 ILCS § 1707/51 (Illinois Regional Planning Act).

**ANSWER:**  The allegation in Paragraph 23 contains legal conclusions to which no response is required.

24.    CMAP made clear that the MPOs' 2040 socioeconomic forecasts and plans should be used to analyze alternative corridors for the Illiana Tollway in the EIS process.  On November 11, 2011, CMAP and NIRPC met with FHWA, IDOT and INDOT regarding the socioeconomic - population and employment - forecasts to be used in the EIS process.  CMAP and NIRPC explained that their official forecasts for the region assumed "revitalization of the urban core" and "more development to existing communities."  AR1_003752.  CMAP did not object to IDOT and INDOT including alternative forecasts in the NEPA study process.  AR1_003753.  CMAP did, however, request that the EIS include "build" and "no-build" scenarios based on the MPOs' population and employment forecasts for the region.  AR1_003753.

**ANSWER:**  Admit that CMAP and NIRPC met with FHWA, IDOT and INDOT on November 11, 2011.  Deny the characterization of CMAP as an "MPO."  Admit that CMAP stated that their preferred scenario results in more development to the existing communities.  Admit that CMAP did not object to the use of market-based forecasts in the NEPA analysis but requested that additional scenarios be presented in the FEIS based on their policy-based socioeconomic forecasts.  The document cited in Paragraph 24 speaks for itself and is the best evidence of its contents.

25.     IDOT and INDOT nonetheless hired their own private consultant, the al-Chalabi Group ("ACG"), to prepare separate population and employment forecasts.  IDOT, INDOT and their consultant ACG apparently understood CMAP's objection (AR3_041130), and that CMAP's staff was offering to create a "2040 'build' CMAP socio-economic scenario with an Illiana expressway" that could be used in conjunction with a "no-build" scenario reflecting the MPOs' forecasts. *Id.*

**ANSWER:**  Admit that INDOT and IDOT hired the al Chalabi Group to prepare market-based population and employment forecasts.  Admit that CMAP offered to create what CMAP characterized as a 2040 "build" socioeconomic forecast based on CMAP's policy-based forecasts.

**IDOT's and INDOT's Refusal to Use the MPOs' Forecasts in the EIS Process**

26.     Before initiating the NEPA-required EIS, IDOT determined that it would not use CMAP's 2040 population and employment forecast for the Illiana Tollway process or for any other new major planning studies.  AR2_038355.

**ANSWER:**  Admit that IDOT determined that rather than using the policy driven population and employment forecasts developed by CMAP for its NEPA analysis, "a more realistic 2040 trends and market constrained population and employment forecast should be developed for use in major project planning studies."  AR2_038355.

27.     ACG prepared alternative 2040 socioeconomic forecasts that were not limited to the Illiana study area.  Instead, the forecasts began with CMAP and NIRPC's overall regional population forecasts for the Chicago metropolitan and Northwest Indiana region, but redistributed the population differently than the MPOs had done in their official forecasts.  AR1_001387.

**ANSWER:**  Admit that ACG prepared a market-based socioeconomic forecast for an extended Chicago metropolitan area, and that the ACG forecast incorporates the overall regional total population forecasted for 2040 by CMAP, NIRPC, and other MPOs in the region.  AR1_001387.  Admit that ACG used a market-based approach to forecast the distribution of population within the region.  AR1_001388–AR1_001405.  Deny the characterization of CMAP as an "MPO."

28.     The MPOs' forecasts assume that transportation investments will be targeted "whenever possible to foster growth in existing communities," leading to a revitalized urban core.  AR1_003752; AR1_007566.  ACG, on the other hand, assumed that growth trends would be dominated by sprawl into outlying areas, with transportation investments made to facilitate this growth.  AR1_001396.

**ANSWER:**  With respect to the first sentence of Paragraph 28, admit that a representative of

CMAP described the GO TO 2040 Comprehensive Regional Plan as emphasizing "the need to

target investments whenever possible to foster growth in existing communities" (AR1_007566);

and admit that a representative of NIRPC described the vision of NIRPC's 2040 Comprehensive

Regional Plan as including "revitalization of the urban core" (AR1_003752).    Deny the

allegation in the second sentence of Paragraph 28 that the ACG forecasts were "dominated by

sprawl into outlying areas."    Deny that the cited page of the Administrative Record

(AR1_001396) supports the allegations in the second sentence of Paragraph 28.  The basis for

the distribution of population and employment in the ACG baseline forecast is described at

AR1_001388 through AR1_001405.

29.     The ACG forecasts and their differences from CMAP and NIRPC's forecasts are documented in a report attached as an exhibit to the Tier 1 FEIS.  AR1_001378-001466.  A table summarizing the differences is available at AR1_001417.  For example, ACG predicted that over 300,000 fewer people would live in the City of Chicago in 2040 than CMAP projected.  AR1_001417.  ACG also allocated more population to outer suburbs and exurbs, including in Will County, Illinois.  *Id.*  For 2040, ACG forecast a Will County population that would be 12.2 percent higher than CMAP's forecast.  *Id.*; AR1_001429.

**ANSWER:**  Admitted.

30.     To support its high growth expectations for Will County, ACG cited potential transportation developments, including the Peotone Airport, the potential construction of the Illiana Tollway itself and the possible extension of a Metra line.  AR1_001429.

**ANSWER:**  Deny that the cited page of the Administrative Record (AR1_001429) supports the

allegations in Paragraph 30.

31.     The differences between the CMAP and ACG forecasts are even more pronounced for southern Will County.  For example, ACG forecast Southwest Will County's

population would nearly quintuple from 42,226 in 2010 to 198,800 in 2040. AR1_001410. In comparison, CMAP forecast a population of approximately 100,000 in 2040.[3] ACG forecast that Southeast Will County population would grow explosively from 55,968 in 2010 to 229,000 in 2040. AR1_001411. By contrast, CMAP forecast a 2040 population of approximately 130,000 in the same area. *Id.* ACG's population forecast of 427,800 by 2040 for southern Will County, as a whole, is thus almost twice as high as CMAP's population forecast of 230,000 by 2040.

**ANSWER:** Admit that the ACG population forecasts and the CMAP forecasts reached different conclusions as to the future populations in Southern Will County. AR1_001410–AR1_001411. Deny that the Administrative Record states that population "would grow explosively." AR1_001411.

32. Both ACG and CMAP forecast much higher growth for Will County, however, than trends identified in United States Census Bureau data:

**Table 1:** U.S. Census Bureau and Bureau of Labor Statistics Population and Employment Estimates for Will County, Illinois, 2007 to 2013

| Year | Population[4] (as of July 1) | Employment[5] (annual average) |
|---|---|---|
| 2007 | 664,048 | 345,864 |
| 2008 | 671,392 | 344,921 |
| 2009 | 674,970 | 328,393 |
| 2010 | 678,859 | 328,134 |
| 2011 | 680,192 | 329,711 |
| 2012 | 681,590 | 336,919 |
| 2013 | 682,829 | 336,713 |

**ANSWER:** Admit that the Census Bureau and Bureau of Labor Statistics have developed estimates of population and employment in Will County, Illinois between 2007 and 2013. Deny

---

[3] The ACG report does not provide exact numbers for CMAP's 2040 estimates. They are graphically represented, though. For Southwest Will County, for example, CMAP's 2040 population estimate is represented by the red dot on the 2040 y-axis. AR1_001410.
[4] Population data for 2010-2013 is available at http://www.census.gov/popest/data/index.html. Population data for 2007-2009 is available at http://www.census.gov/popest/data/intercensal/county/CO-ESTOOINT-0l.html.
[5] Employment data for 2007-2012 is available at http://www.bls.gov/lau/home.htm#cntyaa. Employment data for 2013 is available at http://www.bls.gov/lau/launcntycur14.txt.

the characterization of these estimates as "data." Deny that the Census Bureau and the Bureau of Labor Statistics have "identified trends" for population and employment.

33. County-level population and employment data for Will County from the U.S. Census Bureau and Bureau of Labor Statistics demonstrates flattening population and employment growth in Will County.[6]

**ANSWER:** Admit that the U.S. Census Bureau and Bureau of Labor Statistics have published population and employment estimates for Will County, Illinois. Deny the characterization of these estimates as "data," and the assertion that such estimates "demonstrate[] flattening population and employment growth in Will County."

34. As depicted in Table 2, below, ACG's forecasts outpace actual population growth in Will County. ACG's forecast for average annual population growth in Will County between 2010 and 2040 was 3.39%. By contrast, the U.S. Census Bureau data shows that Will County population increased by only 0.47% from 2007 to 2013. The population "growth" rate decreased to 0.19% annually from 2010 to 2013.

**Table  2:** **Average  Annual Population Growth for Will County, Illinois-ACG and CMAP 2040 Forecasts Compared to United States Census Bureau Actual Estimates**

|  | Year Range | Starting Pop | Ending Pop | Average Annual Growth |
|---|---|---|---|---|
| ACG | 2010-2040 | 677,5607[7] | 1,366,4568[8] | 3.39% |
| CMAP | 2010-2040 | 726,2389[9] | 1,217,87910[10] | 2.26% |
| Census Bureau | 2007-2013 | 664,04811[11] | 682,829 12[12] | 0.47% |

---

[6] This Court may take judicial notice of information contained in public records, including U.S. Census data and publications of the Bureau of Labor Statistics. *See Pickett v. Sheridan Health Care Ctr.,* 664 F.3d 632,648 (7th Cir. 2011) (holding that the Consumer Price Index, published by the Bureau of Labor Statistics, "belongs to the category of public records of which a court may take judicial notice"); *United States v. Bailey,* 97 F.3d 982, 985 (7th Cir. 1996) (taking judicial notice of information from Census Bureau report); *Barnett v. Daley,* 32 F.3d 1196, 1198 (7th Cir. 1994) (stating  that the court could take judicial notice of "census population figures").
[7] ACG's population forecast lists 677,560 as the population for Will County in 2010. AR1_001417.
[8] AR1_001417.
[9] http://www.cmap.illinois.gov/data/demographics/population-forecast. This forecast is part of  the  GO TO 2040 Plan and therefore included in the Administrative Record by reference. *See* n.1, *supra.*
[10] AR1_001417.
[11] http://www.census.gov/popest/data/intercensal/county/CO-EST00INT-01.html.
[12] http://www.census.gov/data/index.html.

| Census Bureau | 2010-2013 | 678,85913[13] | 682,82914[14] | 0.19% |
|---|---|---|---|---|

**ANSWER:** Deny the characterization of population estimates as "actual population growth" in the first sentence of Paragraph 34. Deny that the allegation in the second sentence of Paragraph 34 is supported by the Administrative Record. Deny the characterizations of population estimates in the third and fourth sentences of Paragraph 34.

## The United States Forest Service's Early Objections to IDOT and INDOT Siting the Illiana Tollway Corridor Near the Midewin National Tallgrass Prairie

35.    The United States Forest Service likewise made clear its concerns at the beginning of the NEPA study process. On July 6, 2011, the Forest Service submitted written comments to IDOT expressing concern that a new tollway near the Midewin National Tallgrass Prairie could cause "irreparable environmental damage" to plant and animal habitats, and requested that "only viable routes should be analyzed and considered as alternatives that give wide berth to the natural lands, restored lands, and future lands at Midewin." AR1_002200.

**ANSWER:**    Admit that the Prairie Supervisor for the Midewin National Tallgrass Prairie submitted a written comment dated July 6, 2011. AR1_002200. The comment letter speaks for itself and is the best evidence of its contents.

## IDOT's and INDOT's Draft Purpose and Need Statement

36.    In December 2011, IDOT and INDOT issued their Draft Purpose and Need Statement and a Draft Transportation System Performance Report for the proposed Illiana Tollway. AR3_040527 and AR2_018209. These documents were based on population and employment forecasts prepared by ACG, the private consultant that they had hired. AR1_001378. They were not based on CMAP's and NIRPC's population and employment forecasts.

**ANSWER:** Admit that INDOT and IDOT issued a Draft Purpose and Need Statement and Draft Transportation System Performance Report in December 2011. AR3_040527–AR3_040555 (Draft Statement of Purpose and Need); AR2_018209–AR2_018331 (Draft Transportation System Performance Report). Admit that the analysis presented in these documents relied on

---

[13] Population data for 2010–2013 is available at http://www.census.gov/popest/data/index.html.
[14] http://www.census.gov/popest/data/index.html.

population and employment forecasts prepared by ACG.  These documents speak for themselves and are the best evidence of their contents.

37.    ACG's socioeconomic forecasts were then used as the basis for IDOT's  and INDOT's forecasting model that, first, projected 2040 traffic levels in the study area and, then, led to selection of Corridor B3 for the Illiana Tollway.  AR2_018222, AR1_000160 and AR1_000220.  Based on this analysis, the Draft Purpose and Need Statement identified three asserted needs for the study area:

(1) "Improve regional mobility" - "address[ing] the need to develop a transportation system improvement that serves the projected  growth in east-west traffic in the Study Area; reduc[ing] regional travel times; and improve[ing] access to jobs," AR3_040536;

(2) "Address local system deficiencies" - "focus[ing] on the need to develop a transportation system improvement that serves the projected growth in local traffic, address[ing] the lack of continuous higher functional classification east-west routes through the Study Area, and improve[ing] Study Area travel times/reduces delay," AR3_040539; and

(3) "Provide for efficient movement of freight" - "focus[ing] on the need to improve the accessibility of freight movement to and from its distribution points throughout the region, and provid[ing] more efficient truck freight movement on the roadway network." AR3_040546.

**ANSWER:**  Admit that the ACG population and employment forecasts were used in the travel demand model to predict 2040 traffic levels in the Study Area (AR2_018222), and that an analysis of the travel performance and environmental and socioeconomic impacts of the alternative corridors led to selection of Corridor B3.  AR1_000160; AR1_000220.  The Draft Purpose and Need Statement cited by Plaintiffs speaks for itself and is the best evidence of its contents.

38.    CMAP submitted comments, expressing concerns that IDOT had not considered CMAP's official 2040 population and employment forecasts in determining the purported need for the proposed new tollway.  AR2_017613.  CMAP requested that IDOT prepare traffic demand forecasts using CMAP's forecasts in order "to support current regional planning analyses and to remain consistent with requirements of the National Environmental Policy Act." AR2_017614.

**ANSWER:**  Admit that CMAP submitted a comment letter found at AR2_017613.  That letter speaks for itself and is the best evidence of its contents.

**IDOT's and INDOT's "Preliminary Recommendation" of Corridor B3 for the Proposed Illiana Tollway**

39. In February 2012, before the completion of the Tier 1 EIS, IDOT and INDOT announced their "preliminary recommendation" of Corridor B3 for the proposed Illiana Tollway. AR3_035240. They recognized that "[t]ravel performance decreases as [the tollway's] location shifts south" (AR3_035218), but claimed Corridor B3 was "the best balance of performance, minimizing impacts, financial viability and compatibility with community plans." AR3_035240.

**ANSWER:** Admitted. The documents cited in Paragraph 39 speak for themselves and are the

best evidence of their contents.

40. CMAP, the U.S. Forest Service and many civic groups opposed Corridor B3. CMAP explained that Corridor B3 is located "well south of any substantial development." AR1_003729.

**ANSWER:** Admit that CMAP submitted a comment letter that described Corridor B3 as "well

south of any substantial development." AR1_003729. Deny that the cited page of the

Administrative Record (AR1_003729) supports the remaining allegations in Paragraph 40.

41. The map attached as Exhibit A to Plaintiffs' Opening Memorandum in Support of Summary Judgment depicts Corridor B3 in relation to Defendants' approved "study area" (designated by the dotted-line rectangle) for the NEPA process. *See also* AR1_000008.

**ANSWER:** Admitted.

42. Corridor B3 is generally located about 10 miles south of existing development in northern Will County, Illinois and Lake County, Indiana. *Id.* The area through which Corridor B3 runs is currently used primarily as agricultural land, with other land uses including "scattered rural housing, small lakes and streams, and natural areas." AR1_000602.

**ANSWER:** Admitted.

43. Locating and constructing the Illiana Tollway in Corridor B3 would result in significant adverse natural resources impacts including: the loss of up to 2,725 acres of farmland, including up to 1,607 acres of "prime" farmland; destroying and fragmenting up to 34 acres of wetlands; crossing 33 ecologically-significant rivers and streams, comprising up to 12 acres of stream surface area; and adversely impacting federal and state protected historic and natural areas. AR1 _000228-230; *see generally* Tier 1 FEIS Chapter 3 at AR1_000224.

**ANSWER:** Admit that the cited pages of the Administrative Record (AR1_000228–

AR1_000230) identify the working alignment of Corridor B3 as potentially impacting the

following resources: up to 2,725 acres of farmland (including up to 1,607 acres of "prime" farmland); up to 34.6 acres of wetlands; 33 stream crossings comprising up to 12 acres of stream surface area; and resources protected by Section 4(f) of the Department of Transportation Act. Deny that the cited pages of the Administrative Record support the characterizations of these impacts in Paragraph 43.

44. The Illiana Tollway would also create substantial adverse impacts on the Midewin National Tallgrass Prairie by causing noise, air and light pollution that would drive away wildlife. AR1_000658; AR1_006198-6200.

**ANSWER:** Deny that the cited pages of the Administrative Record (AR1_000658; AR1_006198–AR1_006200) support the allegations in Paragraph 44. These allegations are based on a comment letter submitted by Plaintiffs, which speaks for itself and is the best evidence of its contents. AR1_006198–AR1_006200. The page cited from Section 3 of the FEIS directly contradicts the allegation in Paragraph 44. AR1_000658 ("impacts from such sources as highway noise, air quality, and lighting from these corridors are ***not*** expected to be adverse . . . ." (emphasis added)).

45. The Illiana Tollway would also create new traffic on existing nearby roads, including up to an asserted 11,000 vehicles per day on Illinois Route 53 (ARl_007509), which is listed in the National Register of Historic Places as a part of Alternate Route 66. AR1_000225.

**ANSWER:** Admitted.

46. Illinois Route 53 runs north-south through the Midewin National Tallgrass Prairie and alongside the Abraham Lincoln National Cemetery, a national military cemetery. AR1_006193; AR1_006226. Noise and pollution from additional traffic would adversely impact both of these resources. AR1_006193; AR1_06199-6200.

**ANSWER:** Admit the first sentence of Paragraph 46. The allegations in the second sentence of Paragraph 46 are derived from a comment letter submitted by Plaintiffs. AR1_006193; AR1_06199–AR1_06200. That letter speaks for itself and is the best evidence of its contents.

47.   On March 9, 2012, Plaintiffs and other groups submitted detailed comments stating that the pre-selection of Corridor B3 would preclude a rigorous exploration and objective evaluation of all alternatives.  AR1_003704; AR1_003707.  Plaintiffs requested that IDOT and INDOT evaluate more northern corridors that would better serve existing developed areas (AR1_003708), and they explained why traffic generated by Corridor B3 would cause harmful impacts to the Midewin National Tallgrass Prairie and other natural resources.  AR1_003706.

**ANSWER:**  Admit that Plaintiffs and other groups submitted a comment letter dated February 9, 2012.  AR1_003704–AR1_003709.  This letter speaks for itself and is the best evidence of its contents.

48.   On March 14, 2012, CMAP submitted comments criticizing IDOT's pre-selection of Corridor B3: "[b]y choosing an alignment that is well south of any substantial development . . . the corridor has little positive effect on regional mobility and local system deficiencies." AR1_003729.  CMAP summed up the screening results as "clearly" showing that "as the location shifts south, travel performance decreases."  AR1_003728.  "Also, since it is assumed that this will be a toll facility of some type, the B3 alternative's decrease in performance not only fails to fully address the purpose and need, it also will likely not generate sufficient revenue to construct and maintain the facility."  *Id.* (emphasis added).  CMAP also stated concerns with the Tollway's indirect and cumulative land use impacts:

> Focusing primarily on the B3 alternative may encourage future development outside existing communities. Continued analysis of alternative routes is necessary, to consider whether they can provide a focus for development and redevelopment within existing communities that is consistent with GO TO 2040.

ARl_003729.

**ANSWER:**   Admit that CMAP submitted a comment letter dated March 14, 2012. AR1_003728–AR1_003730.  That letter speaks for itself and is the best evidence of its contents.

49.   In March 2012, the U.S. Forest Service submitted comments stating that Corridor B3 was "not a viable alternative" because of its direct, indirect, and cumulative impacts on wildlife habitat at the Midewin National Tallgrass Prairie and throughout Will County. AR2_014872.  This consulting federal agency urged IDOT to consider other corridors in order to avoid building a new tollway so close to the Midewin National Tallgrass Prairie.  AR2_014872-14873.

**ANSWER:**  Admit that the Prairie Supervisor for the Midewin National Tallgrass Prairie submitted a comment letter dated March 8, 2012.  AR2_014872–AR2_014873.  That letter speaks for itself and is the best evidence of its contents.

50.     The Illiana Tollway would also adversely impact regional transportation planning and funding. Defendants estimate the required capital expenditures to build the Illiana Tollway in Corridor B3 at $1.25 billion or more. AR1_000018. In a draft financial feasibility analysis prepared in October 2012, but never released to the public until its inclusion in the administrative record, consultants for IDOT and INDOT assumed that this expressway would be tolled. AR3_007941. They estimated the amount of "public subsidy" still needed would range from $249 million to $707 million in order to "fully finance" the tollway. AR3_007962 and AR3_007934. The financial feasibility analysis concluded that "[i]n all cases toll revenues alone are not sufficient to cover the entire initial capital cost of the facility." AR3_007962. Their analysis further concluded that this public subsidy could require IDOT and INDOT to shift their transportation funding priorities away from other projects. AR3_007966.

**ANSWER:** Deny that the Administrative Record supports the allegation in the first sentence of Paragraph 50. Admit that the cost of the project is estimated at $1.25 billion. AR1_000018. Admit that the October 2012 Draft Financial Feasibility Assessment Report assesses the facility's potential to generate revenue through tolls. AR1_007939–AR1_007941. Admit that the Draft Financial Feasibility Assessment Report estimates the public subsidy needed to fully finance the Project at $249 million to $707 million. AR1_007934; AR1_007962. Admit that the Draft Financial Feasibility Assessment Report states that "it is [] likely that the DOTs would have to shift funding priorities, unless a new source of state or local funding was identified." AR3_007966.

**The Tier 1 Draft Environmental Impact Statement**

51.     On July 13, 2012, IDOT and INDOT released their Tier 1 Draft Environmental Impact Statement ("DEIS") for the proposed Illiana Tollway project. AR1_007967. It slightly modified the asserted purpose and need (AR1_008022) and compared Corridor B3 to a more northern Alternative A3S2 and to Alternative B4, which is a variation of Corridor B3. AR1_007998.

**ANSWER:** Admit that the Tier 1 DEIS was released by FHWA, INDOT and IDOT on July 13, 2012. This document speaks for itself and is the best evidence of its contents.

52.     The Tier 1 DEIS relied exclusively on consultant ACG's population and employment forecasts (AR1_008079) and did not consider alternatives based on CMAP's and NIRPC's lower forecasts. Based on traffic projections using ACG's forecasts, the Tier 1 DEIS

concluded that each of the three above alternatives addressed the project's purpose and need criteria. AR1_008117.

**ANSWER:** Admitted.

53. The Tier 1 DEIS discussed other potential tollway configurations that it rejected, including the "A Corridors" located in the northern part of the study area, which corresponded to the Illiana Tollway as described in CMAP's GO TO 2040 Plan. IDOT and INDOT recognized that "the alternative corridors located in the northern portion of the Study Area tended to have better travel performance than the alternative corridors located in the central or southern portion of the Study Area" (AR1_008084), but nonetheless still selected Corridor B3.

**ANSWER:** Deny that the cited page of the Administrative Record (AR1_008084) supports the allegations in the first sentence of Paragraph 53. Admit the allegations in the second sentence of Paragraph 53.

### Plaintiffs', CMAP's, NIRPC's, the United States Forest Service's and the United States Department of Interior's Written Comments on the Tier 1 DEIS

54. On August 29, 2012, Plaintiffs and other civic groups submitted detailed written comments explaining that the Tier 1 DEIS had failed to adequately consider a number of environmental impacts, including noise, light and air pollution from traffic on the Illiana Tollway, as well as from new induced traffic on Illinois Route 53. AR2_005150. Plaintiffs' comments were supported by references to additional studies demonstrating the impacts of traffic noise on neighboring bird habitat and maps showing grassland bird habitat along the southern edge of the Midewin National Tallgrass Prairie adjacent to Corridor B3 and, also, near Illinois Route 53. AR2_005160. Plaintiffs stated their agreement and support for CMAP's and NIRPC's concerns that the MPOs' population forecasts had been bypassed and ignored. AR2_005152. Plaintiffs also explained concerns that Corridor B3 was sited too far south to serve existing populations and to fulfill the proposed Illiana Expressway's still-unclear purpose and need. *Id.*

**ANSWER:** Admit that Plaintiffs and other non-governmental organizations submitted written comments on the Tier 1 DEIS dated August 29, 2012. AR2_005150–AR2_005183. The comment letter speaks for itself and is the best evidence of its contents.

55. On August 28, 2012, CMAP submitted written comments on the Tier 1 Draft EIS. CMAP: (1) Requested that IDOT and INDOT evaluate project alternatives using CMAP's official forecasts and cautioned that "[t]he comparative results for the three alternatives could be significantly different" if CMAP's forecasts were used; (2) Expressed "serious concerns" that the Corridor B3 alternative would promote new sprawled development throughout the southern portion of Will County in direct conflict with CMAP's policies to foster growth in existing

communities; and (3) Requested that IDOT and INDOT consider the costs to "provide and maintain the necessary infrastructure to serve" this new low-density, sprawled development. AR2_005204-5205.

**ANSWER:** Admit that CMAP submitted written comments on the Tier 1 DEIS dated August

28, 2012. AR2_000504–AR2_000505. The comment letter speaks for itself and is the best

evidence of its contents.

56. On August 24, 2012, NIRPC submitted written comments on the Tier 1 Draft EIS. NIRPC: (1) Stated that it disagreed with the consultant's forecasts and that, if, instead, NIRPC's forecasts were used, "there would be a basis to predict significantly  less travel and traffic congestion in the study area, and the need for the project would be greatly diminished"; and (2) Stated that the Tier 1 Draft EIS did not account for costs associated with increased population and traffic in the project study area. AR2_005266; AR2_005269.

**ANSWER:** Admit that NIRPC submitted written comments on the Tier 1 DEIS dated August

24, 2012. AR2_005266–AR2_005271. The comment letter speaks for itself and is the best

evidence of its contents.

57. The United States Forest Service submitted comments stating that "all remaining alternatives, due to their close proximity to Midewin's borders, will cause irreparable damage to the habitat" and advised IDOT and INDOT that "now is the time in Tier 1 to find a better alternative than the ones you have elected to evaluate." AR2_005199. The Forest Service also explained the Tier 1 DEIS had failed to identify the Midewin National Tallgrass Prairie, in its entirety, as a Section 4(f) protected area providing wildlife habitat and recreational opportunities. *Id.* The Forest Service stated that "[a]ll of Midewin lands are considered protected under the provisions of [Section 4(f)], and you must afford us the protection and consideration set forth in this act." *Id.*

**ANSWER:** Admit that the Prairie Supervisor of the Midewin National Tallgrass Prairie

submitted written comments on the Tier 1 DEIS. AR2_005199–AR2_005200. The comment

letter speaks for itself and is the best evidence of its contents.

58. On August 29, 2012, the United States Department of Interior submitted written comments also explaining that the Tier 1 Draft EIS failed to fully identify the Midewin National Tallgrass Prairie as a Section 4(f) resource and did not fully recognized the impacts of Illinois Route 53 traffic on the Section 4(f) resources. The Department criticized the Draft EIS's assessment of indirect and cumulative environmental impacts as too narrow. AR2_005090. For example, the Department cited academic studies demonstrating the impacts of traffic noise on

neighboring bird habitat, such as that along the Midewin National Tallgrass Prairie's southern border near Corridor B3, and adjacent to Illinois Route 53.  AR2_005085-5086.

**ANSWER:**  Admit that the Department of the Interior submitted written comments on the Tier 1 DEIS dated August 29, 2012.  AR2_005082–AR2_000591.  The comment letter speaks for itself and is the best evidence of its contents.

**IDOT's and INDOT's Selection of Corridor B3 for the Proposed Illiana Tollway**

59.    In early October, 2012, IDOT and INDOT announced their selection of Corridor B3 for the proposed Illiana Tollway.  AR3_011160.

**ANSWER:**  Admit that INDOT and IDOT issued a report entitled Preferred Corridor Report, dated October 2012, that announced the selection of the B3 Corridor.  AR3_011160–AR3_011180.

60.    On November 12, 2012, Plaintiffs and other groups submitted written comments identifying many of the same deficiencies they had previously explained.  AR3_003906.

**ANSWER:**  Admit that Plaintiffs and other non-governmental organizations submitted written comments on the Preferred Corridor Report, dated November 12, 2012.  AR3_003906 - AR3_003912.  The comment letter speaks for itself and is the best evidence of its contents.

61.    On December 12, 2012, CMAP submitted written comments expressing disappointment and reiterating concerns that: (1) Corridor B3 would cause low-density "sprawl" development in Will County; and (2) IDOT and INDOT had refused to conduct an analysis of need based on CMAP's population and employment forecasts that were the official projections for the region.  AR1_003739-740.

**ANSWER:**  Admit that CMAP submitted written comments on the Preferred Corridor Report, dated December 12, 2012.  AR1_003739–AR1_003740.  The comment letter speaks for itself and is the best evidence of its contents.

62.    On December 20, 2012, FHWA staff sent an email to a FHWA manager Scott McGuire with draft language for the Final EIS "to address the recent comments by CMAP." AR3_002786.  The FHWA manager responded to the draft language as follows:

The response does not address CMAP's 12112/12 letter, and it looks like it is addressing a different letter. My thoughts are the project team either needs to: work with CMAP and get them to send another letter changing their position; OR bring A3S2 into the ROD and into Tier II if the schedule is most critical. My interpretation of CMAP's letter:

"without the inclusion of Alternative A3S2, that comparison is not possible." - it demonstrates FHWA rushed to prejudgment with a pre-ordained alignment. It also creates a major impediment for defending Tier 2 decisions.

"location can greatly affect usage and revenues" - the context is for revenue, but it also demonstrates a lack of consideration for secondary and cumulative impacts: Especially combined with "the real costs ... will add significantly to the projects and the overall development patterns."

Although I personally disagree with the MPO's letter, I think it is inadvisable to sign the ROD without more corrective action. Also, I personally support throwing CMAP under the bus when the politicians start yelling.

It is tough to write-off the MPO, and the submitted language does not come close to providing a defensible basis for the significant comments raised (add your favorite curse words).

AR3_002786 ("McGuire Email").

**ANSWER:** Admitted.

## FHWA's Record of Decision, Tier 1 Final Environmental Impact Statement and Section 4(f) Determination

63. On January 17, 2013, FHWA approved the Tier 1 FEIS and ROD selecting the proposed new Illiana Tollway in Corridor B3 for further study in comparison only to a "no-build" alternative scenario. See AR1_000001 (ROD); AR1_000043 (FEIS). FHWA eliminated all other alternatives from further study. AR1_000006-07.

**ANSWER:** Admitted.

64. Regarding CMAP's comments on using its official population and employment forecasts, the Tier 1 FEIS included substantially the same FHWA staff response that had prompted the McGuire Email reply, as well as a December 20, 2012 letter from IDOT purporting to respond to CMAP. Compare AR1_000809 (Tier 1 FEIS) and AR3_002814 (draft response); AR1_003741 (IDOT letter).

**ANSWER:** Admitted. The documents cited in Paragraph 64 speak for themselves and are the best evidence of their contents.

65.    The Tier 1 FEIS and ROD included an evaluation of the studied alternatives' potential impacts to Section 4(f) resources pursuant to 23 C.F.R. 774.7(e), which allows for a "preliminary Section 4(f) approval" in the case of tiered EISs.  AR1_000022.  Defendants identified potential impacts to several resources, specifically Alternate Route 66, the Wauponsee Glacial Trail and the Des Plaines State Fish and Wildlife Area.  *Id.*

**ANSWER:**  Admitted.  The document cited in Paragraph 65 speaks for itself and is the best evidence of its contents.

66.    FHWA concluded, however, that the Illiana Tollway in Corridor B3 would have "[n]o impact" on the Midewin National Tallgrass Prairie.  AR1_000545.  The Tier 1 FEIS stated that the proximity of Corridor B3 "may impact grassland and migratory bird species," acknowledging the academic studies that Plaintiffs cited regarding the destruction of habitat by traffic noise.  AR1_000548; AR1_000550.  The Tier 1 FEIS nonetheless said that "[i]mpacts from such sources as highway noise, air quality, and lighting ... are not expected to be adverse since it is commonly believed that relatively mobile birds and wildlife would move away from such sources."  AR1_ 000550.

**ANSWER:**  Admitted.

67.    The Tier 1 FEIS stated that FHWA did not anticipate, based on the information in Tier 1, that Corridor B3 would constructively "use" the Midewin National Tallgrass Prairie, but would "further analyze[]" the issue in Tier 2.  *Id.*

**ANSWER:**  Admitted.

68.    Internal FHWA email correspondence demonstrates that FHWA had already reached a final decision on Section 4(f) impacts.  In a November 29, 2012 email, one FHWA staffperson requested that "[i]n the [Tier 1 FEIS's] 4(f) discussion, if a draft Tier II schedule has been established, this should be disclosed in the Section 4(f) section."  AR3_005301.  Another FHWA staffperson responded that no Section 4(f) evaluation schedule would be included because FHWA already knew how it would address the impacts:

> We do not have a schedule to complete a section 4(f) evaluation for tier 2 at this time. Our intention is to either completely avoid known 4(f) resources, issue deminimis  [sic] 4(f) determinations  for any 4(f) impacts, and/or work with [officials with jurisdiction] and apply the temporary occupancy exception.

*Id.*

**ANSWER:**  Deny that the cited page of the Administrative Record (AR3_005301) supports the allegations in Paragraph 68.

**Plaintiffs' Complaint for Declaratory and Injunctive Relief**

69.     On July 10, 2013, Plaintiffs Openlands, Midewin Heritage Association and Sierra Club filed their Complaint for Declaratory and Injunctive Relief alleging that Defendants' approvals of the Tier 1 FEIS and ROD violated NEPA, Section 4(f) and the Administrative Procedure Act.

**ANSWER:** Admitted.

70.     Plaintiffs are not-for-profit conservation and civic organizations, which each have members who use and enjoy the land and resources that would be affected adversely by the construction of the Illiana Tollway in the proposed Corridor B3 in Will County that runs just to the south of the Midewin National Tallgrass Prairie.  Complaint ¶¶ 16-18; *see also* declarations attached to Plaintiffs' Motion for Summary Judgment.  Plaintiffs participated extensively in the environmental study process for the Illiana Tollway, including submitting multiple sets of comments during the process.  *See, e.g.*, Complaint 54; 63-64; and 70; AR1_003704 (Plaintiffs' Comments on the "preliminary recommendation" of Corridor B3); AR1_006189 (Plaintiffs' Comments on the Tier 1 DEIS); AR3_003906 (Plaintiffs' Comments on announcement of Corridor B3 as the "preferred" alternative).

**ANSWER:** Admitted upon information and belief.

Date:  June 4, 2014

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By: s/ Harpreet K. Chahal
    HARPREET K. CHAHAL
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    Telephone:  (312) 353-1996
    Email:  harpreet.chahal@usdoj.gov

ILLINOIS DEPARTMENT OF
TRANSPORTATION

By:  s/ Michael A. Forti
    MICHAEL A. FORTI
    IL ARDC No. 3127929
    100 West Randolph Street
    Suite 6-600
    Chicago, Illinois 60601
    Telephone:  (312) 793-2255
    Email: Michael.Forti@Illinois.gov

    Cindy K. Bushur-Hallam
    IL ARDC No. 6224594
    2300 South Kirksen Parkway
    Room 313
    Springfield, IL 62794
    Telephone: (217) 782-3215
    Email:cindy.bushur-hallam@illinois.gov

*Attorneys for Defendant Illinois
Department of Transportation*

INDIANA DEPARTMENT OF
TRANSPORTATION

By:  s/ Albert M. Ferlo *(pro hac vice)*
    ALBERT M. FERLO *(pro hac vice)*
    Perkins Coie LLP
    700 13th Street, NW
    Suite 600
    Washington, DC  20005
    Telephone:  (202) 654-6262
    Facsimile:  (202) 654-9143
    Email: AFerlo@perkinscoie.com

By:  s/ William G. Malley *(pro hac vice)*
    WILLIAM G. MALLEY *(pro hac vice)*
    Perkins Coie LLP
    700 13th Street, NW
    Suite 600
    Washington, DC  20005
    Telephone:  (202) 654-6250
    Facsimile:  (202) 654-9153
    Email: WMalley@perkinscoie.com

    Kathleen A. Stetsko, ARDC No. 6297704
    Perkins Coie LLP
    131 South Dearborn Street
    Suite 1700
    Chicago, IL 60603-5559
    Telephone:  (312) 324-8512
    Facsimile:  (312) 324-9512
    Email: KStetsko@perkinscoie.com

GREGORY F. ZOELLER
Indiana Attorney General
Atty. No. 1958-98I
Timothy J. Junk
Deputy Attorney General
Atty. No. 5587-02
OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN  46204
Telephone:  (317) 232-6247
Facsimile:  (317) 232-7979
Email:  tim.junk@atg.in.gov

*Attorneys for Defendant Indiana Department of Transportation*