## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| OPENLANDS, MIDEWIN HERITAGE ASSOCIATION and SIERRA CLUB, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, ANTHONY FOXX, Secretary, United States Department of Transportation, FEDERAL HIGHWAY ADMINISTRATION, VICTOR M. MENDEZ, Administrator, Federal Highway Administration, and CATHERINE BATEY, Division Administrator, Illinois Division, Federal Highway Administration, | ) ) ) ) ) ) ) ) ) ) ) | **Case No. 1:13-cv-04950**<br><br>**Judge Shah** |
| Defendants, | ) ) | |
| and | ) ) | |
| ILLINOIS DEPARTMENT OF TRANSPORTATION and INDIANA DEPARTMENT OF TRANSPORTATION, | ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

## REPLY MEMORANDUM IN SUPPORT OF
## PLANTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ................................................................................................................1

I.      Defendants' Exclusive Reliance on a Consultant's Inflated Population Forecasts
        Was Arbitrary and Capricious ..................................................................................3

        A.      The Defendants' Forecast from So-Called "Well-Established" Methodology
                Has No Rational Relation to Actual Population Data in the Study Area .........4

        B.      Defendants' Decision to Ignore the MPO's Forecasts and Create Their Own
                Inflated Forecast Was Arbitrary and Capricious ...............................................6

        C.      The FEIS's "No-Build" and "Build" Forecasts Alike Unreasonably Assume
                That New Transportation Facilities Will Be Built to Accommodate Sprawled
                Growth ..............................................................................................................10

II.     Plaintiffs' Section 4(f) Claims are Compelling, Determinative, and Justiciable ..13

        A.      FHWA's "Preliminary" Section 4(f) Approval is a Final Agency Action ......13

        B.      Plaintiffs' Section 4(f) Claims Are Ripe ..........................................................14

Conclusion .........................................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Bennett v. Spear*, 520 U.S. 154 (U.S. 1997) ..............................................................................13

*Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215 (S.D. Fla. 2010) ...........................3, 8

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 401 (1972) ........................................4

*Conservation Law Foundation v. Fed. Highway Admin.*, 630 F. Supp. 2d 183 (D.N.H. 2007)......3

*Highway J Citizens Group v. U.S. Dep't of Transp.*, 656 F. Supp. 2d 868 (E.D. Wis. 2009)........5

*North Carolina Alliance for Transportation Reform, Inc. v. United States Department of Transportation,* 151 F. Supp. 2d 661 (M.D.N.C. 2001) ..................................................................3

*North Carolina Wildlife Federation v. North Carolina Dep't of Transp.,* 677 F.3d 596 (4th Cir. 2012) .....................................................................................................................................3, 11

*Piedmont Heights Civil Club, Inc. v. Moreland*, 637 F.2d 430 (5th Cir. 1981) .............................8

*Senville v. Peters*, 327 F. Supp. 2d 335 (D. Vt. 2004) ...................................................................8

*Sierra Club v. Marita*, 46 F.3d 606 (7th Cir. 1995).....................................................................4, 6

*Sierra Club v. United States Department of Transportation*, 962 F. Supp. 1037 (N.D. Ill. 1997) .................................................................................................................................... *passim*

*Sierra Club v. United States Department of Transportation,* 310 F. Supp. 2d 1168 (D. Nev. 2004) ..........................................................................................................................................8

*Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997).....................................1

*Texas Independent Producers & Royalty Owners Association v. EPA*, 435 F.3d 758 (7th Cir. 2006) ........................................................................................................................................15

## STATUTES

### Federal

5 U.S.C. § 551................................................................................................................................13

23 U.S.C. § 101..............................................................................................................................9

23 U.S.C. § 134..............................................................................................................................7

42 U.S.C. § 4332 .......................................................................................2, 3, 13, 15

49 U.S.C. § 303 ...................................................................................................2, 15

**State**

70 ILCS 1707/44 .......................................................................................................4

**RULES AND REGULATIONS**

23 C.F.R. § 450.318 ...................................................................................................8

23 C.F.R. § 450.322 ...................................................................................................4

23 C.F.R. Part 450, Appendix A ............................................................................8, 9

23 C.F.R. § 774.7(e)(1) ............................................................................................13

23 C.F.R. § 774.7(e)(2) ............................................................................................14

40 C.F.R. § 1500.1 .....................................................................................................3

40 C.F.R. § 1502.13 ...................................................................................................3

40 C.F.R. § 1502.14 ...............................................................................................2, 3

40 C.F.R. § 1502.16 ...................................................................................................6

40 C.F.R. § 1506.2 .....................................................................................................6

78 Fed. Reg. 9771, 9772 ......................................................................................2, 13

**WEBSITE REFERENCES**

http://factfinder2.census.gov/bkmk/table/1.0/en/PEP/2013/PEPANNRES/0500000US17197 ......5

http://www.census.gov/popest/methodology/2013-nat-st-co-meth.pdf ..........................................5

http://www.cmap.illinois.gov/about#Board_Members ...................................................7

http://www.cmap.illinois.gov/about/2040/supporting-materials/appendices/public-engagement...7

http://www.cmap.illinois.gov/about/involvement/committees/policy-committees/mpo-policy-committee...........................................................................................................................7

https://www.cmap.illinois.gov/documents/10180/13313/GT2040-Pop-Emp-Forecast-Summary-Table_09-11-12.xlsx/2f374220-eccf-437b-9d75-38ae2846467f ...................................................... 10

http://www.cmap.illinois.gov/documents/10180/273487/Socioeconomic+forecast
+for+public+comment+20140528.pdf/2b0cf5c6-cee4-40d8-9240-3e9669ec2ef9.........................10

https://www.cmap.illinois.gov/programs-and-resources/local-ordinances-toolkits ........................7

https://www.cmap.illinois.gov/programs-and-resources/lta ...........................................................7

**INTRODUCTION**

Defendants Federal Highway Administration ("FHWA") and its officials made the same error in approving the Tier 1 Final Environmental Impact Statement ("FEIS") for the proposed new Illiana Tollway that prompted the District Court to reverse FHWA's approval of an earlier proposed tollway in *Sierra Club v. United States Department of Transportation*, 962 F. Supp. 1037 (N.D. Ill. 1997) (hereinafter "*Sierra Club*"). Once again, Defendants have approved an FEIS that relies on inflated, implausibly high population and employment forecasts for the tollway's study area, creating "a self-fulfilling prophecy" that a new tollway is needed and making "a reasoned analysis of how different alternatives satisfy future needs impossible." *Id*. at 1043; *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 670 (7th Cir. 1997) ("a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives."). This Court should reach the same result as in *Sierra Club* and reverse.

Defendants' attempts to distinguish *Sierra Club* may try to run, but cannot hide, from Defendants' having committed the same errors here as in *Sierra Club*. Defendants argue that they "reasonably chose to use a customary, widely accepted forecasting methodology that would accurately predict the future socioeconomic conditions in the area," Defs.' Joint Mem. at 23, but their results are completely at odds with reality. First, Defendants' wildly optimistic forecasts for the study area bear no rational relation to the near-zero population and employment growth in Will County since 2007. Second, the FEIS "fails to examine an important aspect of the problem" before it, *Sierra Club*, 962 F. Supp. at 1041, by ignoring the contrary forecasts of the Chicago Metropolitan Agency for Planning ("CMAP") and Northwestern Indiana Regional Planning Commission ("NIRPC"). CMAP and NIRPC are designated by both federal and state law as the official agencies for developing population and employment forecasts for the region.

1

Defendants, apparently not liking those forecasts, commissioned a consultant to produce forecasts with a built-in "self-fulfilling prophecy" of future sprawled growth. This resulted in 2040 forecasts almost twice as high as CMAP's 2040 forecasts for southern Will County, the area through which the proposed tollway would run. *See* Pls.' Mem. at 13. <u>Third</u>, Defendants' baseline "no-build" forecasts actually are premised on the construction of new transportation facilities (like the Illiana Tollway itself) to meet future demand—just like the forecasts rejected in *Sierra Club*. *Id.* at 1043. As in *Sierra Club*, FHWA's reliance on flawed forecasts means that it has failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303.

Defendants' approval of the FEIS also should be reversed and remanded for further consideration of the proposed Illiana Tollway's "constructive use" of the Midewin National Tallgrass Prairie pursuant to Section 4(f). Defendants wrongly contend that FHWA has not yet taken any action with respect to Section 4(f) that is final and ripe for review. FHWA itself recognized in issuing the Tier 1 Record of Decision ("ROD") that it was taking a final agency action under Section 4(f). 78 Fed. Reg. 9771, 9772 (Feb. 11, 2013). If left to stand, FHWA's Tier 1 decision would curtail its Tier 2 consideration of whether there is a Section 4(f) use of, or are alternatives to using, the Midewin National Tallgrass Prairie. The proposed Illiana Tollway's constructive use of the Midewin National Tallgrass Prairie must be acknowledged in Tier 1, so that all alternatives and possibilities for mitigation of harm to the Prairie are preserved. This Court should reverse Defendants' combined approval of the Tier 1 ROD and FEIS and remand to Defendants with instructions to comply with NEPA and Section 4(f) in a manner that fairly and fully evaluates needs, "[r]igorously explore[s] and objectively evaluate[s] all reasonable alternatives," 40 C.F.R. § 1502.14(a), and reasonably assesses all environmental impacts.

## I. DEFENDANTS' EXCLUSIVE RELIANCE ON A CONSULTANT'S INFLATED FORECASTS WAS ARBITRARY AND CAPRICIOUS.

Plaintiffs and Defendants agree on a central point: "[a]ccurate projection of the future socioeconomic conditions in an area is a fundamental step in the identification of transportation needs." Defs.' Joint Mem. at 14. NEPA required Defendants to specify the "purpose and need" for the proposed Illiana Tollway project and explore reasonable alternatives to meet it. 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.13; 40 C.F.R. § 1502.14(a). To determine whether there is a need for a new transportation project and what alternatives can meet that need, an FEIS must begin with reasonable population and employment forecasts. 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis . . . [is] essential to implementing NEPA."); *Sierra Club*, 962 F. Supp. at 1043; *Conservation Law Found. v. Fed. Highway Admin.*, 630 F. Supp. 2d 183, 210 (D.N.H. 2007); *North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 689-690 (M.D.N.C. 2001); Pls.' Mem. at 29-40. An FEIS's failure to include reasonable forecasts is therefore grounds for reversal. Neither is it possible to accurately assess the environmental effects of a new highway's impacts on regional traffic and population growth patterns if the "baseline" for comparison is inaccurate. *See* 40 C.F.R. § 1502.14(a); *North Carolina Wildlife Fed'n v. North Carolina Dep't of Transp.*, 677 F.3d 596, 603 (4th Cir. 2012) ("[C]ourts not infrequently find NEPA violations when an agency miscalculates the 'no build' baseline or when the baseline assumes the existence of a proposed project."); *Sierra Club*, 962 F. Supp. at 1043; Pls.' Mem. at 40-44.

The FEIS should be reversed because its foundational population and employment forecasts are flawed. Defendants try to cloak the forecasts' flaws in the concept of "deference," asserting that this Court should not act as a "super professional transportation analyst" in judgment of the forecasts. Defs.' Joint Mem. at 25 (citing *Citizens for Smart Growth v. Peters*,

716 F. Supp. 2d 1215, 1225–26 (S.D. Fla. 2010)). Here, CMAP and NIRPC are the "super analysts" designated as the official agencies for developing population and employment forecasts for the region.[1] Defendants rejected their forecasts in favor of a consultant's forecasts predicting nearly twice as much growth in the immediate vicinity of the proposed tollway, though. As the Court of Appeals for the Seventh Circuit has explained, "deference does not mean obeisance," and it cannot "shield an agency action from a thorough, probing, in-depth review." *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995) (internal quotations omitted) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1972)). As in the cases cited above, courts have not hesitated to reverse FHWA's determinations of what forecasts are reasonable to serve as the basis for an FEIS, when those forecasts contain basic errors that render them unreliable. In this case, the FEIS's forecasts have three central flaws that mandate reversal:

(1)     The FEIS' forecasts do not reflect the reality of essentially flat population and employment growth in Will County from 2007 through the present;

(2)     The FEIS ignored the contrary forecasts developed by CMAP and NIRPC, the key metropolitan planning organizations ("MPOs") for the study area; and

(3)     The FEIS's so-called "no-build" forecasts actually assume that transportation facilities will be built to accommodate new sprawled growth, replicating the same methodological error reversed in *Sierra Club*.

A.      **The Defendants' Forecasts From So-Called "Well-Established" Methodology Have No Rational Relation to Actual Population Data in the Study Area.**

The FEIS's forecasts do not reflect the reality that the past seven years have brought near-zero population and employment growth to Will County, according to the United States Census Bureau and Bureau of Labor Statistics. *See* Pls.' Mem., Ex. C. The United States Census Bureau's most recent annual population estimates for Will County demonstrate the trend:

---

[1] *See* 23 C.F.R. § 450.322(e) (requiring metropolitan planning organizations to use "the latest available estimates and assumptions for population, land use, travel, employment, congestion, and economic activity"); 70 ILCS 1707/44 ("CMAP's official forecasts shall be the foundation for all planning in the region.").

678,859 (07/01/2010); 680,192 (07/01/2011); 681,590 (07/01/2012); 682,829 (07/01/2013).[2]  By

contrast, Defendants are relying on wildly unrealistic population forecasts that predict a

population of 1,366,456 in 2040.  AR1_001417.

It is a basic principle of NEPA law that EIS determinations must be based on accurate

facts.  *See* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis . . . [is] essential to implementing

NEPA."); *Highway J Citizens Group v. United States Dep't of Transp.*, 656 F. Supp. 2d 868, 892

(E.D. Wis. 2009) (explaining that an agency's alternatives analysis must be "supported by sound

data and methods").  Will County's half-decade-plus slowdown is not a "short-term trend," as

Defendants describe it, Defs.' Joint Mem. at 41, but rather a development with long-term

consequences that the FEIS failed to take into account.

Defendants call Plaintiffs "misguided" for pointing out this extended period of no growth

as being in conflict with Defendants' consultant's prediction of three decades of consistently

explosive growth for Will County, and insist that "Plaintiffs are not forecasting experts."  Defs.'

Joint Mem. at 41.  Plaintiffs submit that one does not need to be a forecasting expert to see that

the consultant's forecast of 3.39% annual population growth for Will County is deeply

inconsistent with the United States Census Bureau's estimate of population growth of less than

0.5% annually in recent years.  Pls.' Mem., Ex. C.[3]  The gulf between the consultant's forecasts

and actual development in Will County demonstrates the forecasts' implausibility.  This Court

---

[2] *See* http://factfinder2.census.gov/bkmk/table/1.0/en/PEP/2013/PEPANNRES/0500000US17197
(attached hereto as Exhibit A).

[3] Defendants also seek to downplay the accuracy of the United States Census Bureau's postcensal
population estimates for Will County.  Defendants are correct that the Bureau only conducts a full Census
once a decade, but its intercensal county-level population estimates also are based on reliable data.  These
annual estimates are developed using the most recent Census results, adjusted with new government data
on births, deaths, and migration.  *See* U.S. Census Bureau, *Methodology for the United States Population
Estimates by Age, Sex, Race, and Hispanic Origin (Vintage 2013): April 1, 2010 to July 1, 2013*,
*available at* http://www.census.gov/popest/methodology/2013-nat-st-co-meth.pdf, at 2-3; 6-7 (attached
hereto as Exhibit B).  While the Bureau's annual population estimates use a different methodology than
the Census, they still reflect actual changes in county-level population.

should reverse the FEIS and ROD so that FHWA may consider the proposed Illiana Tollway

based on reasonable population and employment forecasts for the tollway's study area.

**B.      Defendants' Decision to Ignore the MPOs' Forecasts and Create Their Own Inflated Forecasts Was Arbitrary and Capricious.**

Defendants did not analyze the proposed Illiana Tollway using the 2040 population and

employment forecasts prepared by CMAP and NIRPC.  An agency violates the Administrative

Procedure Act if it "fails to examine an important aspect of the problem" before it.  *Sierra Club*,

962 F. Supp. at 1041 (citing *Marita*, 46 F.3d at 619).  Also, an EIS must discuss "conflicts" and

"inconsistenc[ies]" with regional and local plans.  40 C.F.R. § 1502.16(c) and 40 C.F.R. §

1506.2(d).  Defendants have failed to meet both standards.  CMAP and NIRPC are the agencies

designated by both federal and state law to develop the population and employment forecasts for

the region.  FHWA is a federal transportation funding and approval agency.  FHWA did not rely

on any kind of internal population forecasts for the region, but, unsatisfied with the MPOs'

forecasts, relied on an outside consultant that developed forecasts almost twice as high as

CMAP's for the study area in southern Will County.  Just as in *Sierra Club*, Defendants'

rejection of the MPOs' forecasts created a "self-fulfilling prophecy" that development will

continue at the edges of the Chicago metropolitan area and require new transportation facilities

like the proposed Illiana Tollway.  962 F. Supp. at 1043.  Defendants' disregard for the MPOs'

forecasts—in the face of repeated requests that FHWA use them[4]—mandates reversal.

In developing its forecasts, Defendants' consultant al-Chalabi Group ("ACG") began

with the MPOs' total regional population forecasts for 2040, but then redistributed population far

differently than CMAP and NIRPC had.  AR1_001387.  The MPOs' "policy-based" forecasts

---

[4] Defendants' contention that CMAP "expressed acceptance" of Defendants' use of the ACG forecasts in the NEPA process misconstrues the MPOs' position.  Defs.' Joint Mem. at 17.  Both CMAP and NIRPC made abundantly clear that they believed that any NEPA analysis that ignored the MPO forecasts was insufficient.  *See* AR2_005204; AR2_005266; AR3_041130.

assumed that transportation investments would be targeted "whenever possible to foster growth in existing communities."  AR1_003752; AR1_007566.  ACG's so-called "market-driven" forecasts assumed that growth would continue to expand at the edges of the region, with continued transportation investments made to facilitate this expansion.  AR1_001396.

Contrary to Defendants' intimations, CMAP's forecasts were not some sort of unilateral attempt to impose its preferences on an unwilling region.  *See*, *e.g*., Defs.' Joint Mem. at 26.  Instead, CMAP's GO TO 2040 Plan and its underlying forecasts were approved <u>unanimously</u> by the CMAP Board and MPO Policy Committee, made up of representatives of municipalities and agencies across the Chicago metropolitan area.[5]  Defendants' contention that CMAP's forecasts reflect what CMAP wants to happen, rather than what is likely to happen, completely discounts CMAP's role and authority to affect growth patterns in the region.  Under the Federal-Aid Highway Act, a transportation project is only eligible to receive federal funding if the relevant MPO has included the project in its Metropolitan Transportation Plan (*e.g*., CMAP's GO TO 2040 Plan) and its shorter-term Transportation Improvement Program. 23 U.S.C. § 134.[6]  CMAP's forecasts are not wishful thinking, but reflections of policies created and implemented by the whole region.

Given the MPOs' central role in transportation decisionmaking, the ACG forecasts are unreasonable and undercut the MPOs' comprehensive regional plans.  It is important to note just how anomalous Defendants' position in this case is.  Plaintiffs have been unable to locate a

---

[5] *See* CMAP, *GO TO 2040 Public Engagement*, *available at* http://www.cmap.illinois.gov/about/2040/ supporting-materials/appendices/public-engagement, and attached hereto as Exhibit C.  The composition of the CMAP Board and MPO Policy Committee is discussed on CMAP's website at http://www.cmap.illinois.gov/about/ involvement/committees/policy-committees/mpo-policy-committee, attached hereto as Exhibits D and E.
[6] CMAP also provides extensive resources to local entities to encourage and assist with the implementation of GO TO 2040. *See* https://www.cmap.illinois.gov/programs-and-resources/local-ordinances-toolkits and https://www.cmap.illinois.gov/programs-and-resources/lta, attached hereto as Exhibit F and Exhibit G.

single federal court decision nationwide in which FHWA has asked a court to uphold its rejection of MPO forecasts in favor of its exclusive consideration of contrary forecasts advanced by a state agency. FHWA's own guidance provides that "[a] sound transportation planning process is the primary source of the project purpose and need" for agencies' NEPA analyses of transportation projects, and describes local population and employment forecasts as "valuable inputs" to the NEPA process. 23 C.F.R. Part 450, App. A, Questions 8 and 13. Defendants point out that FHWA's regulations <u>allow</u> FHWA to use MPO planning products in NEPA analyses, but do not mandate that FHWA use them. *See* Defs.' Joint Mem. at 8-9 (citing 23 C.F.R. § 450.318 and 23 C.F.R. Part 450, App. A, Question 13). Yet nothing in FHWA's regulations purports to condone the agency's wholesale rejection of MPO forecasts.

The far more typical case over the past three decades, many examples of which have been cited by both Plaintiffs and Defendants, upholds FHWA's use of forecasts and other MPO planning products. *See*, *e.g.*, *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 442 (5th Cir. 1981) (upholding FHWA's reliance on MPO's population forecasts); *Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168, 1189-90 (D. Nev. 2004) (upholding FHWA's reliance on MPO's forecasts because MPO was "a government entity charged with developing transportation plans based on forecasted needs in the area"); *Senville v. Peters*, 327 F. Supp. 2d 335, 367 (D. Vt. 2004) (upholding FHWA's reliance on MPO's analysis). *See also Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1224 (S.D. Fla. 2010) (upholding FHWA reliance on MPO planning, stating that federal-MPO relationship "should be one that is premised on the idea that the representatives of the community are best situated to make the decisions regarding transportation planning for their community").

This Court should not approve FHWA's complete rejection of the regional population and employment forecasts prepared by the MPOs responsible under law for preparing such forecasts. Allowing FHWA to entirely disregard MPO planning would frustrate the transportation planning process required by Congress in the Federal-Aid Highway Act, 23 U.S.C. 101 *et seq*. MPOs are intended to be the agencies responsible for regional transportation planning. *See* 23 C.F.R. Part 450, App. A (noting "congressional intent that . . . metropolitan transportation planning should be the foundation for highway and transit project decisions"). Here, though, Defendants unreasonably discounted the impact of the MPOs' plans to reduce sprawl, and their authority to implement those plans through the transportation planning process.

Defendants assert that the MPOs' forecasts are not entitled to any consideration because they are "policy-based." Defs.' Joint Mem. at 26-29. As CMAP's executive director stated in meeting with the transportation agencies in 2011, though, "policies are always a factor in socioeconomic forecasts." AR1_003752 (emphasis added). There are two crucial differences between the MPOs' so-called "policy-based" forecasts and ACG's so-called "market-driven" forecasts. First, the policy assumptions underlying the MPOs' forecasts (the direction of transportation investments to spur infill development in existing communities) are made explicit, while the policies underlying ACG's forecasts (the continual outward expansion of the Chicago metropolitan area's transportation system) are not. Second, the MPOs have authority in the transportation planning process to implement the region's preferred policy, while FHWA does not. Defendants' exclusive reliance on ACG's forecasts was unreasonable and created an inconsistency with local transportation planning that was not addressed in the FEIS and ROD.

Finally, Defendants also state that they ignored CMAP's forecasts because the forecasts were not based on official 2010 Census results, which had not been released when CMAP's GO

TO 2040 Plan was released.[7]  Defendants' observation only serves to highlight how unrealistic the ACG forecasts for the study area were.  Defendants point only to differences between CMAP's 2010 estimates and official 2010 Census results for the City of Chicago.  The City of Chicago's population is not nearly as relevant to studying the proposed tollway as is population in Will County.  Will County's official 2010 Census results showed substantially lower population than CMAP's 2010 estimates.[8]  CMAP's estimated population of 726,238 was over 8.5% higher than the official 2010 Census results of 669,013.  ACG's reaction to the official 2010 Census results was not to assume a more conservative rate of growth for Will County than CMAP did, though, but rather to project a much faster pace of growth than CMAP did.  *See* Pls.' Mem. at 14, table 2.  It is irrational for Defendants to criticize CMAP's forecasts for not taking into account the official 2010 Census results when there is no evidence that ACG did, either.[9]

## C.    The FEIS's "No-Build" and "Build" Forecasts Alike Unreasonably Assume That New Transportation Facilities Will Be Built to Accommodate Sprawled Growth.

The FEIS's supposedly "no-build" population and employment forecasts actually assume the future construction of transportation facilities such as the Illiana Tollway that would be

---

[7] Indeed, CMAP is in the process of revising its regional forecast for 2040 to reflect the results of the 2010 U.S. Census.  http://www.cmap.illinois.gov/documents/10180/273487/Socioeconomic+forecast +for+public+comment+20140528.pdf/2b0cf5c6-cee4-40d8-9240-3e9669ec2ef9 (attached as Exhibit H).  For Will County, CMAP's revised 2040 population forecast is 1,155,009 (compare to CMAP's original 2040 forecast of 1,215,818).

[8] *See* https://www.cmap.illinois.gov/documents/10180/13313/GT2040-Pop-Emp-Forecast-Summary-Table_09-11-12.xlsx/2f374220-eccf-437b-9d75-38ae2846467f (attached as Exhibit I).  A table displaying representative differences between CMAP's 2010 population estimates and official 2010 Census results is attached as Exhibit J.

[9] Neither do Plaintiffs "fundamentally misrepresent" a December 20, 2012 email from an FHWA manager expressing concerns with FHWA's draft response to CMAP's December 12, 2012 comments, in which CMAP contended that the preferred Corridor B3 would cause low-density "sprawl" development in Will County, and objected to the FEIS's failure to conduct an analysis of need based on CMAP's forecasts.  (See Pls.' Mem. at 22; Defs.' Joint Mem. at 44).  The FHWA manager expressed clear concerns about the environmental study process, stating that the EIS and ROD needed "corrective action," and describing CMAP's comments as "significant."  AR3_002786.  Even if the FHWA manager did not share CMAP's views, he stated that it would be "tough to write-off the MPO."  *Id.*

necessary for population growth to expand outward at the edges of the Chicago metropolitan area. Just as in *Sierra Club*, then, the FEIS "assumes transportation facilities will be developed to meet the needs of an increasing population." *Sierra Club*, 962 F. Supp. at 1040. This circular "self-fulfilling prophecy" cannot support NEPA's requirements of a description of a project's "purpose and need" and an analysis of the alternatives that could fulfill that need. *Id.* at 1043; *North Carolina Wildlife Fed'n*, 677 F.3d at 603.

Defendants argue that the "no-build" forecasts prepared by ACG were based on inputs "independent of any particular transportation facilities." Defs.' Joint Mem. at 34. That statement obscures an important point, though. While the ACG "no-build" forecasts may not have relied upon the existence of any "particular" transportation facility, they did presume that the transportation system as a whole would continue to grow outward in order to accommodate new sprawled growth. As Defendants stated in the FEIS, their anticipated growth for the region is "fueled by several factors including the continuing western and southern expansion of the Chicago metropolitan area . . . ." AR1_000623. This "expansion of the Chicago metropolitan area" necessarily requires a concomitant expansion of the area's transportation network.

A close reading of ACG's report makes this underlying assumption clear. AR1_001378–AR1_001466. ACG describes an "underpinning" of the "S-Curve" growth model as employed by the consultants: "As development reaches maturity in close-in [t]ownships, growth in adjacent townships accelerates. This is true as long as the region, as a whole, is growing and <u>as long as appropriate accessibility is available</u>." AR1_001388; AR1_001396 (emphasis added). As Defendants have stated, ACG then cited to the Illiana Expressway "as an example of a transportation project that has been proposed to address the anticipated level of growth" in Will and Lake (Indiana) Counties. Defs.' Joint Mem. at 35 (citing AR1_001429; AR1_001452).

ACG's "no-build" forecasts are implausible because they are, implicitly and explicitly, "build" forecasts that assume the continued outward expansion of the transportation network with new facilities such as the Illiana Tollway. Only with the construction of such new highways could the historic "expansion of the Chicago metropolitan area" ACG identified in past decades continue. Again, this presumption of a continually expanding transportation network was the same methodological error that the District Court cited in reversing and remanding Defendants' approval of an earlier Will County tollway in *Sierra Club*. In *Sierra Club*, the single "build"/"no-build" forecast "assume[d] transportation facilities will be developed to meet the needs of an increasing population." 962 F. Supp. at 1040. Therefore, the Court concluded, "the final impact statement in this case relies on the implausible assumption that the same level of transportation needs will exist whether or not the tollroad is constructed." *Id*. at 1043.

Defendants claim that *Sierra Club* is "easily distinguishable" because the Defendants in that case had "used a single socioeconomic forecast from the MPO to evaluate all alternatives, including the 'no-build' alternative." Resp. Mem. at 37. Defendants miss a central point of the *Sierra Club* decision, though. The issue in that case was not simply that a single forecast had been used, but that this single forecast had assumed the construction of a highway "such as the tollroad." *Sierra Club*, 962 F. Supp. at 1043. The problem in *Sierra Club* was, therefore, the use of a single "build" forecast. Defendants now have purported to correct that error in this case, by purportedly including "no-build" and "build" forecasts in the FEIS. The problem remains, though, that ACG's claimed "no-build" forecast is actually still is a "build" forecast that assumes the study area's transportation network will expand. Adding "build" forecasts on top of the flawed initial forecast does not correct its "self-fulfilling prophecy," and cannot serve as a legitimate basis for the FEIS.

## II.    PLAINTIFFS' SECTION 4(F) CLAIMS ARE COMPELLING, DETERMINATIVE, AND JUSTICIABLE.

In order to avoid adjudication of Plaintiffs' claim that the proposed Corridor B3 would "constructively use" the Midewin National Tallgrass Prairie under Section 4(f), Defendants argue that the Tier 1 FEIS and ROD included only a "preliminary," not a "final," Section 4(f) determination. Defs.' Joint Memo at 47. FHWA itself, however, recognized when it issued the Tier 1 ROD that it was taking final agency action under Section 4(f). 78 Fed. Reg. 9771, 9772 (Feb. 11, 2013). FHWA's Tier 1 determination is final because, by carrying forward only the B3 Corridor and a "no-build" alternative for consideration in the Tier 2 analysis, FHWA has eliminated all other possible alternatives in reliance on its incorrect "preliminary" determination that Corridor B3 would not constructively use the Midewin National Tallgrass Prairie. FHWA thereby failed to meet its Section 4(f) obligation to "include all possible planning to minimize harm." 23 C.F.R. § 774.7(e)(1). FHWA's Tier 1 Section 4(f) decision is a final agency action and ripe for review.

### A.    FHWA's "Preliminary" Section 4(f) Approval Is A Final Agency Action.

FHWA's "preliminary" Section 4(f) approval is a final agency action. 5 U.S.C. § 551, *et seq.*  For an action to be "final," it must "mark[] the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations omitted). FHWA's Tier 1 Section 4(f) determination falls squarely within this definition.  FHWA precluded the consideration of any other "prudent and feasible alternatives" and therefore locked itself into its "preliminary" determination that there would be no constructive use of the Midewin National Tallgrass Prairie by approving a Tier I FEIS and ROD that advanced only the B3 Corridor—along with a "no-build" alternative—for

consideration in Tier 2. FHWA has clearly finished its decisionmaking process, as it took action predicated on the premise that no constructive use would occur. Indeed, an FHWA staffperson stated in an email at the conclusion of the Tier 1 process that the agency did not even have a schedule for a Section 4(f) evaluation during the Tier 2 analysis. AR3_005301.

Although Defendants make much of the description of FHWA's Tier 1 Section 4(f) evaluation as "preliminary," 23 C.F.R. § 774.7(e)(2) provides that "[r]e-evaluation of the preliminary Section 4(f) approval is only needed to the extent that new or more detailed information available at the second-tier stage raises new Section 4(f) concerns not already considered." Barring new or more detailed information, FHWA could "finalize" its "preliminary" finding of no constructive use of the Midewin National Tallgrass Prairie in Tier 2 without further analysis or consideration. FHWA has no intention of any further Section 4(f) analysis, based on the email cited above. Accordingly, FHWA's Section 4(f) decisionmaking process concluded with its Tier 1 "preliminary" determination, such that this Tier 1 determination should be deemed final.

Legal consequences might flow from FHWA's Tier 1 Section 4(f) approval. Defendants claim that "[t]he potential for a constructive use will be further analyzed in the Tier Two NEPA studies." Defs.' Joint Mem. at 49 (quoting AR1_000550). FHWA, however, has already proceeded based on the assumption that its "preliminary" determination was accurate in eliminating all other alternatives to the proposed Illiana Tollway.

### B. Plaintiffs' Section 4(f) Claims Are Ripe.

Plaintiffs' Section 4(f) claims also are ripe for adjudication. To determine whether a case is ripe for review, a court should consider "whether: (1) delayed review of an agency decision could cause hardship to the petitioner; (2) judicial intervention would inappropriately interfere

with further administrative action; and (3) the court would benefit from further factual development of the issues presented." *Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 435 F.3d 758, 766 (7th Cir. 2006). Plaintiffs' claims meet this standard.

First, a delay in review of FHWA's determination would cause hardship to Plaintiffs. FHWA acted on its "preliminary" determination of no constructive use in eliminating alternative corridors from further consideration. If review is not permitted until the end of Tier 2, the Illiana Tollway project could have been allowed to progress to the stage where other prudent and feasible alternatives are no longer on the table, and avoidance of a use of the Midewin National Tallgrass Prairie is no longer possible other than through the "no-action" alternative.

Second, judicial intervention would not interfere with further administrative action, nor would the Court benefit from further factual development of the issues presented. FHWA is already advancing the Illiana Tollway based on the assumption that the B3 Corridor would not use the Midewin National Tallgrass Prairie. Although FHWA might later consider efforts to mitigate or minimize its effects during Tier 2, the sufficiency of these measures is not what is at issue here. FHWA has made a legally effective determination with respect to the question of a constructive use of the Prairie, and Plaintiff's claims are ripe for adjudication.

## CONCLUSION

For the foregoing reasons, Defendants violated NEPA and Section 4(f) by approving the Tier 1 FEIS and ROD for the proposed Illiana Tollway in Corridor B3. Accordingly, Plaintiffs request that this Court grant Plaintiffs' Motion for Summary Judgment on Counts I and II of Plaintiffs' Complaint for Declaratory and Injunctive Relief and grant such additional relief as is just, reasonable, and equitable.

Respectfully submitted,


/s Howard A. Learner
Howard A. Learner
Andrew B. Armstrong
Environmental Law and Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL  60601
phone:  (312) 673-6500
fax:  (312) 795-3730
HLearner@elpc.org

Attorneys for Openlands, Midewin Heritage
Association and Sierra Club


Date:   July 2, 2014

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify on July 2, 2014, a copy of the foregoing REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**AUSA**
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604
USAILN.ECFAUSA@usdoj.gov

**Harpreet Kaur Chahal**
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604
(312)353-1996
harpreet.chahal@usdoj.gov

**Michael A. Forti**
Illinois Department of Transportation
100 W. Randolph Street
Suite 6-600
Chicago, IL 60601
(312)793-2255
Michael.Forti@Illinois.gov

**Lance T. Jones**
Illinois Department of Transportation
2300 S. Dirksen Parkway
Room 313
Springfield, IL 62764
(217) 725-3215
Lance.Jones@illinois.gov

**Albert M Ferlo**
Perkins Coie Llp
700 Thirteenth Street Nw
Suite 600
Washington, DC 20005
(202) 654-6262
aferlo@perkinscoie.com

**Kathleen A. Stetsko**
Perkins Coie LLP
131 S. Dearborn St.
Suite 1700
Chicago, IL 60603
312 324 8400
kstetsko@perkinscoie.com

**Cindy K Bushur-hallam**
Ill Dept. Of Trans. - Office Of Chief Counsel
2300 South Dirksen Parkway
Room 313
Springfield, IL 62794
(217) 782-3215
cindy.bushur-hallam@illinois.gov

/s/ Andrew B. Armstrong
Andrew B. Armstrong
Environmental Law and Policy Center