**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **OPENLANDS, MIDEWIN HERITAGE ASSOCIATION, and SIERRA CLUB,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 4950** |
| | ) | |
| **UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,** | ) | **Judge Jorge L. Alonso** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ILLINOIS DEPARTMENT OF TRANSPORTATION, INDIANA DEPARTMENT OF TRANSPORTATION,** | ) | |
| | ) | |
| **Defendant-Intervenors.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs seek summary judgment on their claim that the Federal Highway Administration's Record of Decision and approval of the Tier 1 Final Environmental Impact Statement ("EIS") for the proposed Illiana Tollway violates the National Environmental Policy Act ("NEPA") and section 4(f) of the Transportation Act. For the reasons set forth below, the Court grants plaintiffs' motion.

**<u>Background</u>**

On June 8, 2011, the Federal Highway Administration ("FHWA") issued a notice of intent to prepare "a Tier One Environmental Impact Statement (EIS) . . . for the Illiana Corridor Project" with anticipated "termini [of] Interstate Highway 55 in Will County, Illinois and Interstate Highway 65 in Lake County, Indiana." 76 Fed. Reg. 33401.[1] The Tier One study was conducted jointly by the FHWA, the Illinois Department of Transportation ("IDOT"), and the Indiana Department of Transportation ("INDOT") ("the Agencies"). (Defs. & Def.-Intervenors' Jt. Stmt. Material Facts ¶ 1.) The study area was "approximately 950 square miles in portions of Will and Kankakee counties in Illinois and Lake County in Indiana." 76 Fed. Reg 33401.

After issuing the notice of intent, the Agencies received input from a variety of federal, state, and local stakeholders regarding the EIS. The stakeholders included the Illinois and Indiana metropolitan planning organizations ("MPOs"), state-created entities required by federal law to develop both long-range "transportation plans," with a planning horizon of at least twenty years, and short-range "transportation improvement programs," which are updated every four years, in "metropolitan areas of [a] State." 23 U.S.C. § 134(c)(1); 23 C.F.R. §§ 450.322(a), 450.324(a). Among the MPOs involved in the process were the Chicago Metropolitan Agency for Planning ("CMAP"), which is "responsible for developing and adopting a funding and implementation strategy for an integrated land use and transportation planning process for the northeastern Illinois region," and the Northwestern Indiana Regional Planning Commission ("NIRPC"), which is charged with "institut[ing] and maintain[ing] a comprehensive planning and programming process" for

_____

[1]"For major transportation actions," FHWA is permitted to prepare the EIS in two tiers. *See* 23 C.F.R. § 771.111(g). "The first tier EIS . . . focus[es] on broad issues such as general location, mode choice, and areawide air quality and land use implications of the major alternatives. The second tier . . . address[es] site-specific details on project impacts, costs, and mitigation measures." *Id.*

transportation, economic development, and environmental policy for northwestern Indiana. *See* 70 Ill. Comp. Stat. 1707/15(a); Ind. Code 36-7-7.6-12.

When the notice of intent was issued, CMAP and NIRPC each had long-range transportation plans in place. CMAP's plan, called GO TO 2040, was based on a 2040 Forecast of Population, Households and Employment that reflected CMAP's policies for development in the region. *See* http://www.cmap.illinois.gov/data/demographics/population-forecast. Though CMAP had previously used market-based forecasts for its long-range planning, for GO TO 2040 it "chose . . . a policy-based plan (dealing with the investments and high-level choices that shape [the] region) as opposed to a land use plan (dealing with specific types of development in specific locations.)." (Defs. & Def.-Intervenors' Stmt. Facts., Ex. 5, AR4_000026; *id.*, Ex. 8, AR4_000417.) The CMAP GO TO 2040 forecast projects that the population of and employment in Will County will increase by 76% and 116.5%, respectively, between 2010 and 2040. *See* http://www.cmap.illinois.gov/data/demographics/population-forecast.

NIRPC's long-range plan projects that the Northwest Indiana region, comprised of Lake, Porter, and LaPorte counties, will see increases of 13% and 29%, respectively, in population and employment by 2040. *See* http://www.nirpc.org/media/3136/crp_summary_finaldraft_compressed. pdf.

The Agencies did not, however, use the MPOs' 2040 forecasts to prepare the EIS because, they said, the forecasts were based on "aggressive assumptions regarding infill, redevelopment & densification." (AR2_038304.) Instead, the Agencies used market-driven forecasts developed by consultants. (*See generally* AR1_001378-1466.) The Agencies' forecasts project that by 2040, the population of Will County will have grown by 102%, the population of Lake County will have

grown by 26%, and the population of the study area as a whole will have grown by 176%. (AR2_018252.) The forecasts also project that by 2040, employment in Will County will have grown by 167%, employment in Lake County will have grown by 36%, and employment in the study area overall will have grown by 225%. (AR2_018257.)

In November 2011, the Agencies met with CMAP and NIRPC to discuss the forecasts. (*See* AR1_003752-54.) CMAP and NIRPC objected to the market-driven forecasts, explaining that their policy-driven forecasts envisioned "revitalization of the urban core" and "more development to existing communities." (AR1_003752.) CMAP did not object to the Agencies' use of their own forecasts but asked them to prepare a "'policy based' forecast using CMAP's 2040 socioeconomic scenario" as well. (AR1_003753.)

In December 2011, CMAP submitted comments to IDOT on the proposed "Purpose and Need" section of the draft EIS ("DEIS") for the Illiana project:

> CMAP staff has worked closely with [IDOT] on this project, particularly regarding the population and employment forecasts that are being used in this study. For purposes of preparing revenue forecasts under market conditions, [IDOT] is basing its demand forecasts on an alternative geographic distribution of households and jobs that departs from those assumed under GO TO 2040. While CMAP understands the reasons behind this, we are asking that demand forecasts for the project also be prepared using GO TO 2040 assumptions to support current regional planning analyses and remain consistent with requirements of the National Environmental Policy Act.

(AR3_002569-70.) IDOT responded that "a refined project level forecast [was] being developed." (AR3_002571.)

After receiving input from a variety of stakeholders and analyzing dozens of potential corridor routes, the Agencies chose three potential corridors to analyze in the DEIS: A3S2 (the northernmost alternative that runs north of the Midewin National Tallgrass Prairie ("Midewin")),

B3 (a corridor adjacent to the south side of Midewin), and B4 (a variation of B3 with a more southern terminus in Indiana). (*See* AR 1_000200-04.) However, in February 2012, before the DEIS was complete, the Agencies made "[t]he preliminary recommendation [that] . . . Alternative B3 . . . be carried forward as the finalist" for the Tier Two EIS. (AR3_035240.)

In March 2012, plaintiffs objected that the Agencies had "prematurely limit[ed] [their] analysis of reasonable alternatives by solely comparing the 'B3' route to a no action alternative in the upcoming EIS." (AR1_003707.) ''By dismissing variations of northern alignments as a reasonable alternative," plaintiffs said, the Agencies "ha[d] not rigorously explored and objectively evaluated all reasonable alternatives." (*Id.*)

On March 14, 2012, CMAP told the Agencies:

[W]e are concerned with the Preliminary Recommendation to carry forward only the B3 alternative . . . . The Purpose and Need Statement identifies the need to improve regional mobility and to address local system deficiencies. By choosing an alignment that is well south of any substantial development, while minimizing property impacts, the corridor has little positive effect on regional mobility and local system deficiencies. The screening results clearly showed that, as the location shifts south, travel performance decreases.

Also, since it is assumed that this will be a toll facility of some type, the B3 alternative's decrease in performance not only fails to fully address the purpose and need, it also will likely not generate sufficient revenue to construct and maintain the facility.

And finally, while considering quality of life in northeastern Illinois, GO TO 2040 seeks to direct investment toward strengthening existing communities, and finding opportunities to encourage new development and redevelopment in livable communities that are denser and designed for mixed uses. Focusing primarily on the B3 alternative may encourage future development outside existing communities. Continued analysis of alternative routes is necessary, to consider whether they can provide a focus for development and redevelopment within existing communities that is consistent with GO TO 2040.

. . . . We would encourage the Illinois Department of Transportation to carry forward additional northern corridors through the Draft Environmental Impact Statement.

That information will be pertinent both to the continuation of this current process and, ultimately, to how this project will be evaluated for potential inclusion in the prioritized, fiscally constrained major capital project that is part of GO TO 2040, the region's official long range plan.

(AR1_003729.)

In July 2012, the Agencies issued the DEIS, which states that the Illiana project will address "three principal needs": (1) "[i]mprove regional mobility"; (2) "[a]lleviate local system congestion and improve local system mobility"; and (3) "[p]rovide for efficient movement of freight." (AR1_008022.) These needs were based in part on the Illiana Corridor *Transportation System Performance Report* ("TSP"), which, in turn, is based on the Agencies' forecasts of population and employment growth. (*See* AR1_001378-1466, 008022; AR 2 _018216.) As discussed above, the forecasts project that by 2040, the population of and employment in Will County will grow by 102% and 167%, respectively, and the population of and employment in the study area as a whole will grow by 176% and 225%, respectively. (AR2_018252, 018257.) These forecasts are the foundation for the DEIS' analysis of how building the Illiana corridor in one of the three "finalist" locations or not building it at all will impact the area. (*See, e.g.,* AR1_007993, 8004, 8015-40, 8163-64.)

In August 2012, NIPRC submitted the following comments on the DEIS to the Agencies:

**1.4 Project Need**
Third paragraph:
*The Study Area is expected to increase population by 176 percent and employment by 225 percent between 2010 and 2040. This strong population growth in the Study Area will result in increased local and regional traffic demands.*

NIRPC deviates with the assumptions of population and employment growth in the study area. The study has relied on market-based forecasts of future population and employment for the purposes of estimating facility design requirements and toll revenue. NIPRC has indicated that the use of market-based forecasts may be useful for the development of the Illiana project's toll and facility design requirements, but the use of market-based forecasts is inconsistent with the 2040 Growth and Revitalization Vision that the Commission adopted in October, 2010. The

6

distribution of regional growth as envisioned by the study team differs significantly form the distribution of growth in the 2040 Comprehensive Regional Plan for Northwest Indiana, which was adopted by NIRPC in June, 2011.

In the Indiana portion of the study area, NIRPC has planned for a population growth of 19.8% and an employment growth of 27.9%. The limited growth assumed by NIRPC reflects issues of the protection of the rural character of the Indiana part of the study area, the need to prioritize reinvestment on the urban core communities on the Lake Michigan Shore and limited access to high quality fresh water from Lake Michigan in the study area.

. . . .

The Illiana study is based on the assumption of a 176 percent increase in population and a 225 percent increase in employment in the study area. If the official MPO [*i.e.*, NIRPC] forecasts were used instead of the consultant team's forecasts, there would be a basis to predict significantly less travel and traffic congestion in the study area, and the need for the project would be greatly diminished.

(AR2_005266.)

On August 28, 2012, CMAP submitted its comments on the DEIS to the Agencies:

To maintain and strengthen our region's position as one of the nation's few global economic centers, GO TO 2040 recommends policies and investments that promote livability and sustainability. While acknowledging that some growth will occur on the outer fringes of our region, GO TO 2040 emphasizes the need to target investments whenever possible to foster growth in existing communities. We are concerned that the Illiana project's alternatives are not being evaluated using the CMAP forecasts developed for GO TO 2040. It is our understanding that the EIS process would also test potential alternatives using the CMAP forecasts, which have been developed through a cooperative, comprehensive planning effort and follow from a series of policy recommendations that have been approved by the CMAP Board and MPO Policy Committee. We encourage you to undergo this analysis for all of the alternatives under consideration. The comparative results for the three alternatives could be significantly different than those developed with the forecasts that you developed for this project.

(AR1_006152.)

On August 29, 2012, plaintiffs submitted written comments to the Agencies questioning the

utility of B3 as the Illiana route:

. . . . [W]hile the agencies agreed to several requests from stakeholders to include a northern route as part of their alternatives analysis, IDOT and INDOT have decided (again based on inadequate and missing information) that their originally preferrerd [sic] B3 alternative still offers the best balance to meet the project's purpose and need. . . .

However, it remains unclear what good an Illiana expressway along this southern route would serve. The B3 corridor would do little to address northern traffic congestion on I-80, and is the least effective alternative to address . . . intermodal truck traffic.

The southern routes run contrary to both concerns raised by [CMAP] in the scoping process, and to . . . [NIRPC's] 2040 Comprehensive Regional Plan, which shows dramatically different predictions for Indiana growth in population and employment within the Illiana study area than the figures relied upon by IDOT and INDOT . . . .

(AR1_005150). Plaintiffs also asserted that the DEIS failed to adequately consider a number of environmental impacts, including those that would affect Midewin:

Constructing Illiana south of Midewin will introduce intense noise, light, dust and pollution that will constrict and degrade the viable habitat for grassland birds, especially in cases where they need large expanses of prairie and grassland to thrive. The dramatic increase of truck traffic along Illinois 53 will further encroach upon this important bird habitat . . . . Birds either avoid areas near heavy use or are found in lower numbers. One study found that bird presence and breeding were reduced by 1200 meters from a road with heavy traffic volume. Another study shows that birds can be negatively impacted by traffic noise up to 1.2 miles from the road. . . . Birds communicate through auditory signals. If birds cannot discriminate between their own songs and background noise, it makes it more difficult for them to advertise locations of food and form pair bonds. . . .

. . . .

While the DEIS is correct in its assumption that certain grassland birds in the area would avoid the noise, light and air pollution from the roadway, this hardly means that the impact is not adverse. . . . To the contrary, removing or encroaching upon Midewin so that the birds no longer find areas habitable marks a significant impact, especially when Midewin has been preserved for the purpose of allowing these species the expanses they need to survive and nest. The Illiana should be viewed as contributing impacts to an already constrained landscape that is crucial for sustaining these grassland bird populations.

(AR1_005161.)

In October 2012, the Agencies announced their selection of Alternate B3 as the proposed site for the Illiana Corridor. (AR3_011164.)

On December 12, 2012, CMAP submitted comments on the Agencies' choice, reiterating its concern that "the Illiana project's alternatives [were] not being evaluated using CMAP forecasts developed for GO TO 2040." (AR3_003307). CMAP said it was "under the impression that the EIS process would also test potential alternatives using the CMAP forecasts," which "could significantly change the scoring of the alternatives for the performance measures used in the Preferred Corridor Report." (AR3_003307-08.)

On December 20, 2012, the agencies responded as follows:

<u>Coordination</u>
There appears to be some misunderstanding regarding past coordination efforts between our agencies, particularly with respect to the topic of forecasting. As documented in the November 21, 2011 meeting held with the Illiana team . . . , the rationale for our forecasting approach was discussed in depth. The meeting summary also reflects CMAP's concurrence with the Illiana team's forecasting approach, as well as our response to CMAP's request that the GO TO 2040 forecast also be used for the Illiana study. Since that time, there have been follow up meetings with CMAP staff . . . . Beyond these specific coordination efforts, CMAP was part of the project's Corridor Planning Group; CMAP staff attended these meetings, and asked these same questions, which were then responded to in this public forum. Moving forward, we are committed to working through these issues until they are fully resolved.

<u>Forecasts</u>

With respect to forecasts, as noted in the coordination meetings referenced above, there are a number of very important reasons why the Illiana team must use a "market based" forecast for NEPA studies, rather than simply using the GO TO 2040 forecast. This is consistent with the approach taken by IDOT, in consultation with CMAP and its predecessor agencies over the past 15 years on major corridor projects. Since the late 1990s, the courts have required a No Build/Build analysis that reflect [sic] actual development and travel behavior that result from a major new transportation project. Actual development is synonymous with market-driven economic forecasts and as such, they were developed for the Illiana Corridor Study. Market-driven economic forecasts are also needed for detailed NEPA level project development for design, environmental impact, and financial analysis. Market-driven economic forecasts are also being used by IDOT on other major projects and by the Illinois Tollway.

. . . .

The Illiana team is not using the CMAP GO TO 2040 policy-driven forecasts in the alternatives analysis in the EIS for several reasons. The use of two sets of forecasts will result in multiple sets of traffic forecasts and impacts that will confuse readers and potential investors should the project be financed through public private partnerships. The CMAP GO TO 2040 policy-driven forecasts do not reflect build conditions with an Illiana Corridor facility and other baseline projects, and a build condition is required for the analysis. Finally, actual growth in the region will occur based on jurisdictional local land use policies, which may not reflect or be consistent with CMAP policy-based forecasts. We have, however, included a discussion of the CMAP GO TO 2040 forecast in appendix E the DEIS.

(AR1_003741-42.)

On January 17, 2013, the FHWA approved the Tier One Final EIS and Record of Decision selecting Corridor B3 as the sole proposed site for further study. (AR1_000006-7.) With respect to CMAP's comments, the EIS says the following:

CMAP submitted a letter with six comments regarding the project's Purpose and Need and consistency with the GO TO 2040 long-range comprehensive regional plan. Specifically, CMAP expressed concern that the project alternatives are not being evaluated using the CMAP forecasts developed for GO TO 2040. The agency expressed concerns about Corridor B3 and its likelihood to encourage growth that is not near existing development. . . .

Response Summary:

In response, it was stated that the Illiana Corridor project team coordinated with CMAP during Tier One to develop the Illiana Corridor study's 2040 market-based forecasts for use in developing traffic forecasts for design and financial analysis, rather than use of CMAP's policy-based GO TO 2040 forecasts. CMAP's policy-based forecasts do not account for an Illiana "build" scenario which is required by federal regulations. Per federal regulations, the forecasts must reflect the presence of the transportation network, in this case a "build" forecast scenario must be developed. . . .

(AR1_000809.) Moreover, the EIS concludes that the proposed Illiana corridor would not impact or "constructive[ly] use" the Midewin Tallgrass Prairie because: (1) "[f]ederal listed species within Midewin National Tallgrass Prairie are known to be located further north within the property away from the working alignment[] within Corridor B3 . . . , reducing the potential for proximity impacts"; and (2) "[i]mpacts from such sources as highway noise, air quality, and lighting from these corridors are not expected to be adverse since it is commonly believed that relatively mobile birds and wildlife would move away from such sources." (AR1_000550.)

## Discussion[2]

The Court's determination of whether the Record of Decision ("ROD") and final EIS comply with NEPA and section 4(f) of the Transportation Act is governed by the Administrative Procedures Act ("APA"). *Ind. Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003). Under the APA, the Court will set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To make this determination, the Court must consider "'whether the decision was based on a consideration of the

---

[2]Though plaintiffs have moved for summary judgment, in the administrative review context, a "motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994).

relevant factors and whether there has been a clear error of judgment.'" *Ind. Forest Alliance*, 325 F.3d at 859 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *see Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995) ("Where an 'agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' the agency has violated the standards of the APA." (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). However, "'[t]he court is not empowered to substitute its judgment for that of the agency.'" *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977)).

NEPA requires every federal agency to include an EIS "in every recommendation or report on proposals for legislation [or] other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. An EIS is comprised of various sections, including: (1) the purpose of and need for the proposed action; (2) the alternatives to the proposed action; and (3) the environmental consequences of the proposed action. 40 C.F.R. § 1502.10. The "purpose and need" section "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. The "alternatives" section "is the heart" of EIS and shall "[r]igorously explore and objectively evaluate all reasonable

alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 49 C.F.R. § 1502.14(a). The environmental consequences section must discuss both direct and indirect effects of the proposed action and the "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local . . . land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16.

Plaintiffs contend that the ROD and EIS do not justify the stated needs for the B3 Illiana Corridor, *i.e.*, to improve regional mobility, alleviate local system congestion and improve local system mobility, and provide for efficient movement of freight (AR1_000010), because those needs are derived from: (1) population forecasts that conflict with CMAP and NIRPC's forecasts and ignore relevant census data; and (2) baseline or "no build" forecasts that are, in reality, premised on the assumption that the project will be built.

The Agencies say they rejected CMAP and NIRPC's population forecasts because: (1) market-based forecasts "reflect actual development and travel behavior that result from a major new transportation project"; (2) "actual growth in the region will occur based on jurisdictional local land use policies, which may not reflect or be consistent with CMAP policy-based forecasts"; (3) the market-based forecasts are similar to those used by CMAP in transportation plans that pre-dated GO TO 2040; and (4) "[t]he use of two sets of forecasts [in the EIS] will result in multiple sets of traffic forecasts and impacts that will confuse readers and potential investors should the project be financed through public private partnerships." (AR1_003741-42; AR2_038304.)

Given the MPOs' legal mandate to develop long-range transportation plans for their areas and the influence they wield over local land use decisions through those transportation plans, it would seem unwise for the Agencies to reject the MPOs' population forecasts. But plaintiffs cite

no authority requiring the Agencies to accept the MPOs' forecasts, and the question for the Court is not whether the Agencies' refusal to do so was unwise, but whether it was "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). Because the Agencies have articulated reasonable, if not persuasive, reasons for their decision not to use the MPOs' forecasts, that decision is not arbitrary within the meaning of the APA. *See Marsh*, 490 U.S. at 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Sierra Club*, 46 F.3d at 621 ("The [agency] is entitled to use its own methodology, unless it is irrational."); *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 442 (5th Cir. 1981) ("Proof on an issue such as the inaccuracy of population projections is inherently difficult because of the uncertainty in population projections; however, citing a conflicting projection does not prove the invalidity of another projection.").

Plaintiffs also argue that the Agencies' forecasts ignore data from the Census Bureau, which show that there was virtually no growth in Will County between 2007 and 2013. (*See* Pls.' Mem. Supp. Summ. J., Ex. C.) The record, however, contains no support for this contention. The EIS and underlying documents repeatedly state that the Agencies used census data to determine historic population trends in the study area and to formulate the market-based forecasts of future growth. (*See, e.g.*, AR1_000247, 250, 256 (EIS stating that census data was used to investigate "current and historic population trends," "household income characteristics," and "housing characteristics and trends"); AR2_018248, 018254 (TSP stating that census data was used "to investigate current and historic population trends in the study area counties," and to determine "total current employment"); AR1_001390, 001395 (Agencies' No Build Scenario document stating that information on historical

growth and population trends was based on census data).)   Moreover, the Agencies' population forecasts project growth over a thirty-year period, starting in 2010 and ending in 2040.  The fact that there was little or no growth in Will County in the first few years of that period does not necessarily invalidate the thirty-year projection as a whole.  It would, perhaps, have been more prudent for the agencies to acknowledge the fallow period and explain its effect, if any, on the overall forecast.  But, prudent or not, the Agencies' failure to account explicitly for the lack of growth in the early part of the forecast period does not make the forecast arbitrary.

Plaintiffs' final contention is that the EIS' "no build" forecast is fatally flawed.  That forecast is described in a document entitled Historic and Forecasted Growth of Employment and Population in the Extended Region of Chicago, Market-Driven versus Policy-Based Socio-Economic Forecasts (2010-2040), No-Build Illiana Expressway Scenario.  (*See generally* AR1_001378-1466; *see also* AR1_000248 (EIS stating that "[p]opulation forecasts were reviewed . . . to determine the magnitude of growth projected in the Study Area . . . within the next 30 years, under the No-Action Alternative (*i.e.*, without the Illiana Corridor).").)  After explaining the methodology used to create the forecast, the document projects that Will County will have a population of 1,366,456 and employment of 672,961, if the Illiana project is not built.  (AR1_001417.)  However, in the appendix pertaining to Will County, the document states:

> Over the next several decades there are, in planning and development, a number of significant projects which should benefit virtually all portions of Will County. Joining growth in the northwest corner, which currently is benefitting from O'Hare-related development, are:
>
> •     Continued developments related to the extension of I-355 to I-80 in Homer and New Lenox Townships (primarily residential and retail).
> •     Major multi-modal developments in Jackson, Joliet, Channahon and Wilmington Townships; and potentially, in Crete.

- South Suburban Airport development in Monee, Crete, Will and Washington Townships.
- *Potential construction of the Illiana Expressway connecting all the above projects – to one another – and to the national highway/rail/aviation network.*
- Possible development of Metra's Southeast Service from Chicago to Crete.

For these reasons, the Market-Driven expectations for Will County are excellent. Population is forecasted to increase to 1,366,456, by 2040; this is 12.2 percent higher than the CMAP forecast of 1,217,879. The Market-Driven employment forecast is 672,961 BEA jobs. This is approximately 28.4 percent higher than the CMAP 2040 employment forecast. . . .

(AR1_001428-29) (emphasis added).

The Agencies argue that this "two line[]" reference in the appendix cannot plausibly be read to suggest that their no build forecast, in fact, assumes that the project will be built. (Defs. & Def.-Intervenors' Opp'n Mot. Summ. J. at 34.) The Court disagrees. The document plainly states that "[p]otential construction of the Illiana Expressway" is one of "the[] reasons" the "[p]opulation [of Will County] is forecasted to increase to 1,366,456, by 2040." (AR1_001429.) Because the record shows that the "no build" population forecast may or does include the "build" condition, the record does not support the EIS' statement that the purpose and need for the Illiana Corridor is to accommodate the anticipated population boom in Will County.

Moreover, the flawed "no build" forecast is the foundation for the Agencies' projection of future traffic in the study area and their conclusion that the existing roadways cannot adequately serve the future transportation needs. As the Agencies explain in the TSP:

1.5.4     2040 Travel Demand Forecasts
Analytical studies of the transportation system using a travel demand forecasting model were conducted. Specifically, travel characteristics on the existing 2010 transportation system and the 2040 No Build Alternative were evaluated with the aid of the travel demand model, which forecasts travel patterns and origins and destinations of trips for the region and in the study area. . . .

*Existing and projected future travel demand forecasts are prepared based on the 2010 and 2040 socio-economic forecasts.* The outputs from the travel demand forecasts are the basis for much of the transportation system performance analysis.

### 1.5.5    Transportation System Performance Analysis

The information assembled and developed in the preceding tasks was then used to analyze the ability of the transportation system within the general study area to handle current and future travel demand. *This included the analysis of historical, current and projected 2040 socioeconomic and transportation system characteristics and performance.* Performance measures were developed and used to evaluate the adequacy and ability of the transportation system in accommodating current and future travel demand. . . . .

### 1.5.6    Transportation Needs Assessment

*Based on the results of the transportation system performance analysis, transportation deficiencies and needs have been identified.* In addition, public and stakeholder input has been used to identify transportation deficiencies and need.

(AR1_000881-82 (emphasis added); *see* AR1_000111 (EIS projection that daily truck trips in the study area will increase by 193% from 87,800 in 2010 to 257,100 in 2040); AR1_000110 (EIS projection that truck hours of delay will increase by 442% from 480 in 2010 to 2,600 in 2040).)   In short, the purpose and need for the Illiana Corridor identified in the EIS are derived directly from the faulty "no build" analysis.  Because that analysis does not substantiate the purpose and need, the FHWA's approval of the ROD and final EIS is arbitrary and capricious and in violation of NEPA.

The flawed "no build" analysis also dooms the ROD and EIS' analysis of the direct effects of the proposed Corridor.  *See* 40 C.F.R. § 1508.8 (defining "direct effects as those "which are caused by the action and occur at the same time and place").  With respect to these impacts, the Agencies say:

IL 53 is projected to carry 17,000 vehicles per day by 2040 in a "no build" scenario. The potential additional growth of traffic on IL 53 in the Midewin area with an Illiana Corridor build alternative varies from 0 to 11,000 vehicles per day (for a total of 17,000 to 28,000 vehicles per day) depending on the corridor location, connectivity of the Illiana Corridor to IL 53, and the application of tolling to the Illiana Corridor.

(AR1_007509.) As discussed above, however, it is not clear that the EIS contains a true "no build" analysis. Without such an analysis, it is impossible to determine the extent to which building the Corridor will increase traffic on existing roads and the impact such increased traffic may have on the study area. Thus, absent a supported no build analysis, the EIS does not comply with NEPA's directive to analyze the project's direct impacts.

NEPA also requires the EIS to assess the "indirect effects" of a project, *i.e.*, those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," including "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8. The EIS states that the B3 Corridor "falls within an area that is largely undeveloped," in which "[m]ore than 72 percent of streets and highways . . . are rural" and "approximately 62 percent of roadways (2,093 miles) are local or municipal streets." (AR1_000250, 322.) CMAP and NIRPC both commented that building the Illiana Corridor in such an area was likely to require the states and local communities to upgrade those roads:

> As stated in our letter commenting on Draft Tier I EIS, to maintain and strengthen our region's position as one of the nation's few global economic centers, GO TO 2040 recommends policies and investments that promote livability and sustainability. To achieve that, major transportation investments need to be positioned to foster growth in existing communities. CMAP has serious concerns that the preferred alternative, B3, will encourage growth that is not near existing development. This alignment will promote low-density development throughout the southern portion of Will County. And while B3 is noted to have the lowest impact on existing housing and might be the least costly in terms of property acquisition, the real costs to provide and maintain the necessary infrastructure to serve such development should be considered, because they will add significantly to the project costs and the overall development patterns.

(AR1_003739; *see* AR2_005269 (NIRPC commenting to INDOT that "[i]t is likely that the[] [rural] roads will need to be improved to accommodate the traffic induced by the Illiana; the cost of these improvements will be borne not by the private partner, but by the local and state governments.").) Yet the EIS does not suggest measures for mitigating these impacts or even acknowledge that they exist. (*See generally* AR1000606-63 (EIS discussion on indirect and cumulative impacts); *see also* AR3_002786 (FHWA intra-agency email stating that CMAP's comment about costs for additional infrastructure "demonstrates [the Agencies'] lack of consideration for secondary and cumulative impacts").)

The EIS also does not discuss the "[p]ossible conflicts between the proposed action and the objectives of . . . regional . . . land use plans," "any inconsistency [between] a proposed action [and] any approved . . . local plan," or "the extent to which the [Agencies] would reconcile [the] proposed action with the plan." 40 C.F.R. §§ 1502.16(c), 1506.2(d). The Agencies acknowledge that the market-based population forecasts that undergird their choice of B3 for the Illiana Corridor conflict with the policy-based forecasts contained in the MPOs' long-range transportation plans, which seek to limit outward growth. The Agencies do not, however, acknowledge that the growth induced by construction of the B3 corridor would also conflict with those plans. In fact, the only thing the EIS says with respect to the MPOs' transportation plans is: "At the regional level, CMAP's Go To 2040 – Comprehensive Regional Plan is for the future of the Chicago metropolitan area. In addition, the NIRPC approved its 2040 Comprehensive Regional Plan in June 2011. The regional plans establish a policy framework, while the authority for land use control remains at the municipal level." (AR1_000616.) Given the clear inconsistency between the MPOs' long-range plans and the

proposed Illiana Corridor, NEPA obligates the Agencies to address it and explain how they would

"reconcile [the] proposed action with the plan[s]." 40 C.F.R. §§ 1502.16(c), 1506.2(d).

Plaintiffs also contend that the Agencies violated section 4(f) of the Transportation Act, which provides:

> [T]he Secretary [of the FHWA] may approve a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if–
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c). In this context, "use" includes "constructive use," 23 C.F.R. §§ 774.17, which

"occurs when the transportation project does not incorporate land from a Section 4(f) property, but

the project's proximity impacts are so severe that the protected activities, features, or attributes that

qualify the property for protection under Section 4(f) are substantially impaired." 23 C.F.R. §

774.15(a).

> [The FWHA has] determined that a constructive use occurs when:
>
> (1) The projected noise level increase attributable to the project substantially interferes with the use and enjoyment of a noise-sensitive facility of a property protected by Section 4(f), such as: . . .
> (v) Viewing wildlife in an area of a wildlife and waterfowl refuge intended for such viewing.
>
> . . . .
>
> (5) The ecological intrusion of the project substantially diminishes the value of wildlife habitat in a wildlife and waterfowl refuge adjacent to the project, substantially interferes with the access to a wildlife and waterfowl refuge when such

access is necessary for established wildlife migration or critical life cycle processes, or substantially reduces the wildlife use of a wildlife and waterfowl refuge.

23 C.F.R. § 774.15(e)(1)(v), (e)(5).  Midewin is property subject to section 4(f):

> The largest public open space in northeastern Illinois, Midewin National Tallgrass Prairie is on land once used as the Joliet Army Arsenal Plant and is now managed for National Forest System purposes.  Midewin National Tallgrass Prairie is partially open to the public for various recreational activities.  The Midewin National Tallgrass Prairie's management plan indicates that the full property is designated a "prairie under construction."  Since portions of the property are open for public recreational activities and areas are planned for future preservation and wildlife refuge, the Midewin National Tallgrass Prairie is considered protected by Section 4(f).

(AR1_000540.)

The ROD and EIS conclude that the B3 Corridor will not directly use Midewin.  (*See* AR1_000550 ("Corridor[] B3 . . . would not directly impact southern portions of the Midewin National Tallgrass Prairie.").)  But they only tentatively rule out constructive use:

> The Midewin National Tallgrass Prairie management plan indicates the area along IL-53 is located within a restoration management area. . . .  Federal listed species within Midewin National Tallgrass Prairie are known to be located further north within the property away from the working alignment[] within Corridor B3 . . . , reducing the potential for proximity impacts. . . .  Based on the information available at Tier One, a constructive use of this resource is not anticipated. The potential for a constructive use will be further analyzed in the Tier Two NEPA studies.

(*Id.*)  In fact, the final EIS expressly states that the Agencies' determinations as to all 4(f) properties are  preliminary:

> An evaluation of the proposed project's potential impacts to Section 4(f) properties is being conducted under § 774.7(e), which allows for a preliminary Section 4(f) approval for Tier One documents, provided that opportunities to minimize harm at subsequent stages are not precluded by decisions made in Tier One.  Section 4(f) approval will be finalized in Tier Two.  A preliminary Section 4(f) approval would be subject to a reevaluation if new or more detailed information becomes available during the Tier Two NEPA studies.  Feasible and prudent avoidance alternatives, if any, should be identified, and all possible conceptual planning to minimize impacts will be discussed in the Tier One NEPA studies.  Further evaluation of measures to

minimize harm to Section 4(f) properties will also occur in the Tier Two NEPA studies.

(AR1_000536-37)  Because the documents clearly state that the 4(f) determination with respect to Midewin is not final, it is not ripe for review under the APA.  *See* 5 U.S.C. § 704 (stating that "final agency action" is subject to APA review); *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) ("As a general matter, two conditions must be satisfied for agency action to be considered 'final':  First, the action must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.") (citations and quotations omitted);  *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614 (7th Cir. 2003) (stating that an action is final when "the agency has completed its decisionmaking process, and . . . the result of that process is one that will directly affect the parties.") (quotations omitted).

**Conclusion**

For the reasons set forth above, the Court grants plaintiffs' motion for summary judgment [41] and declares that FHWA's approval of the Tier 1 final EIS and ROD for the proposed new Illiana Expressway was arbitrary and capricious and in violation of NEPA. Therefore, the Court remands the Tier 1 final EIS and ROD to the Agencies for further proceedings consistent with this Memorandum Opinion and Order. Moreover, the Court grants defendant's motion to strike [71] the letter submitted by plaintiff on April 13, 2015 [63] because it pertains to matters not at issue in this case and strikes as moot plaintiffs' motion to reassign [77]. This case is terminated.

**SO ORDERED.**                                     **ENTERED:   June 16, 2015**

_____
**HON.  JORGE ALONSO**
**United States District Judge**